IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

THOMAS ALEXANDER PORTER,

                                        Petitioner,

    v.

KEITH W. DAVIS,
Warden, Sussex I State Prison

                                        Respondent.

Civil Action No. 3:12-CV-550-JRS

## MEMORANDUM OPINION

THIS MATTER is before the Court on Warden Keith Davis's ("Warden") Motion to Dismiss (ECF No. 57). Porter seeks relief under 28 U.S.C. § 2254 from his capital murder conviction and death sentence for the 2005 shooting death of a Norfolk police officer. Porter filed his § 2254 Petition on October 9, 2012. His petition was amended with leave of the Court on May 9, 2013 ("Amended Petition"). For the reasons below, the Court will GRANT the Motion to Dismiss. Porter's related Second Motion for Discovery (ECF No. 72) will be DENIED AS MOOT.

## FACTUAL AND PROCEDURAL BACKGROUND

The following is a brief summary of the facts and procedural history relevant to the present Amended Petition. On March 14, 2007, Porter was convicted by a jury in the Circuit Court for Arlington County of the capital murder of Norfolk Police Officer Stanley Reaves ("Officer Reaves"), use of a firearm in the commission of a murder, and grand larceny of a firearm. On the afternoon of October 28, 2005, Porter and another man, Reginald Copeland ("Copeland"), traveled to a Norfolk apartment complex to inquire about purchasing marijuana. They entered the apartment of Copeland's acquaintance, Valorie Arrington, where her two daughters, two cousins, sister, and niece were also present. Porter eventually began arguing with the women over the marijuana and brandished a semi-automatic pistol concealed on his person.

1

Copeland exited the apartment, with Porter locking the door behind him, and then left the complex. After walking a few blocks, Copeland came across three uniformed police officers, including Officer Reaves, and reported Porter's behavior to the officers. Officer Reaves then drove to the complex with Copeland following on foot. As Officer Reaves exited his vehicle and approached the building, he encountered Porter on the sidewalk in front of the complex. Officer Reaves confronted Porter by grabbing his left arm, and instructed Porter to take his hands out of his pockets. Porter drew the pistol concealed in his pocket and shot Officer Reaves three times, killing him. Porter then took Officer Reaves's service revolver and fled.

At trial, the prosecution argued that Porter was guilty of capital murder under Virginia Code § 18.2-31.6 because he intentionally killed Officer Reaves in order to interfere with the performance of his official duties. Specifically, the prosecution argued that Porter, who was already a convicted felon and knew that he could be sent back to jail if found in possession of a firearm, shot Officer Reaves to prevent Officer Reaves from arresting him for being a felon carrying a firearm. Porter did not deny shooting Officer Reaves, but claimed that he did so because Officer Reaves pulled out his service revolver, causing Porter to fear for his life and safety. A key issue argued at the guilt phase was at what point Porter knew that there was a police officer outside the complex whom he might encounter and, thus, when he could have formed the intent to interfere with a police officer engaged in his official duties. Valorie Arrington's daughter Latoria testified that before Porter left the apartment, she stated aloud that she could see Copeland and Officer Reaves talking outside through the apartment window. Valorie testified that when Porter left, he ran out of the apartment and down the building stairs quickly. Valorie's sister, Monika Arrington, and her cousins, Monica Dickens and April Phillips, testified corroborating Valorie and Latoria's accounts.

The Commonwealth sought the death penalty under Virginia Code § 19.2-264.2[1] based on Porter's "future dangerousness," namely the probability that he would commit acts of violence constituting a continuing serious threat to society. Porter argued in closing arguments that, in considering the probability that he would commit violent criminal acts constituting a serious threat to society, the term "society" meant prison society since Porter would spend the rest of his life incarcerated without parole if not sentenced to death. *Porter v. Commonwealth* (*Porter I*), 661 S.E.2d 415, 442 (Va. 2008). The Commonwealth objected, and the trial court instructed the jury that: "Society is everything. Everybody, anywhere, anyplace, anytime." (SH App. 4169).[2] Porter's counsel then continued that the jury should focus on the fact that society incorporates persons within the penitentiary system, and after the Commonwealth again objected, the trial court instructed that: "Virginia law is very clear. Society is everyone, everywhere. You are not required to simply consider what may happen in a penitentiary. You are required to consider society. It's a definitional word. It's not that complex to start with. It means everybody, everywhere, any place, any time. It's pretty simple." (SH App. 4172). Trial counsel did not object at the time, but orally moved for a mistrial at the end of closing argument based on these instructions, which the trial court denied. Porter also moved for the appointment of a risk assessment expert to rebut the evidence of his future dangerousness, but this motion was denied.

The jury convicted Porter of all counts, and at the sentencing phase, found the future dangerousness aggravating factor. The jury sentenced Porter to death for the capital murder

---

[1] "[A] sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society. . . ." § 19.2-264.2; *see* § 19.2-264.4(C).

[2] The Joint Appendix ("JA") encompasses Volumes 1-12 (or pages 1-4817). The State Habeas Appendix ("SH App.") encompasses the Joint Appendix and Volumes 13-21 (pages 4817-8335). Volumes 13-21 (pages 4817-8335), however, are only in electronic form. Additional materials are in the Federal Appendix ("Fed. App.").

conviction and to a total of twenty-two (22) years of imprisonment for the non-capital offenses.

The Supreme Court of Virginia found the following facts regarding the sentencing phase of trial:

> During the penalty stage of the proceedings, the Commonwealth presented evidence in aggravation, which included Porter's prior convictions of misdemeanor carrying a concealed weapon in 1994, felony robbery and use of a firearm during the commission of a felony in 1994, misdemeanor disturbing the peace, misdemeanor assault and battery and misdemeanor threatening a police officer and resisting arrest in 1996, felony possession of heroin, felony possession of a firearm with drugs, and felony possession of a firearm by a convicted felon in 1997, misdemeanor assault and battery in 1997, and misdemeanor obstruction of justice in 2005. The Commonwealth presented evidence of several incidents while Porter was incarcerated, including altercations between Porter, fellow inmates, and prison guards. The Commonwealth also introduced audiotapes of portions of two telephone conversations between Porter and an unidentified female recorded during Porter's incarceration, which the Commonwealth introduced because they "are directly relevant to the issue of the defendant's lack of remorse" and included Porter bragging that he was a "good shot."
>
> The Commonwealth also introduced the testimony of Officer Reaves' wife and sister, and each described the devastating impact of Officer Reaves' death upon his extended family. Porter presented mitigation evidence which included testimony of his mother and sister as to his childhood, family life and educational background.

*Porter I*, 661 S.E.2d at 424. On July 16, 2007, the Circuit Court for the City of Norfolk imposed

the jury's sentences and entered final judgment on July 18, 2007.

On August 13, 2007, Porter appealed his capital murder conviction and death sentence to

the Supreme Court of Virginia, which affirmed the judgment on June 6, 2008. Porter then

petitioned the United States Supreme Court for a writ of certiorari, which was denied on April

20, 2009. On August 10, 2009, Porter filed a petition for state habeas post-conviction relief in

the Supreme Court of Virginia, raising several claims of ineffective assistance of trial counsel

under *Strickland v. Washington*, 466 U.S. 668 (1984), among other claims. The Warden moved

to dismiss the state habeas petition, and after the production of relevant work-product from

Porter's trial counsel relating to the ineffective assistance claims and a supplemental motion to

dismiss, the Supreme Court of Virginia dismissed Porter's petition on March 2, 2012. *See Porter*

*v. Warden of the Sussex I State Prison* (*Porter II*), 722 S.E.2d 534 (Va. 2012). The Supreme

Court of Virginia denied Porter's petition for a rehearing on April 28, 2011, and the trial court set Porter's execution for August 2, 2012.

Porter filed a motion for a stay of the execution in this Court on July 27, 2012, and the Court granted a stay of ninety (90) days on July 30, 2012. The Court also directed Porter to file his petition, not to exceed eighty (80) pages, within seventy (70) days. On July 31, 2012, by Porter's Motion, the Court appointed two attorneys as counsel, one of whom had also represented Porter in his state habeas proceedings. Porter moved for an extension of time and for an extension of the page limit on September 20, 2012, and the Court denied both motions on September 25, 2012. On October 9, 2012, the date his Petition was due, Porter filed a second motion for an extension of time until February 19, 2013, or alternatively, an additional sixty (60) days to file his procedurally defaulted claims.

The Motion was filed by one of Porter's appointed counsel individually seeking to prepare claims that Porter's state habeas counsel—Porter's other appointed counsel in this Court—provided ineffective assistance by failing to raise claims of ineffective assistance of *trial* counsel in the state habeas proceedings, arguing that the default of the underlying ineffective assistance claims was excused in light of the recently decided *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Porter filed his Amended Petition on May 9, 2013. Porter's Petition includes seventeen claims that can be divided into exhausted claims and those that have not been procedurally defaulted or exhausted. The exhausted claims include:

I.     Juror Misconduct Violated Porter's Rights to an Impartial Jury and to Due Process
II.    The Prosecution Violated *Brady* Regarding Officer Reaves's History of Unprofessional Conduct
III.   The Prosecution Violated *Brady* and *Napue* Regarding Selethia Anderson
IV.    Counsel Unreasonably Failed To Have Officer Reaves's Holster Examined For Fingerprints
V.     Trial Counsel Unreasonably Failed to Call Powerful Exculpatory Testimony Regarding Trial Counsel's Use of Copeland's Testimony
VI.    Counsel Unreasonably Failed to Obtain a Jury Instruction on First-Degree Murder
VII.   Trial Counsel Failed to Investigate Officer Reaves's History of Unprofessional

Conduct

VIII.   Counsel Failed to Conduct an Adequate Investigation into Porter's Chaotic and Abusive Childhood and Failed to Present Uncovered Evidence

IX.   Counsel Failed to Reasonably Investigate the Prosecution's Aggravating Evidence

X.   Counsel Failed to Investigate and Present Evidence of Porter's Correctional Experiences

XI.   The State Court Violated Porter's Rights Under the 8th and 14th Amendments by Denying Porter the Assistance of a Risk Assessment Expert

Claims that have not been procedurally exhausted include:

XII.   The Prosecution Withheld Material Evidence Impeaching a Penalty-Phase Witness

XIII.   Counsel Unreasonably Failed to Protect Porter's Constitutional Right to Testify

XIV.   Counsel Unreasonably Failed to Assert that His Proposed Risk Assessment Would Be of the Same Nature as that Contained in his Expert's Declaration

XV.   Counsel Unreasonably Failed to Object to Improper Curative Instructions and Comments by the Trial Court during His Closing that Denied Porter a Fair Sentencing

XVI.   Counsel Failed to Adequately Investigate the Shooting of Officer Reaves

XVII.   The Prosecution Withheld Material Evidence Impeaching a Guilt-Phase Witness

## LEGAL STANDARDS

### I.   Standard of Review

A federal court may review a petition for a writ of habeas corpus by a person serving a sentence imposed by a state court only on the ground that the person is being held in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The federal court may grant the petition on a claim decided on its merits by the state court only if that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). "The only limitation on § 2254(d)'s application is that the claims submitted must have been adjudicated on the merits in state court. When a claim has not been adjudicated on the merits by the state court, a federal court reviews the claim de novo." *Winston v. Kelly*, 592 F.3d 535, 553-54 (4th Cir. 2010).

A decision is "contrary to" federal law if it resolves a question of law in a way that contradicts the relevant Supreme Court precedent, or if it yields a result that differs from the outcome of a Supreme Court case involving "materially indistinguishable" facts. *Williams v. Taylor*, 529 U.S. 362, 405-06, 413 (2000). A decision applies federal law unreasonably if it is based on the correct legal principle but applies that rule unreasonably to the facts of a case. *Winston*, 592 F.3d at 554. A state court's decision must have been objectively unreasonable as opposed to merely incorrect or erroneous. *Id.* The question is not "whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 473, 1939 (2007) (citing *Williams*, 529 U.S. at 410). This standard similarly applies to a state court's factual determinations. *Winston*, 592 F.3d at 554. A federal court is to presume the correctness of the state court's finding of facts and not find an "unreasonable determination" of the facts, unless the petitioner rebuts the presumption that the state court's findings were incorrect by clear and convincing evidence. *Id.*

Thus, under § 2254(d), if a state court applies the correct legal rule to the facts of a case in a reasonable way, or makes factual findings reasonably based on the evidence presented, a federal court does not have the power to grant a writ of habeas corpus, even if the federal court would have applied the rule differently. *Williams*, 529 U.S. at 406-08.

## II.    Exhaustion

State exhaustion "'is rooted in considerations of federal-state comity,'" and in Congressional determination via federal habeas laws "that exhaustion of adequate state remedies will 'best serve the policies of federalism.'" *Slavek v. Hinkle*, 359 F. Supp. 2d 473, 479 (E.D. Va. 2005) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92 & n.10 (1973)). The purpose of the exhaustion is "to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks omitted). Exhaustion has two aspects. First, a petitioner must utilize

all available state remedies before he can apply for federal habeas relief. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844–48 (1999). As to whether a petitioner has used all available state remedies, the statute notes that a habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

The second aspect of exhaustion requires a petitioner to have offered the state courts an adequate opportunity to address the constitutional claims advanced on federal habeas. "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995)). Fair presentation demands that "'both the operative facts and the controlling legal principles' must be presented to the state court.'" *Longworth v. Ozmint*, 377 F.3d 437, 448 (4th Cir. 2004) (quoting *Baker v. Corcoran*, 220 F.3d 276, 289 (4th Cir. 2000)). The burden of proving that a claim has been exhausted in accordance with a "state's chosen procedural scheme" lies with the petitioner. *Mallory v. Smith*, 27 F.3d 991, 994-995 (4th Cir. 1994). Accordingly, claims that are not presented to the state court system are procedurally defaulted and barred from review here, absent a showing of cause and prejudice or actual innocence.

### III.    Ineffective Assistance of Counsel

Ineffective assistance of counsel claims under the Sixth Amendment are examined under the two-prong test set forth in *Strickland*, 466 U.S. at 687. To succeed under *Strickland*, a petitioner must show both that: (1) his attorney's performance fell below an objective standard of reasonableness, and (2) he suffered actual prejudice. *Id.* The first prong of *Strickland* (performance prong) requires the petitioner to "'show that counsel's representation fell below an objective standard of reasonableness' measured by 'prevailing professional norms.'" *Lewis v. Wheeler*, 609 F.3d 291, 301 (4th Cir. 2010) (quoting *Strickland*, 466 U.S. at 688). There is a

8

"strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. When making an ineffective assistance of counsel determination, a court must consider "the practical limitations and tactical decisions that counsel faced." *Bunch v. Thompson*, 949 F.2d 1354, 1363 (4th Cir. 1991). The second prong of *Strickland* (prejudice prong) requires the petitioner to show that counsel's errors were serious enough to deprive the petitioner of a fair trial. *Strickland*, 466 U.S. at 687. In essence, the petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. If it is clear the petitioner has failed to satisfy either prong of the *Strickland* standard, a court need not inquire into whether he satisfied the other. *Id.* at 697.

A counsel's failure to investigate adequately for sentencing can be ineffective, thus, violating the performance prong of *Strickland. Emmett v. Kelly*, 474 F.3d 154, 161 (4th Cir. 2007). The prevailing question is "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the petitioner's] background was itself reasonable." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003); *see also Romipilla v. Beard*, 545 U.S. 374, 380 (2005). In the context of a capital case, "[t]he ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins*, 539 U.S. at 524. However, counsel's actions are assessed in light of context and the facts "as seen from counsel's perspective at the time" *Id.* "[A] strategic choice made by counsel after a thorough investigation is 'virtually unchallengeable.'" *Emmett*, 474 F.3d at 178 (quoting *Strickland*, 466 U.S. at 691); *see also Stout v. Netherland*, Nos. 95-4008, 95-4007, 1996 WL 496601, at *10 (4th Cir. Sept. 3, 1996) ("[P]rovided there is a conceivable strategic advantage to the decision not to introduce certain evidence in mitigation, that choice is virtually unassailable

on collateral review."). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-691. The Supreme Court clarified that, "[i]n other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. A petitioner's counsel does not have to investigate every possible avenue of mitigation. *See id.*; *see also Emmett*, 474 F.3d at 161.

Regarding prejudice in the context of mitigation evidence, "[w]hen a defendant asserts prejudice with respect to his sentence, the Court must 'reweigh the evidence in aggravation against the totality of available mitigating evidence.'" *Hedrick v. True*, 443 F.3d 342, 349 (4th Cir. 2006) (quoting *Wiggins*, 539 U.S. at 534). The Fourth Circuit explained that:

> The question a reviewing court must answer in determining whether a petitioner was prejudiced by a failure to present such evidence, then, is not whether the evidence was as "powerful" as the mitigation evidence in *other* cases, but rather whether the evidence was "powerful" enough to offset the aggravating evidence and demonstrate a reasonable probability of a different result in the *petitioner's* case.

*Yarbrough v. Johnson*, 520 F.3d 329, 342 (4th Cir. 2008). Further "[a] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome . . . ." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

## IV.  *Martinez* Claims

The Supreme Court held in *Martinez* that, "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective

assistance." 132 S. Ct. 1309, 1320 (2012). A federal habeas court may excuse a defendant's procedural default where

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding.

*Trevino v. Thaler*, 133 S. Ct. 1911, 1918 (2013) (quoting *Martinez*, 132 S. Ct. at 1318-19, 1320-21).

## V.   *Brady* Claims

Under *Brady v. Maryland*, 373 U.S. 83 (1963), a court is required to vacate a conviction and order a new trial if it finds that the prosecution suppressed material, exculpatory evidence. *United States v. King*, 628 F.3d 693, 701 (4th Cir. 2011). In order to obtain relief under *Brady*, a litigant must "(1) identify the existence of evidence favorable to the accused; (2) show that the government suppressed the evidence; and (3) demonstrate that the suppression was material." *Id.* (citing *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003)). Under the *Brady* analysis, evidence is material if it generates a "reasonable probability" of a different result at trial had the evidence been disclosed. *Moseley v. Branker*, 550 F.3d 312, 318 (4th Cir. 2008) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). "Showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more." *Kyles*, 514 U.S. at 437.

The Fourth Circuit has recently interpreted defaulted *Brady* claims in the context of the Supreme Court's decision in *Banks v. Dretke*, 540 U.S. 668, 691 (2004)

> The Supreme Court has explained that the cause and prejudice showing necessary to overcome a defaulted *Brady* claim parallel[s] two of the three components of the alleged *Brady* violation itself. . . . Thus, the required showing

> of cause corresponds to the *Brady* requirement that the petitioner show that the
> state suppressed the evidence. . . . The showing of prejudice required to excuse a
> procedural default corresponds to the *Brady* prejudice requirement.

*Walker*, 589 F.3d at 137 (internal citation and quotation marks omitted). To be material, failure

to disclose must "deprive the defendant of a fair trial." *Bagley*, 473 U.S. at 675. As such,

"evidence is material only if there is a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different. A 'reasonable

probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473

U.S. at 682; *see also Kyles*, 514 U.S. at 434. Further, "*Brady* requires that the government

disclose only evidence that is not available to the defense from other sources, either directly or

through diligent investigation." *McCleskey v. Zant*, 499 U.S. 467, 498 (1991).

## VI.    Evidentiary Hearings

The decision to grant an evidentiary hearing is left to the "sound discretion of district

courts." *Schriro*, 550 U.S. at 473; *see* 28 U.S.C. § 2254, Rule 8(a) ("[T]he judge must review the

answer [and] any transcripts and records of state-court proceedings . . . to determine whether an

evidentiary hearing is warranted."). A federal court must consider whether the evidentiary

hearing would provide the petitioner the opportunity to "prove the petition's factual allegations,

which, if true, would entitle the applicant to federal habeas relief." *Schriro*, 550 U .S. at 474; *see*

*Mayes v. Gibson*, 210 F.3d 1284, 1287 (10th Cir. 2000). Courts must also consider the standards

prescribed by § 2254 when considering whether an evidentiary hearing is appropriate. *Schriro*,

550 U.S. at 474.

## VII.   Affidavit of Facts

The Court's July 30, 2012, order required Porter to:

> (e) state any facts which Petitioner wants the Court to consider in a separate
> section titled "Affidavit of Facts." The Court will not accord any evidentiary value
> to conclusory statements of law or fact; and each fact must be set forth in a
> separately numbered paragraph and in the form prescribed by Fed. R. Civ. P.
> 56(c), accompanied by an affirmative statement that demonstrates that the fact
> asserted is based on personal knowledge or other referenced evidence in the
> record; and

> (f) with respect to any statement of a fact in the petition, and the subsequent briefs or motions submitted by the parties, also cite to the page of the trial transcript or the state court record that supports the factual proposition asserted. To the extent Petitioner relies on his own knowledge as the basis for a particular fact, the statement should be accompanied by a citation to the appropriate numbered paragraph of the "Affidavit of Facts" described in paragraph (3)(e) herein.

(ECF No. 8). As the Warden notes, Porter has failed to comply with these requirements. Under the heading "Affidavit of Facts," Porter includes only one sentence: "An affidavit of facts, signed under penalty of perjury is in the state record. SH 8238–75." (Am. Pet. 2). The reference is to Porter's affidavit filed with his state habeas petition. Porter does not incorporate his state affidavit into his federal petition and never cites to the appropriate numbered paragraph of that affidavit in his present petition. Porter does not assert that his state habeas affidavit is in the form required by Federal Rule of Civil Procedure 56(c). The Warden contends that the Court need not look anywhere but Porter's affidavit to find support for Porter's claims. *See id.* 56(c)(3). However, Rule 56(c)(3) states that "[t]he court need consider only the cited materials, but it may consider other materials in the record." *Id.* As such, the Court will consider the entire record in this case.

## EXHAUSTED CLAIMS

### I.  Claim One: Voir Dire Claim Involving Bruce Treakle

The state habeas court reviewed the following facts:

> In this case, defense counsel, Joseph A. Migliozzi, Jr., asked the jurors, "But is anyone here, or a member of your close personal family, worked in law enforcement in any capacity as a volunteer or an employee?" Several prospective jurors, including Juror T, raised hands in response. The entirety of the exchange with Juror T was as follows:
> [JUROR T]: My nephew is an Arlington County police officer.
> MR. MIGLIOZZI: Your nephew?
> [JUROR T]: Yes.
> MR. MIGLIOZZI: In this county here?
> [JUROR T]: Yes.
> MR. MIGLIOZZI: Do you think, with that being the case, that that would impair your ability to sit on this jury and render a fair and impartial verdict in this case?
> [JUROR T]: No.

> Upon receiving Juror T's negative response, counsel moved on to the next prospective juror.

*Porter II*, 722 S.E.2d at 539. On those facts, the Supreme Court of Virginia applied the two part test stated in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984) to find that

> The record demonstrates that Juror T answered truthfully that he had a nephew who was an Arlington County Police Officer, Arlington County being the jurisdiction where the case was being tried following a change of venue, and that he was not asked, nor did he have the opportunity to answer, if he had any additional relationships with law enforcement officers. Thus, petitioner has failed to demonstrate that Juror T failed to answer honestly a material question during voir dire.

*Porter II*, 722 S.E.2d at 539.

### A.  Reasonable Application of the Facts?

By affidavit, Maryl Sattler indicates that Bruce Treakle ("Juror Treakle") told her that his brother was a sheriff's officer in Norfolk. (*Id.* at 6215). During voir dire, Juror Treakle only answered that his nephew was an Arlington county police officer; he was not, however, asked if other relatives were police. (*Id.* at 1225-29). Pernell Treakle later indicated in an affidavit that he is a Chesapeake duty Sherriff and has been employed at this law enforcement position since 2000. (SH App. 5491).

The record reflects that Juror Treakle's brother was actually employed as a member of the Chesapeake Police Department. The record does indicate that Chesapeake officers were especially upset by victim's death. (*Id.* at 7702-804). The parties point to no conclusive indication on the record that Juror Treakle knew that his brother worked in Chesapeake rather than Norfolk. There are also no allegations that Juror Treakle's brother influenced or pressured him, *see Fullwood v. Lee*, 290 F.3d 663, 681-82 (4th Cir. 2002), or that Juror Treakle was close-minded to the evidence or had made up his mind before trial. Contrary to Porter's argument that Treakle remained silent when his trial counsel again asked the panel if anyone had anything more to say on this question before changing topics, (*see* SH App. 1229-30), the record does not

reflect that Porter's trial counsel asked a catch-all question or an additional question regarding relatives that Juror Treakle failed to answer. Specifically, after interviewing all of the jurors who had familial ties to law enforcement, Porter's trial counsel asked: "All right. Any more hands?", (*id.* at 1229), indicating that he wanted to know if any more people had ties to law enforcement. It does not appear that the state habeas court made an unreasonable finding.

### B. Reasonable Application of the Law?

The state habeas court appears to have reasonably applied clearly established law. The Sixth Amendment mandates that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial[] by an impartial jury." U.S. Const. amend. VI. The Sixth Amendment prohibits biased jurors from serving on criminal juries. *See United States v. Wood*, 299 U.S. 123, 133 (1936). Under the *McDonough* test, "a juror's bias may be established by showing (1) that the juror 'failed to answer honestly a material question on *voir dire*'; and (2) that 'a correct response [to that question] would have provided a valid basis for a challenge for cause.'" *Conaway v. Polk*, 453 F.3d 567, 584-85 (4th Cir. 2006) (quoting *Greenwood*, 464 U.S. at 556) (the "*McDonough* test"); *see also Billings v. Polk*, 441 F.3d 238, 244 (4th Cir. 2006). Additionally, "where, . . . the two parts of the *McDonough* test have been satisfied, a juror's bias is only established under *McDonough* if the juror's 'motives for concealing information' or the 'reasons that affect [the] juror's impartiality can truly be said to affect the fairness of [the] trial.'" *Id.* at 588 (quoting *McDonough*, 464 U.S. at 556).[3]

"The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law." *Jones v. Cooper*, 311 F.3d 306, 313 (4th Cir. 2002). Such a presumption is justified where a juror is "a close relative of one of the participants in the trial or the criminal transaction." *Conaway*, 453 F.3d at 586 (citing *Phillips*, 455 U.S. at

---

[3] "[B]eliefs, biases, and preferences of every juror may be explored and exposed by the defendant at voir dire." *Stockton v. Commonwealth*, 852 F.2d 740, 744 (4th Cir. 1988). "Further, when some external manifestation of a juror's predisposition subsequently calls the juror's impartiality into question, the defendant is afforded the opportunity to establish the juror's actual bias." *Id.* Typically, "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982).

222) (O'Connor, J., concurring). However, at the same time, state habeas court findings are presumptively correct under 28 U.S.C. § 2254(d) and federal courts in habeas proceedings must not disturb the findings of state courts unless the federal habeas court finds that there is convincing evidence undercutting the state court finding. *Eaton v. Angelone*, 139 F.3d 990, 995 (4th Cir. 1998) ("[W]e refuse to transform a federal habeas proceeding into a second trial. In this case an evidentiary hearing.").[4]

In sum, Porter argues that the state habeas court erred when it held that Juror Treakle did not give a dishonest response or omit material information because Porter's trial counsel asked (1) whether Juror Treakle had any family that were law enforcement officers and (2) whether Juror Treakle had anything else to add. Porter's claim fails at the first step of the *McDonough* test. It is clear that Juror Treakle did not volunteer false information. The main question of import is whether Juror T's omission of an additional family member that was a law enforcement officer amounted to a "material omission." "*McDonough* provides for relief only where a juror gives a dishonest response to a question actually posed, not where a juror innocently fails to disclose information that might have been elicited by questions counsel did not ask." *See McDonough*, 464 U.S. at 555.

Juror Treakle's failure to advise that he had additional relationships with law enforcement officers did not amount to a deliberate omission of material information. In *Billings v. Polk*, the Fourth Circuit highlighted a set of acts in *Williams v. Taylor* that were indicative of a material omission. *Billings*, 441 F.3d at 244 n.2. There, a juror indicated that she was not related to any of the witnesses even though she had been married to one of them for 17 years and was the mother of his four children. *Id.* (citing *Williams*, 529 U.S. at 440). Additionally, the woman stated that she had never been represented by any of the attorneys

---

[4] *Remmer v. United States*, 347 U.S. 227, 229 (1954) is typically cited for the proposition that "a presumption of prejudice arises when there is 'any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury.'" *Billings*, 441 F.3d at 248 (quoting *Remmer*, 347 U.S. at 229).

even though one of them had represented her during her divorce. *Id.* (529 U.S. at 440-41). In comparison, it does not appear that any of Juror Treakle's answers were submitted with scienter in mind, i.e., "misleading, disingenuously technical, or otherwise indicative of an unwillingness to be forthcoming." *Id.* Porter's trial counsel simply failed to ask Juror Treakle whether he had additional family members that were law enforcement officers. *See Billings*, 441 F.3d at 245. On the other hand, if the Court assumes that Juror Treakle knew that his brother transported prisoners in the custody of the department of corrections, it is hard to believe that he could have not realized that such a position constituted "law enforcement in any capacity." *See Porter II*, 722 S.E.2d at 539. A Deputy Sheriff is clearly a law enforcement officer. *Williams*, 529 U.S. at 441–42. In any event, even if Porter meets the first step of the *McDonough* test, he cannot show actual or implied bias on the part of Juror Treakle.

The fact that a juror "once had a family member in law enforcement is plainly not one of the 'extreme situation[s]' in which bias may be implied." *United States v. Brewer*, No. 1:12CR1, 2012 WL 4757894, at *5 (N.D.W. Va. Oct. 5, 2012), *aff'd*, 533 F. App'x 234 (4th Cir. 2013) (quoting *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988)); *see also United States v. LaRouche*, 896 F.2d 815, 830 (4th Cir. 1990). Further, it appears that Porter's trial counsel and the trial court judge were convinced that Juror Treakle would act impartially because of his familial affiliation with another law enforcement officer. Porter now contends that Juror Treakle may have been biased because the city of Chesapeake and its law enforcement community were especially incited by the murder of Officer Reaves. Porter avers that Treakle's relationship with his brother impacted his perception of the evidence and his participation in deciding Porter's guilt and punishment. It may be true that officers from the Chesapeake Sherriff's Office were more involved in his case than officers in Arlington County. However, Porter presents only circumstantial evidence of bias, and a showing of implied bias is a very high bar.

"[T]he doctrine of implied bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that

it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Person*, 854 F.2d at 664 (internal quotation marks and citations omitted). "As examples of the 'exceptional' and 'extraordinary' situations that might require a finding of implied bias, Justice O'Connor cited 'a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction.'" *Fitzgerald v. Greene*, 150 F.3d 357, 365 (4th Cir. 1998) (citing *Smith*, 455 U.S. at 222) (O'Connor, J., concurring). Porter's is not such an egregious situation. There is no *per se* rule requiring the exclusion of a juror whose close relative was a victim of a crime similar to that with which a defendant is being tried, *see United States v. Jones*, 608 F.2d 1004, 1008 (4th Cir. 1979), and "[a]bsent a specific showing of bias, a defendant accused of murdering a police officer is not entitled to a jury free of policemen's relatives," *United States v. Caldwell*, 543 F.2d 1333, 1347 (D.C. Cir. 1974). *See also Jones*, 608 F.2d at 1008. Absent the general connection of the Chesapeake law enforcement officers to the victim, nothing indicates that any of Juror Treakle's relatives had a particularly close connection to the murder. On the information provided, the Court cannot hold that Porter has shown that it was "highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Person*, 854 F.2d at 664.

In sum, it does not appear that the state habeas court unreasonably applied established federal law. While Porter argues that the best way to clear up any discrepancies is to hold an evidentiary hearing, such measures are unnecessary. Because the Court can decide this matter on the record at hand, the Court will deny Porter's request for a hearing.

## II.   Claim Two: *Brady* Claim Regarding Officer Reaves's Employment History

The state habeas court held that:

> [P]etitioner alleges the Commonwealth was required to, but did not, disclose information regarding previous incidents of the victim's unprofessional conduct as a Baltimore, Maryland police officer. Petitioner contends the

Commonwealth did not provide exculpatory evidence regarding a 1994 incident in which Officer Reaves handcuffed a suspect on the ground and slashed the tires of the suspect's bicycle. During this incident, a bystander, George Hite, objected and was arrested for disorderly conduct. A fellow Baltimore police officer swept Hite's legs out from under him, causing Hite to hit his head resulting in Hite's death. In a subsequent civil lawsuit, Officer Reaves stated he believed his fellow officer had acted appropriately, although eyewitnesses contradicted Officer Reaves' version of events.

Another incident of Officer Reaves' alleged unprofessional conduct occurred in 2001, when he allegedly engaged in a pursuit of a dirt bike in contravention of police policy. When Officer Reaves caught up to the dirt bike, the driver lost control of the bike, was thrown into a utility pole and died of head injuries. Petitioner argues that evidence regarding these incidents would have undermined the Commonwealth's assertions that Officer Reaves was not aggressive, bolstered petitioner's defense that Officer Reaves drew his gun and pointed it at petitioner without provocation, and created a reasonable probability that at least one juror would have concluded the Commonwealth did not establish "future dangerousness" during the sentencing phase.

The Court need not resolve questions related to whether this information was material because the Court holds that the evidence was not known to the Commonwealth. The record, including a 2009 Freedom of Information Act response from the Assistant City Attorney for the City of Norfolk and the affidavit of Philip Evans II, Deputy Commonwealth's Attorney for the City of Norfolk, demonstrates that the Commonwealth did not possess any information concerning the 1994 or 2001 incidents. Furthermore, pursuant to *Brady*, there is no obligation to produce information available to the defendant from other sources, including diligent investigation by the defense. *See Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002); *Cherrix v. Commonwealth*, 257 Va. 292, 302–03, 513 S.E.2d 642, 649, *cert. denied,* 528 U.S. 873, 120 S. Ct. 177, 145 L.Ed.2d 149 (1999).

*Porter II*, 722 S.E.2d at 541.

## A.  Reasonable Application of the Facts?

The state habeas court found that the relevant evidence was not known to the Commonwealth. Porter presents circumstantial evidence showing that the Norfolk Police Department required a background check regarding prior employment. Porter infers that this policy must mean that the Norfolk Police Department was aware of the two incidents at issue regarding Reaves's history as a Baltimore police officer.[5]

The first incident referenced by Porter reportedly involved an incident in 1994 ("1994 Incident") in which Officer Reaves allegedly slashed an arrestee's tires after detaining him and

---

[5] To the extent that Porter relies on evidence that was not properly before the state habeas court, this Court declines to consider it. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1402 (2011).

in which another fellow officer caused the death of the same detainee by sweeping him off of his feet while he was handcuffed. The second incident reportedly involved an arrest in 2001 ("2001 Incident") where Officer Reaves allegedly caused the death of a suspect by chasing him in his patrol car. Porter contends that Officer Reaves's employment records supported his testimony that he panicked when Officer Reaves approached him in a threatening manner. Regarding the 1994 Incident, Officer Reaves stated that an official investigation was launched regarding his actions after the incident. He further stated that he saw a related investigative report ("IID report") first hand, that he was sanctioned, and that he was later removed from street duty. (SH App. 6915). However, Officer Reaves did not state that he was ever formally reprimanded or that a formal IID report was ever filed in his personal record. (*Id.* at 6916). Regarding the 2001 Incident, Porter does not proffer any direct evidence that Officer Reaves had any disciplinary action taken against him as a result of the incident. Collectively, Porter has not provided sufficient evidence to show that prosecutors must have necessarily known about either the 1994 or the 2001 Incident. As such, the Court finds that the state habeas court did not unreasonably apply the facts.

## B.  Reasonable Application of the Law?

The state habeas court did not incorrectly apply federal law when it held that the prosecutors had no obligation to produce information available to Porter from other sources, including diligent investigation by the defense. *See Fullwood*, 290 F.3d at 686. Because the state habeas court did not unreasonably apply the facts on the record, there is no indication that the prosecutors withheld any *Brady* material available to the Norfolk Police Department.

Even assuming that reports of the 1994 and 2001 Incidents existed, under *Brady*, a prosecutor has duty to learn of favorable evidence known to others acting on government's behalf, including the police. *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (referencing investigating officers, not police in general). To the extent that Porter argues that the prosecutors should have been able to obtain Officer Reaves's alleged disciplinary record

20

from the Baltimore Police Department, *Kyles* cannot "be read as imposing a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue." *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir. 1996); *see also United States v. Pelullo*, 399 F.3d 197, 216, 218 (3rd Cir. 2005) (concluding that prosecutors did not violate *Brady* where that there was no "constructive knowledge" because there was no reason to believe that officials from the Pension and Welfare Benefits Administration were acting on behalf of the prosecution or were members of the "prosecution team."). Accordingly, the state habeas court did not unreasonably apply the applicable federal law.

### III.   Claim Three: *Brady* and *Napue* Claims Regarding Selethia Anderson

The state habeas court held that:

> [P]etitioner alleges the Commonwealth failed to disclose to him that Simone Coleman, a prosecution witness, contradicted the claim of Selethia Anderson, another prosecution witness, of having seen the shooting occur. Relying on an affidavit by Coleman, petitioner argues that Anderson's testimony that she was sitting on her front porch when she saw the police vehicle arrive, watched as petitioner approached the officer and shot him, and observed petitioner run towards his parked vehicle and point his gun in her direction, causing her to flee inside with her baby, was subject to impeachment by Coleman's statement that she lived in the same apartment and did not see anyone sitting on the porch during the same time frame.
>
> The Court need not resolve questions related to whether this information was material because the Court holds that the evidence was not favorable to petitioner, as it did not contradict the testimony of Selethia Anderson and, therefore, failure to disclose was not a violation of *Brady*. In order to show a violation of *Napue*, petitioner must show that Anderson's testimony was false, that the prosecution knew of the falsity, and that the falsity affected the jury's judgment. *Napue*, 360 U.S. at 269–71, 79 S. Ct. 1173. *See Teleguz*, 273 Va. at 491–92, 643 S.E.2d at 729.
>
> The record, including the trial transcript and Coleman's affidavit, demonstrates that Anderson was sitting on her front porch and saw a police vehicle pull up and park across the street. Anderson witnessed petitioner shoot the officer, and then retreated to her home when she saw petitioner move toward his vehicle and point a gun in her direction. Coleman's trial testimony and affidavit demonstrate that she noticed the police vehicle pulling up the road as she was "coming out of [her] home and starting to cross 28th Street." After Coleman walked down the street, she glanced back and witnessed petitioner shoot the police officer. Coleman ran away from the shooting, but then returned to her apartment after she saw the petitioner flee. The witnesses' testimony supports the inference that Anderson entered and exited the porch in between

> the time that the porch would have been visible to Coleman as she exited her apartment and walked down the street. Furthermore, Coleman's affidavit states only that she "most likely" would have noticed if Anderson had been sitting on the porch when Coleman exited the building.

*Porter II*, 722 S.E.2d at 540-41.

### A. Reasonable Application of the Facts?

Porter argues that the state habeas court decision was based on at least two unreasonable determinations of the facts under § 2254(d)(2): first, that the state habeas court found that the record, including trial transcripts and Simone Coleman's ("Coleman") affidavit, demonstrated that Selethia Anderson ("Anderson") was sitting on her front porch and saw a police vehicle pull up to the scene of the shooting; and second, that Anderson's trial testimony was presumed to be true and that it supported an inference that Anderson only arrived on the front step after Coleman passed over the step and left the step before Coleman returned. Porter contends that concealed information came from Coleman who told police that she stood on the same small front step where Anderson claimed she stood *at that same* time that Anderson claimed to be standing on the step but that she did not see Anderson. Porter contends that each woman had to exit her apartment over the same front step but Anderson expressly testified that she had been outside on the front step waiting for her daughter to come home from school *before* Officer Reaves's car pulled up and Coleman claimed that she crossed the front step *as* Officer Reaves's car pulled up and Anderson was not there. Porter contends that any inconsistency is material because the two women's apartments were right next to each other. Porter contends that the state court simply altered the evidence in the record before it to find that the trial testimony "supports an inference" that Anderson left her apartment sometime after Coleman left her apartment and that Anderson went back inside her apartment before Coleman returned. Porter also argues that the Virginia Supreme Court unreasonably relied on Coleman's[6] handwritten addition to her affidavit that she only "most likely" would have noticed someone on the porch as

---

[6] Simone Coleman is currently referred to as "Simone Moore" or "Moore" in parts of both parties' briefs. For the sake of simplicity this memorandum will refer to her as "Coleman."

limiting her certainty. *Porter II*, 722 S.E.2d at 541; (*see* SH App. 8231, ¶ 8).

Coleman testified that she came out of her home shortly before 4:00 pm and was crossing 28th street, about to cross her driveway, when police pulled up to the scene of the shooting. (SH App. 1717-20, 1744). Coleman was walking away from her home until Porter shot Officer Reaves, at which point she ran home on foot. (*Id.* at 1739-41). Anderson states that she was on the porch shortly before 4:00 pm when Reaves's police car pulled up to the scene of the shooting, (*id.* at 2225-26), and when Porter shot Officer Reaves, (*id.* at 2230). When Coleman was on the porch, she did not notice anyone except one man in the area. (*Id.* at 1759-60). Both Coleman and Anderson indicated that they lived across the street from the brick house where the murder took place. (*See id.* at 1117-18, 2224-26). Anderson described the place that she lived as the brick building in the upper left corner of Commonwealth Exhibit 26. (*Id.* at 4369). Coleman described her house as the brick building in the far corner of Commonwealth Exhibit 26. (*Id.*) While there is no mention of an address, the record indicates that both Selethia Anderson and Coleman lived in the same brick building.[7]

In any event, it is theoretically possible that Selethia Anderson entered the porch after Coleman left for work and entered her apartment shortly before Coleman made her way back to her apartment. Although Coleman's new affidavit explicitly states that she would have seen someone sitting on the porch as she left the apartment, Coleman does not explicitly state that she did not see, or even knew of, Selethia Anderson. (*See id.* at 8230-31). The record reflects that there is no conflict between the testimony of Anderson and Coleman because Coleman cannot speak to events that took place when she was not present. Thus, Porter has not met his heavy burden to show that the state habeas court's finding of fact was unreasonable.

### B.  Reasonable Application of the Law?

Porter essentially contends that Coleman's amendment to her original affidavit was

---

[7] The brick building—identified by Porter as 404 West 28th Street, Norfolk, Virginia—is the only brick building from which Selethia Anderson could have witnessed Reaves's murder consistent with her testimony.

somehow misinterpreted by the state habeas court. However, a witness's undisclosed statement is not favorable if it is not inconsistent with her trial testimony. *McHone v. Polk*, 392 F.3d 691, 701 (4th Cir. 2004). As stated by the state habeas court, *Brady* and *Napue* do not apply to this claim because the evidence at issue is not exculpatory.

Regarding the knowledge of Coleman's testimony, Porter must meet a heavy burden to show false testimony. "A defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured." *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987). "Inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." *Id.*; *see also Allen v. Ballard*, CIV.A. 1:06-0597, 2009 WL 669273, at *44, *47 (S.D.W. Va. Mar. 11, 2009). The Court finds that Porter failed to present any evidence during his state habeas proceedings that would indicate that false testimony was presented by the prosecutor. Thus, his allegation that the prosecutor engaged in misconduct by offering false testimony is without merit. Accordingly, the state habeas court did not unreasonably apply the applicable federal law.

## IV.  Claim Four: Ineffective Assistance Claim Regarding Fingerprinting of Officer Reaves's Holster

The state habeas court held that

> [P]etitioner alleges he was denied the effective assistance of counsel because counsel failed to request that Officer Reaves' gun holster be tested for fingerprints. Petitioner asserts such testing would have shown that petitioner's fingerprints were not on the snap and thumb break of the holster, which would have supported his testimony that Officer Reaves had already drawn his gun when petitioner shot him, and undermined the Commonwealth's assertion that petitioner took the gun from Officer Reaves' holster.
>
> The Court holds that [Porter's claim] satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland.* Petitioner has failed to proffer any evidence that, had fingerprint testing been done, it would have shown the absence of his fingerprints on Officer Reaves' holster, or that such evidence would have supported petitioner's version of the events. Although the testimony at trial demonstrated that the holster snap would have had to be released in order for the gun to be removed, there was no evidence that unsnapping the device required a maneuver that would leave a clear and identifiable fingerprint. Thus, petitioner has failed to demonstrate that counsel's

performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

*Porter II*, 722 S.E.2d at 549-50.

### A.  Reasonable Application of the Facts or Law?

Porter argues that the facts before the state habeas court, including (1) expert testimony that prints of value can be recovered from the holster's thumb break surface, (SH App. 4818), and (2) that a person attempting to remove a weapon from Officer Reaves's holster would have had to touch the thumb break surface, (SH App. 3091-92), show that the state habeas court's findings were unreasonable. Porter notes that his trial counsel had the presence of mind to ask the prosecution's witnesses if they tested the holster for fingerprints. (SH App. 2699, 2724). Porter contends that eliminating himself as a possible source for the fingerprint on the holster strap was likely to establish the fact that Officer Reaves drew his weapon before Porter shot him and, thus, provide evidentiary support for jury instructions on self-defense and on first and second degree murder. As a result, Porter contends that, absent his trial counsels' ineffective assistance, there would have been a reasonable probability of a different outcome in jurors' decisions. Porter represents that his request for the assistance of an expert in state habeas proceedings to examine the holster for fingerprints as "part of the evidence establishing prejudice" for his claim was inappropriately denied. (Fed. App. 305). Porter argues that any deficiency in his allegations is the result of the state habeas court's refusal to allow him access to Officer Reaves's holster and the assistance of an expert fingerprint examiner.

The record reflects that no witness testified that they actually saw Porter take the handgun from Reaves's holster and touch the thumb strap. Porter is the only witness that testifies that Officer Reaves pulled his service weapon from his holster and subsequently dropped it when Porter shot him in the head. Porter is the only witness that testified that he did not, in fact, touch Reaves's holster in attempting to retrieve his service weapon.

Porter has a burden to show a reasonable probability that the trial jury would have had a

reasonable doubt about his guilt had trial counsel shown that his fingerprints were not on the holster. *See Joyner v. United States*, CRIM. No. 3:06-00016, 2010 WL 2998464, at *5 (D.S.C. July 27, 2010); *see also Henry v. Johnson*, CIVA No. 3:07CV583, 2008 WL 2704401, at *4 (E.D. Va. July 3, 2008). Although the state habeas court held that "[a]lthough the testimony at trial demonstrated that the holster snap would have had to be released in order for the gun to be removed," it did not make an explicit finding that a person would have had to touch the holster snap with his hand to release it. *See Porter II*, 722 S.E.2d at 550. Further, the state habeas court held that "there was no evidence that unsnapping the device required a maneuver that would leave a clear and identifiable fingerprint." *Id.*

Even assuming that Porter's trial counsel unreasonably failed to perform testing on the holster, the prosecution was free to argue that Porter, and not Officer Reaves, took the service weapon from the holster by twisting or jiggling the weapon free. The record reflects that Porter's witness deemed it possible to remove Reaves's service weapon with a "twist" or "jiggle." (*See* SH App. 3101-02). Therefore, an absence of fingerprints on the holster would not undermine the testimony of multiple witnesses that Officer Reaves did not draw his weapon from his holster prior to grabbing Porter. Thus, there is no prejudice because there is not a reasonable probability that the jury would have reached a different verdict had trial counsel introduced fingerprint evidence. *See Joyner*, 2010 WL 2998464, at *5. As such, Porter cannot meet the prejudice prong of *Strickland*.

Porter's trial counsel did not perform deficiently in failing to test Reaves's holster for fingerprints. As stated above, it was possible for Porter to retrieve Reaves's gun without touching the holster. Therefore, there would have been little benefit to ascertaining whether Porter's fingerprints were on the holster. Conversely, in testing the holster, Porter's trial counsel would have taken a huge risk that Porter's fingerprints were on the holster. Such representation cannot be said to be constitutionally deficient. As such, Porter cannot meet the performance prong of *Strickland*.

In sum, the state habeas court did not unreasonably apply the facts or the applicable federal law.

**V. Claim Five: Ineffective Assistance of Counsel Claim Regarding Trial Counsel's Use of Copeland's Testimony**

The state habeas court held that:

> [P]etitioner alleges he was denied the effective assistance of counsel because counsel failed to emphasize Copeland's testimony that he saw petitioner exit the apartment building as Copeland ran up to Officer Reaves, who had parked in front of the apartment building. Petitioner asserts this testimony directly conflicted with the testimony of Latoria Arrington, and of other witnesses in the apartment, that petitioner did not leave the apartment until she said, "Why is Reggie talking to the police officer?" According to petitioner, Copeland's testimony, when viewed with the petitioner's testimony, was sufficient to cast doubt on the prosecution's argument that petitioner knew he would be confronting a police officer when he left the apartment. Petitioner continues that despite the fact that the timing sequence was critical, his counsel only argued to the jury that Arrington and the other apartment occupants could not have seen out of the window due to the positioning of the blinds. Petitioner contends that counsel failed to emphasize that Copeland's "far more powerful and credible" testimony undermined Arrington's credibility, and created reasonable doubt that Officer Reaves was killed for the purpose of interfering with his official duties.
>
> The Court holds that [Porter's claim] satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland.* The record, including the trial transcript and the September 8, 2009 affidavit of counsel, demonstrates that counsel reasonably chose to pursue a trial strategy of attacking the credibility of the Commonwealth's witnesses, Copeland and Latoria Arrington. Furthermore, petitioner's own statement established that he saw Officer Reaves on the sidewalk before the shooting, which would support the Commonwealth's argument that petitioner chose to confront Officer Reaves. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

*Porter II*, 722 S.E.2d at 543.

**A. Reasonable Application of the Facts and Law?**

Under the *Strickland* analysis, "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003). As such, "[j]udicial review of a defense attorney's summation is therefore highly deferential-and doubly deferential when it is conducted through

the lens of federal habeas." *Id.* at 6.

The record reflects that Porter's trial counsel made a strategic decision not to rely on Copeland's testimony because they did not view him as a credible witness. (Fed. App. 441 ¶ 5, 445 ¶ 4). Pursuant to this strategy, trial counsel told jury not to believe Copeland or other witnesses on several points, (*see* SH App. 3234-36), but wanted the jury to believe one part of Copeland's testimony, (*id.* at 3269). These actions appear to be part of counsels' strategy to use Copeland's testimony sparingly in light of the fact that they were challenging his credibility. (*Id.* at 3234-35). Despite Porter's ability to imagine a different or more effective tactic during closing arguments, there is no indication that Porter's trial counsels' representation fell below the objective standards of reasonableness. Because there is a strong presumption that Porter's attorney's conduct was within the wide range of reasonable professional assistance, and Porter's trial counsels' strategic choices were logical based on all the circumstances and evidence, Porter cannot satisfy the performance prong of *Strickland*.

Additionally, there is no prejudice regarding Porter's trial counsels' failure to use Copeland to refute the testimony of Latoria Arrington. Even assuming that Porter was able to successfully impeach Latoria Arrington's testimony—ostensibly weakening the value of her testimony regarding Porter's state of mind prior to the murder of Officer Reaves—other testimony establishes the fact that Porter saw Officer Reaves in uniform and approached him, thus, choosing to confront him. (*See* SH App. 1724-35) (detailing Simone Coleman's account of Porter's actions when he left the building where Valorie Arrington lived). As the state habeas court notes, Porter's own testimony indicates that he saw Officer Reaves on the sidewalk prior to shooting him. *Porter II*, 722 S.E.2d at 543. There is not a reasonable probability that, but for his trial counsels' alleged error, the result of the proceeding would have been different and, thus, Porter cannot meet the prejudice prong of *Strickland*.

To the extent that Porter presents a separate claim that his trial counsel should have argued that Officer Reaves arrived later than the witnesses in the Valorie Arrington's apartment

initially testified by relying on the testimony of Spruill and Coleman, such a claim is improper because it was never fairly presented to the Supreme Court of Virginia. *See Mallory*, 27 F.3d at 995; *Gray*, 518 U.S. at 162; *see also Boerckel*, 526 U.S. at 848.

In sum, the state habeas court did not unreasonably apply the facts or the applicable federal law.

## VI. Claim Six: Ineffective Assistance Claim Regarding Jury Instruction for First-Degree Murder

The state habeas court held that:

> [P]etitioner alleges he was denied the effective assistance of counsel because counsel failed to request and obtain a jury instruction on the lesser-included offense of first-degree murder. Petitioner asserts that without proof of the gradation element that the killing was for the purpose of interfering with the law enforcement officer's official duties, the killing of an officer is no more than first-degree murder. Petitioner testified that Officer Reaves grabbed petitioner's arm and pointed a gun at petitioner without provocation. Petitioner contends that this testimony was corroborated in part by Copeland and Melvin Spruill, and established that petitioner believed Officer Reaves was not acting in his official capacity as a law enforcement officer at the time of the shooting. Petitioner argues counsel's failure to request the instruction was not strategic because counsel fought for instructions on other lesser offenses, and there was more than a scintilla of evidence to support granting the first-degree murder instruction.
>
> The Court holds that [Porter's claim] satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). The record, including the trial transcript and the September 8, 2009 affidavit of counsel, demonstrates that counsel made a strategic decision not to request a jury instruction that was not supported by the evidence. Porter testified that he knew there was a warrant out for his arrest, that he knew he was carrying a firearm although he was a convicted felon, and that he saw Officer Reaves in his police uniform. Although Porter also testified that he was not thinking about the warrant and that he thought Officer Reaves was "pulling a gun on him," accepting petitioner's testimony as true, and viewing the evidence in the light most favorable to him, nothing supports a finding that Porter reasonably believed the officer was not engaged in the execution of official duties at the time of the shooting. Furthermore, central to petitioner's defense was counsel's argument that petitioner did not premeditate his action. Therefore, a first-degree murder instruction, which would necessarily include the element of premeditation, would have been inconsistent with counsel's theory. Counsel's strategic decision to not request a first-degree murder instruction was reasonable under counsel's theory of the case. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

*Porter II*, 722 S.E.2d at 542-43.

### A. Reasonable Application of the Facts?

Porter's argument that the state habeas court unreasonably held that *nothing* supports a finding that Porter reasonably believed Officer Reaves was not engaged in the execution of official duties at the time of the shooting is technically correct because, at the very least, as seen below, Porter's own testimony supports his theory that he believed otherwise. Porter is correct in noting that "the crucial inquiry . . . is not whether the officer was in fact engaged at the time he was killed in performing a law enforcement duty but, rather, whether the killer acted with the purpose of interfering with what he perceived to be an officer's performance of a law enforcement duty." *Delong v. Commonwealth*, 362 S.E.2d 669, 676 (Va. 1987). That being said, the Court's underlying holding that Porter could not have reasonably believed Officer Reaves was not engaged in the execution of official duties at the time of the shooting is supported by the facts. Porter does not point to any clear and convincing evidence that establishes that the state habeas court's factual findings were in error.

### B. Reasonable Application of the Law?

A defendant is not entitled to a first-degree jury instruction if there is no evidence to support it. *See Pruett v. Thompson*, 996 F.2d 1560, 1564 (4th Cir. 1993); *Winston v. Commonwealth*, 604 S.E.2d 21, 44 (Va. 2004). Under Virginia Code § 18.2–31(6), the "willful, deliberate, and premeditated killing of a law-enforcement officer" for the purpose of "interfering with the performance of his official duties" constitutes capital murder. In order for Porter's trial counsel to have obtained an instruction for first-degree murder, the trial court would have had to conclude that there was more than a scintilla of evidence to believe that Officer Reaves was not killed "for the purpose of interfering with the performance of his official duties." *Id.*

Porter, in effect, contends that his trial counsel could and should have pursued a theory that Officer Reaves was not engaged in his official duties when he came into contact with Porter. In support, Porter presents an alternate strategy and avers that his trial counsel did not obtain

an instruction due to some type of confusion regarding the applicable law. However, the record reflects that the issue was all but conceded as a part of Porter's trial counsels' deliberate strategy. (Fed. App. 441 ¶ 4) ("After assessing the evidence that Officer Reaves was fatally shot while in uniform and on patrol, we concluded that we could not successfully make the contrary argument that his shooting was not "for the purpose of interfering with the performance of his official duties."). As the Warden notes, Porter's trial counsel argued as the center of his defense that Porter did not premeditate his actions, based on Porter's own statements. (SH App. 3149, 3167, 3176, 3270, 3273). "Failure to request an instruction on a lesser-included offense can be proper trial strategy." *Washington v. United States*, 291 F. Supp. 2d 418, 442 (W.D. Va. 2003); *see Hooks v. Ward*, 184 F.3d 1206, 1234 (10th Cir. 1999) ("[I]n the context of instructions on lesser included offenses, we see particular strategy reasons why a defendant might not want to present the jury with a compromise opportunity."). Given Porter's trial counsels' strategy, it was not unreasonable for his counsel to opt not to seek a first-degree murder jury instruction because it would have been contrary to his theory of the case. *See Elliott v. Kelly*, No. 1:08-CV-430, 2009 WL 855796, at *17 (E.D. Va. Mar. 31, 2009) ("Counsel cannot be faulted for refusing instructions contrary to his theory of the case."); *Parks v. Pitcher*, No. 1999 U.S. Dist. LEXIS 19679, *39–40 (E.D. Mich. Nov. 11, 1999) ("In the present case, counsel's main strategy was to attack the intent to kill element and seek a complete acquittal for petitioner on these charges. Petitioner has failed to show that counsel's decision to attack the intent to kill element and seek a complete acquittal for petitioner on this ground was not reasonable trial strategy."). While Porter did not explicitly admit that Officer Reaves was acting in his official duties when he approached him, (*see* SH App. 3041), he did admit that Officer Reaves was a police officer in uniform prior to leaving the building where Valorie Arrington lived, (*see id.* at 2993). Further, multiple witnesses contradicted Porter's testimony that he did not know that Copeland had summoned the police in response to Porter being in the apartment of Valorie Arrington. (*Id.* at 2075, 2122, 2151). In contrast to Porter's current arguments, Porter repeatedly testified at trial that he did not make a

decision to kill Officer Reaves, (*id.* at 3033-34), and "blanked out" when he shot Officer Reaves a second and third time in the head, (*id.* at 3009-10), implying a lack of premeditation. Porter's argument that attempting to attain a jury instruction for first-degree murder was possible does not establish that his trial counsel's contrary actions were unreasonable. Porter has not rebutted this considerable deference and presumption and, thus, cannot satisfy the performance prong of *Strickland*.

Regarding prejudice, Porter fails to show that, had his counsel attempted to obtain an instruction on first-degree murder, the result of the guilt phase of his trial would have been different. As the Warden notes, the trial court held that Porter did not make out a case of self-defense, and the state habeas court found that "nothing supports a finding that Porter reasonably believed the officer was not engaged in the execution of official duties at the time of the shooting." *Porter II*, 722 S.E.2d at 543. Thus, Porter would have had no basis on which to pursue a first-degree murder charge. In addition, Porter's trial counsel did not pursue a theory of self-defense, based on Porter's own statements. (SH App. 3149, 3167, 3176, 3270, 3273). A first-degree instruction would not have fit Porter's trial counsels' theory and would not have been persuasive to the jury absent some foundation. As such, Porter fails the prejudice prong of *Strickland*.

### i.  Irrebuttable Presumption

Porter argues that his trial counsel improperly understood the applicable law regarding jury instructions on first-degree murder as creating some type of "irrebuttable presumption" is barred because it was not presented to the state habeas court. Porter argues that the trial court improperly adopted this understanding of the law in derogation of *Sandstrom v. Montana*, 442 U.S. 510 (1979). Porter did not present this claim to the state habeas court. It is axiomatic that in order for a federal claim to be exhausted, it must be presented to the highest state court. *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1994). To the extent that Porter attempts to now bring this separate claim, not based on *Strickland*, it is barred as unexhausted. In any event,

there is little indication that Porter's counsel understood the law as creating any irrebuttable presumption that the element of "interfering with the performance of his official duties" was proven beyond a reasonable doubt. As such, Porter's related argument has no merit.

## VII.   Claim Seven: Ineffective Assistance Claim Regarding the Alleged Conduct of Officer Reaves

The state habeas court held that:

> [P]etitioner alleges he was denied the effective assistance of counsel because counsel failed to discover and use evidence of Officer Reaves' history of unprofessional conduct while he was a Baltimore City police officer. Petitioner contends that counsel should have requested Officer Reaves' personnel file when Officer Reaves' previous performance was obviously relevant because the main factual dispute at trial was whether Officer Reaves approached petitioner forcefully and with his gun drawn. Petitioner contends that had the jury been presented with such evidence, there is a reasonable probability that he would not have been convicted of capital murder and at least one juror would have found that "an aggravating factor was not proven beyond a reasonable doubt or that death was not the most appropriate punishment."
>
> The Court holds that [Porter's claim] satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland.* Petitioner acknowledges that counsel was not on notice of Officer Reaves' alleged prior employment history. Petitioner fails to articulate how personnel records relating to Officer Reaves' employment as a Baltimore police officer, which do not show any formal disciplinary proceedings and do not reference any instances of Officer Reaves inappropriately displaying or using his service weapon, would have been relevant in bolstering petitioner's testimony that Officer Reaves forcefully approached petitioner with his gun drawn. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

*Porter II*, 722 S.E.2d at 549.

### A.   Reasonable Application of the Facts?

The record reflects that Porter's trial counsel did not have constructive or actual notice of Officer Reaves's alleged prior employment history. Porter's inference that his trial counsel may have been on constructive or actual notice of Reaves's employment records fails in light of the state habeas court's finding that "Petitioner acknowledge[d] that counsel was not on notice of Officer Reaves' alleged prior employment history." *Porter II*, 722 S.E.2d at 549. Factual findings of a state habeas court are presumed correct unless rebutted by clear and convincing evidence.

*See* 28 U.S.C. § 2254(e)(1). The finding is supported by Porter's trial counsels' statement that his investigation did not reveal any information about Reaves's personnel files. (Fed. App. 447, ¶ 9). Here, Porter has not met his burden to present clear and convincing evidence to the contrary. *See supra* Claim Two.

### B.  Reasonable Application of the Law?

As stated above, the record reflects that Porter's trial counsel did not have constructive or actual notice of Officer Reaves's alleged prior employment history. As such, Porter does not identify any evidence his trial counsel possessed that "would have led a reasonably competent attorney to investigate further." *Wiggins*, 539 U.S. at 534. Further, Porter's counsel indicated that they made a strategic decision not to pursue such a strategy. As stated previously, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Counsel had reason to limit his investigation into Reaves's employment history: Reaves's employment record was not relevant to Porter's trial counsels' theories that (1) Porter shot Reaves's without premeditation; or (2) that Porter did not constitute a future danger. The record also reflects that Porter's trial counsel did not believe that the theory that Officer Reaves acted outside his official capacity was viable. (Fed. App. 441, ¶ 4). The fact that Officer Reaves acted in his official capacity when he approached Porter weakens Porter's current theory that evidence of Reaves's service record could have help refute the prosecution's theory that Officer Reaves approached Porter simply to talk to him. Therefore, Porter has not satisfied the performance prong of *Strickland*.

In the alternative, Porter was not prejudiced even if his trial counsel failed to uncover disciplinary records regarding Officer Reaves. Porter's arguments are consistent with his apparent overarching theory that his trial counsel could or should have made a self-defense argument in retrospect. Again, the trial court held that Porter did not make out a case of self-defense, (SH App. 3173), and absent evidence that Porter acted in self-defense, character evidence of his victim was inadmissible. *See Jordan v. Commonwealth*, 252 S.E.2d 323, 325

34

(Va. 1979). Thus Porter would have had no basis on which to pursue a first-degree murder charge. In addition, Porter's theory of self-defense was contradicted by his own statements. (SH App. 3149, 3167, 3176, 3270, 3273). A first-degree instruction would not have fit Porter's trial counsels' theory and would not have been persuasive to the jury absent some foundation. As such, Porter has not met the prejudice prong of *Strickland*.

### VIII.   Claim Eight: Ineffective Assistance Claim Regarding Usage of Mitigating Facts from Porter's Childhood

The state habeas court held that:

> [P]etitioner alleges he was denied the effective assistance of counsel because counsel failed to conduct an adequate investigation into petitioner's childhood and present important mitigating evidence regarding the abuse petitioner received as a child. Petitioner asserts counsel should have presented evidence that he was physically beaten by his caregivers and grew up amidst neighborhood and family violence. Petitioner contends that counsel conducted only cursory interviews with petitioner's mother and other adults in his life as he grew up, and did not follow up on evidence of physical abuse. Petitioner further asserts counsel's failure resulted in depriving his mental health expert of information crucial to his evaluation, and undermined confidence in the jurors' sentencing phase decisions because they were not provided with a proper context for understanding petitioner's behavior.
>
> The Court holds that [Porter's claim] satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland*. The record, including the trial transcript, demonstrates that counsel presented mitigating evidence to the jury through testimony about the violent neighborhood in which petitioner was raised, the abuse he observed his mother receive, the loss of a younger sibling, the lack of parental involvement and supervision, and the learning and emotional difficulties petitioner experienced in school. Petitioner's mother, Bernice Porter, specifically denied that any incidents of physical or sexual abuse of petitioner were ever reported. The affidavits of counsel demonstrate that counsel investigated and interviewed numerous friends and family members, and made the strategic decision not to call one of petitioner's caregivers because she would not have made a good witness. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

*Porter II*, 722 S.E.2d at 544.

### A.   Reasonable Application of the Facts?

Porter essentially contends that the state habeas court unreasonably discounted or failed to take into account his mitigation evidence regarding his emotional and physical abuse as a child. Porter asserts that the state habeas court refused to consider any of his evidence establishing his failure-to-investigate argument.

The record reflects that Porter presented virtually the same facts before the state habeas court, whose findings are presumed correct absent clear and convincing evidence to the contrary. The state habeas court does not cite some of Porter's evidence in support of its holding that Porter could not satisfy *Strickland* under either the performance or prejudice prongs. *Porter II*, 722 S.E.2d at 544. The state habeas court acknowledged, however, that Porter "asserted counsel should have presented evidence that he was physically beaten by his caregivers and grew up amidst neighborhood and family violence." *Porter II*, 722 S.E.2d at 544. There is little indication that the state habeas court refused to consider Porter's potential mitigation evidence. Porter cites no legal support for his argument that the failure to make specific findings regarding each specific piece of evidence can constitute an unreasonable finding of fact. For these reasons, the Court holds that the state habeas court did not make any unreasonable findings of fact in this claim. Porter's implied argument that the state habeas court did not properly weigh his mitigation evidence during its *Strickland* analysis will be addressed in the next section.

### B.  Reasonable Application of the Law?

#### i.  Performance Prong of *Strickland*

Porter appears to argue that the state habeas court erred because it did not take into account the powerful nature of the mitigation evidence that his trial counsel refused to pursue. Porter essentially argues that this powerful evidence should have greatly informed the state habeas court's assessment of both the performance and prejudice prongs of *Strickland*. However, as stated above, there is no indication that the state habeas court discounted evidence in the record. Further, a state habeas court's holdings are assessed for reasonableness, not

correctness, and the Court must still apply a "heavy measure of deference to counsel's strategic decision not to investigate further." *Strickland*, 466 U.S. at 691.

Porter essentially states that the mitigation evidence that his trial counsel neglected to investigate showed that he was emotionally and physically abused and neglected. Two of Porter's siblings that were not interviewed did not actually grow up in the household with Porter. (SH App. 5321, 5324-26). It appears that Porter's counsel did not interview at least one person—Wynonia Roberts—who could have testified that George Avant both hit Porter, (*see id.* at 5341), and that Porter was neglected, (*see id.* at 5344). However, the state habeas court explicitly found that Porter's trial counsel investigated and interviewed numerous friends and family members. *Porter II*, 722 S.E.2d at 544. The record reflects that Porter's trial counsel interviewed, among others, his entire immediate family, including Cora Gaston and Porter's girlfriend Janice Hendricks. (Fed. App. 442 ¶ 9, 446 ¶ 6); (SH App. 8278). Porter's trial counsel, Joseph Migliozzi specifically reported that he extensively interviewed Cora Gaston and Bernice Porter. (*Id.* at 489).

Porter claims to have informed his trial counsel that he was beaten as a child by Bernice Porter, George Avant, Cora Gaston, and William Wilson (Fed. App. ¶ 57). Bernice Porter, however, specifically stated that there were no reports or allegations of sexual or physical abuse. (SH App. 3646, 3655). The Court can infer from Porter's and his mother's testimony that Porter's trial counsel were at least aware of his allegations of abuse. In light of the fact that Porter's own mother denied that any instances of abuse were reported or alleged—despite reportedly beating Porter with broom handles and belts—it would not have been unreasonable for Porter's trial counsel to decline to expend resources on reports of abuse that were explicitly denied by a key mitigation witness. While it would have been reasonable for Porter's counsel to investigate further, it was not unreasonable for them not to do so.

Porter's trial counsel reasonably concluded based on their earlier investigation that the evidence they developed would have given the jury an accurate picture of Porter's personality

and upbringing and that further investigation would turn up unreliable, insubstantial, or cumulative evidence. *See Bacon v. Lee*, 225 F.3d 470, 481 (4th Cir. 2000). Porter's trial counsel conducted a reasonable investigation in light of the fact that there was little indication on the record before the Court that witnesses at the time reported that Porter was physically abused. Further, Bernice Porter explicitly denied any incidences of abuse. The fact that Porter now presents multiple witnesses that support his story is not dispositive because the relevant issue is the reasonableness of the scope of the investigation. Porter's trial counsels' investigation and representation were not deficient or unreasonable.

Porter's trial counsel made a strategic decision not to use the testimony of Cora Gaston, (Fed. App. 442), and decided not to utilize Porter's mental health expert, (Fed. App. 443, 446). These strategic decisions are afforded considerable deference and such representation was not constitutionally deficient.

The record before this Court indicates that Porter's trial counsel interviewed multiple people who now affirm that Porter was beaten but whose testimony was either not utilized at all or not utilized for the purpose of establishing abuse. Specifically Porter's trial counsel could have utilized the testimony of: (1) Derrick Jones—who now reports that Cora Gaston beat Porter several times and was emotionally abusive, (SH App. 5212), and who was not asked at trial about the abuse of Porter, (*id.* at 3740-56); (2) George Avant—who now admits to hitting Porter, (*id.* at 4831), and who testified but now reports that he does not remember much and was not asked about his abuse of Porter, (*id.* at 3677-85); and (3) Cora Gaston who now reports that she beat Porter when he "acted up," (*id.* at 5102), tried to give Porter back to his mom several times, (*id.* at 5102), and essentially told Porter that she doesn't care about him, (SH App. 5104). The state habeas court noted that, instead of presenting evidence of abuse, Porter's counsel "presented mitigating evidence to the jury through testimony about the violent neighborhood in which petitioner was raised, the abuse he observed his mother receive, the loss of a younger sibling, the lack of parental involvement and supervision, and the learning and emotional

difficulties petitioner experienced in school." *Porter II*, 722 S.E.2d at 544.

Porter's trial counsel chose to highlight different types of evidence during the sentencing phase of Porter's trial including, among other things: (1) that he grew up a troubled child with behavioral, mental, and perhaps neurological problems, (SH App. 4181-93), (2) that he had no male role model growing up, (*id.* at 4196), and (3) that he wanted to work and be a productive citizen, (*id.* at 4197-200). The central theories of Porter's trial counsel appear to be that: (1) Porter grew up with limited choices and his later criminal actions were a product of his upbringing, (*see id.* at 4195); (2) that no one was there to help Porter make better decisions or understand the consequences of his bad acts, (*see id.* at 4195-96), and (3) that Porter eventually grew up to be an impulsive and immature person, causing him to make the mistake of shooting Officer Reaves, (*see id.* at 24201-03). Porter's trial counsel also presented at least some mitigating evidence showing neglect—specifically, the lack of parental involvement and supervision. These are reasonable theories and the evidence to support them was obtained through sufficient investigations.[8] In sum, Porter cannot meet the performance prong of *Strickland*.

### ii.  Prejudice Prong of *Strickland*

Porter presented support for his allegations of abuse to the state habeas court. (*See* Fed. App. 129-37). The state habeas court acknowledged that Porter "asserted counsel should have presented evidence that he was physically beaten by his caregivers and grew up amidst neighborhood and family violence." *Porter II*, 722 S.E.2d at 544. The sole mention of abuse by the state habeas court was that: upon being interviewed by counsel, Porter's mother expressly stated that no incidences of sexual or physical abuse were reported. *Id.* There is no indication, however, that the state habeas court failed to assess "the totality of the available mitigation

---

[8] These theories are consistent with the report of Porter's mental health expert who interviewed Bernice Porter separately. (*See id.* at 8279-80).

evidence-both that adduced at trial, and the evidence adduced in the habeas proceeding," *Williams*, 529 U.S. 397-98.[9]

"'[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse.'" *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) *abrogated by Atkins v. Virginia*, 536 U.S. 304 (2002)) (quoting *California v. Brown,* 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)). This is not a case where Porter's trial counsel did not produce any mitigation evidence or withheld especially helpful evidence supporting a theory that Porter was not morally culpable. *See, e.g.*, *Wiggins*, 539 U.S. at 535. As the state habeas court notes, Porter's trial counsel presented mitigation evidence going toward moral culpability including testimony about the violent neighborhood in which petitioner was raised, the abuse he observed his mother receive, the loss of a younger sibling, the lack of parental involvement and supervision, and the learning and emotional difficulties petitioner experienced in school. It is true that presenting additional mitigation evidence showing that Porter was abused and neglected would have, as Porter points out, provided additional "context for understanding Porter's later behavior." (Am. Pet. 45). This evidence could have also have strengthened Porter's counsels' theories that Porter was essentially born without a chance to succeed in life and that he had no real role models to help him navigate his life. However, as evidence used to mitigate moral culpability, such evidence is largely cumulative and not dispositive. *See Wong v. Belmontes*, 558 U.S. 15, 23 (2009) (prejudice did not arise from a counsels' failure to use cumulative "humanizing" mitigation evidence); *Jackson v. Kelly*, 650 F.3d 477, 482 (4th Cir. 2011) (holding that prejudice typically does not arise from a counsel's failure to use anecdotal, cumulative examples of abuse).

---

[9] It is possible that the state habeas court made a credibility determination. It is also possible that the state habeas court held that the evidence Porter sought to introduce was cumulative in nature or outweighed by aggravating evidence.

To the extent that Porter's trial counsel failed to establish that Porter was physically abused, as stated above, this presentation was consistent with his counsels' reasonable investigations.

While somewhat mitigating, Porter's alleged of physical abuse from Avant and Wilson was not as severe as the type of physical abuse that is typically found to be necessary to vacate a trial. *See Wiggins*, 539 U.S. at 535 (nothing that petitioner was severely physically abused and molested repeatedly by his mother and a series of foster parents, was hospitalized after his mother forced his hand onto a hot stove, and was raped by his second foster father). There would have been at least some negative effect of introducing evidence of abuse by his mother and Cora Gaston because supporting witnesses would have been subjected to cross-examination where they would have had to testify to Porter's bad acts as a child, *Cf. Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005), and would be subject to impeachment by the prosecution. At least some of Porter's alleged physical abuse may also have been interpreted as disciplinary, thus, contradicting his trial counsels' theory that Porter grew up severely neglected and without any proper parenting. (*See* SH App. 5012) (Cora Gaston stating that "[w]hen Thomas acted up, I had to beat him.").

Porter implies that his trial counsels' inadequate investigations effectively precluded him from utilizing his mental health expert. However, utilization of his expert would have allowed the prosecution to use its expert as well. The prosecution's mental health expert report contains testimony from Porter that is both aggravation and potential impeachment evidence. The report generally states that certain factors of Porter's childhood history were mitigating but that the larger portion of his life reflects his own independent decision making capacity. (Fed. App. 451). Porter reportedly told the prosecution's mental health expert that he "posed too much of a challenge to the women who raised him," and that he "intentionally violated the rules of the household" as part of his "philosophy of reciprocal retribution." (*Id.*) Any contrary testimony by Porter risked impeachment.

In any event, Porter's additional evidence of abuse must also be weighed against the prosecution's aggravating evidence regarding future dangerousness, including: the potential positive effect of Porter's teachers and child psychologists, Porter's extensive criminal history, his extensive history of violent acts as both a juvenile and an adult, his poor work history, the terrible nature of Officer Reaves's murder, and the murder's effect on Reaves's immediate family. Moreover, the jury was presented with evidence of Porter's lack of remorse as demonstrated by a phone call in which Porter stated he was a "good shot." The Court finds that the aggravating evidence far outweighs the potential mitigating evidence that Porter proffers. For the above reasons, there is not a reasonable probability that, but for Porter's trial counsels' alleged error, the result of the proceeding would have been different. Porter cannot satisfy the prejudice prong of *Strickland*.

In sum, the state habeas court did not unreasonably apply the facts or the law.

## IX.   Claim Nine: Ineffective Assistance Claim Regarding the Prosecution's Aggravating Evidence

The state habeas court held that:

> [P]etitioner alleges he was denied the effective assistance of counsel because counsel failed to reasonably investigate the Commonwealth's evidence of some of petitioner's prior convictions and unadjudicated bad acts. Petitioner contends that counsel was unable to rebut this aggravating evidence because counsel did not investigate these incidents and merely whispered questions about the incidents to petitioner as the Commonwealth's witnesses were taking the stand. According to petitioner, a proper investigation would have uncovered valuable mitigating information that would have explained how petitioner was provoked prior to each incident and how petitioner was punished afterwards.
>
> Regarding another incident, petitioner alleges he punched another inmate in 1998 because the other inmate had attacked petitioner for no reason. Petitioner alleges counsel failed to discover that Corrections Officer Adkins' testimony of an incident in which petitioner grabbed Adkins' shirt through the cell bars and banged Adkins against the bars did not match Adkins' contemporaneous report of the incident. In addition, contrary to Adkins' testimony, petitioner alleges that after the incident petitioner was mistreated and punished. Concerning another incident, petitioner alleges that an inmate attacked by petitioner in 1997 had provoked petitioner by bumping into him during a fight the inmate was having with two other men, and by uttering "fighting words."

Petitioner contends that counsel made petitioner's reaction appear less reasonable by characterizing the "fighting words" as a homosexual advance. Petitioner also alleges counsel further failed to ascertain that on February 15, 2007, petitioner did not "refuse to go to court, saying he was not going to court without a fight." Petitioner states that he had questioned deputies as to a change in the strip search procedure, and that deputies responded by rushing the cell, punching and kicking petitioner, shooting petitioner with "mace balls," and pushing petitioner into an elevator wall. Petitioner alleges that counsel refused to take any action despite petitioner's complaints and "failed to confront witnesses about the unprovoked and unjustified quality of their actions." Finally, petitioner contends counsel failed to rebut the Commonwealth's argument that petitioner ran away from police into a "stranger's house" by establishing that petitioner lived in the townhouse with his mother.

The Court holds that [Porter's claim] satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland.* Petitioner fails to allege how the punishment or response petitioner may have received following each event serves to mitigate petitioner's actions. The record, including the trial transcript and the September 8, 2009 affidavit of counsel, demonstrates that counsel had investigators review the nearly 100 convictions and unadjudicated bad acts the Commonwealth intended to rely on during the sentencing phase of trial and obtain as much information as possible about each incident. Counsel personally visited Wallens Ridge and Red Onion State Prisons to obtain information about the incidents that took place while petitioner was an inmate at these facilities. Counsel also cross-examined witnesses about the incidents. Counsel attempted to elicit testimony that a guard had overheard the victim in the 1998 incident say something to petitioner prior to the altercation, which the officer denied. Counsel further elicited testimony that petitioner required medical treatment after the 1998 incident.

As to the Adkins incident, counsel specifically questioned Adkins as to whether his testimony had changed from his initial report, and Adkins clarified his testimony. As to the 1997 incident, counsel attempted to present evidence that the victim verbally provoked petitioner, but the court sustained the Commonwealth's objection to such testimony on the grounds that "words never justify an assault." Counsel reasonably followed up with questions regarding whether the inmate ever made physical advances toward petitioner, in order to demonstrate that petitioner had been provoked. Counsel also pursued this line of questioning because petitioner had told counsel that the victim was "queer."

As to the February 15, 2007 incident, counsel questioned the testifying deputy as to whether the officers had changed the procedures by which petitioner was searched to find out "if there was any particular reason why this may have caused this event to take place." Further, the deputy testified that petitioner was physically handled, by stating officers "took him down," held him against a wall so he could not move, pushed him into his cell, and "forced him in there hard." Finally, petitioner cites no support in the record for his assertion that he resided in the townhouse to which he fled during a police chase. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

*Porter II*, 722 S.E.2d at 544-46.

**A.  Reasonable Application of the Facts?**

Porter contends that his trial counsel made no attempt to provide proper context at the sentencing phase of his trial. Porter contends that the state habeas court's decision was based on two unreasonable determinations of fact. First, Porter contends that the court's finding that his trial counsel had their investigators "obtain as much information as possible about each incident" is solely supported by his trial counsels' self-serving affidavit. Porter represents that available evidence—including investigator and prison inmate testimony—shows that no such investigation took place. (Fed. App. 511, 566) (affidavits of Daryl Van Horne and Jennifer Schweizer). Second, Porter represents that the *only* investigation his trial counsel claim to have personally undertaken related to the altercations in Wallens Ridge or Red Onion State Prisons, was meeting with one unidentified inmate at either Wallens Ridge or Red Onion State Prisons. Porter argues that the state court's decision rested on an unreasonable determination of the facts and its process of making its factual determinations regarding the scope of counsels' investigation was so defective that the decision deserves no deference. Porter argues that the state habeas court's finding that his trial counsel cross-examined some witnesses is nonresponsive to Porter's claim that his trial counsels' deficient investigation prevented them from effectively rebutting the prosecution's evidence at the sentencing phase of his trial.

Porter argues that the state habeas court made an unreasonable finding of fact that he did not make a prejudice argument in a portion of his claim. Porter contends that an explanation of the circumstances of Porter's prior bad acts would have taken weight off the aggravating side and added weight to the mitigating side, because jurors would have learned that Porter was not a violent and unpredictable aggressor but instead a man reacting—albeit in ways that demonstrated his limited life experiences—to the violent circumstances that confronted him.

Porter also claims that the state habeas court's finding, that he cited "no support in the record for his assertion that he resided in the townhouse to which he fled during a police chase," is rebutted by the record. Regarding whether this information was properly before the Court,

Porter argues that he had originally cited to the relevant entry in his affidavit in the long petition that Porter submitted to the state court with his motion to exceed the 60-page limit. Porter contends that, when counsel edited the long petition to comport with the page limit, the reference to the record was inadvertently deleted. Porter notes that other pages of Porter's affidavit were cited in support of this claim in his 60-page petition. (Fed. App. 141–42); *see also* ECF No. 52, at 12–13 (finding that Porter presented claim that he lived in the townhouse to the state court).

Regarding Porter's claim that the state habeas court erred regarding whether he resided in the townhouse to which he fled during a police chase, the only piece of evidence that Porter cited was a trial exhibit showing an arrest warrant, (*see* Fed. App. 142-43; SH App. 4541-45). This evidence is unpersuasive because the address of the townhouse to which he ran was not given at trial or in his state petition. (SH App. 3416-20; State Habeas Pet 37-38, Fed. App. 142-43). Moreover, Porter's second citation to his own affidavit (SH App. 8257-58) was not cited in his state petition, (*see* Fed. App. 142-43). There is no indication that the Court did not consider Porter's affidavit or the record, however. The Court finds that Porter has not met his burden to show that the state habeas court's finding was unreasonable.

Regarding whether the state habeas court erred by finding that Porter's counsel obtained as much information as possible, Porter bases his arguments on affidavits from Daryl Van Horn and Jennifer Schweizer—two investigators on Porter's defense team at trial. Porter notes that the investigator's recollections differ from those of his trial counsel. (*See* Fed. App. 456).[10] Porter's argument that the state habeas court's related finding was unreasonable has not been adequately supported by convincing evidence. Porter does not present any convincing evidence

---

[10] This Court has previously held that Jennifer Schweizer's affidavit was before the state habeas court because it was appended to Porter's opposition to the Warden's Supplemental Motion to Dismiss the state habeas petition. (ECF No. 52 at p. 14) (citing Fed. App. 500 n.6, ECF No. 22-17; *Porter II*, 722 S.E.2d at 538). The Court further held that it was not apparent that Van Horn's affidavit was before the state habeas court but that Van Horn's affidavit does not present any new facts that are material to this claim because he was the investigator for the guilt phase of Porter's trial. (ECF No. 52 at p. 14). As such, the Court will take into consideration Jennifer Schweizer's affidavit.

contradicting the affidavits of Porter's trial counsel stating that they performed an adequate investigation. Further, the state habeas court's finding is more appropriately interpreted as stating that "Porter's trial counsel conducted a reasonable investigation."

Regarding Porter's second argument that the state habeas court erred when it found that his trial counsel cross examined witnesses about the incidents, Porter's citation to Schweizer's affidavit is not dispositive because her affidavit indicates only that she did not interview anyone regarding Porter's unadjudicated acts. (Fed. App. 511) ("I did not interview any witness or victim relating to the 76 unadjudicated bad acts.") This does not contradict Porter's trial counsels' assertion that they personally conducted such interviews. (*See id.* at 442). To the extent that Porter relies on his own affidavit or the testimony of prison inmates, the Court finds that such testimony does not rise to the level of showing by clear and convincing evidence that the state habeas court's finding was unreasonable. The state habeas court had at least some basis for its finding considering that Porter's trial counsel submitted sworn statements. (*Id.* at 442, ¶ 9).

To the extent that the state habeas court made a factual finding that Porter failed to argue that he was prejudiced, *see Porter II*, 722 S.E.2d at 545, Porter has not proffered convincing evidence to the contrary. Porter makes a legal argument that explaining the circumstances of his prior bad acts would have lessened the effect of the aggravating evidence and increased the strength of his mitigation evidence. However, to the extent that the state habeas court's statement is a factual finding, Porter's explanation does not make the state habeas courts finding unreasonable. At most, Porter merely differs in opinion as to state habeas court's the interpretation of his argument. This issue is a question of law that will be addressed in the next section.

### B. Reasonable Application of the Law?

Porter's trial counsel acted reasonably and the state habeas court reasonably applied the applicable federal law to the facts. The state habeas court expressly found that:

> The record, including the trial transcript and the September 8, 2009 affidavit of counsel, demonstrates that counsel had investigators review the nearly 100 convictions and unadjudicated bad acts the Commonwealth intended to rely on during the sentencing phase of trial and obtain as much information as possible about each incident. Counsel personally visited Wallens Ridge and Red Onion State Prisons to obtain information about the incidents that took place while petitioner was an inmate at these facilities. Counsel also cross-examined witnesses about the incidents.

*Porter II*, 722 S.E.2d at 545-47. Porter's evidence to the contrary, mainly consisting of his own affidavit and the affidavits of prisoners that stated that they were not interviewed as a part of any investigation, (*see* SH App. 5133, 5136, 5209, 5247, 5495-98), is not dispositive. The record reflects that after an investigation, Porter's counsel chose to rely on cross-examination of the prosecution's witnesses as opposed to another tactic. (*See id*). All of this evidence was before the state habeas court, (*See* Fed. App. 139-48) (Claims E and F of Porter's state habeas petition), which then made a credibility finding. Porter's trial counsel expressly stated that they personally went to both of the prisons at issue and interviewed the inmates and corrections officers involved. (*Id.* at 442 ¶ 9).

Porter contends that his trial counsel did not appropriately investigate the circumstances of his attack on Downey. Porter contend that had his counsel properly investigated the incident, they would have known that Downey yelled at Porter "Suck my Dick" prior to the altercation. (Am. Pet. 56). Due to this purported failure, Porter argues that his trial counsel were unable to effectively place the attack in a proper context. However, as the state habeas court notes, the trial court sustained the prosecution's objection that "words never justify an assault." (SH App. 3430). Porter's trial counsel could not have rendered unreasonable representation by failing to provide this "context." Instead, Porter's trial counsel subsequently attempted to establish that Porter by questioning whether Downey made some type of homosexual advance. (*Id.* at 3428-33). This representation was objectively reasonable.

Porter cannot meet the performance prong of the *Strickland* test and, based on these facts, the state habeas court applied the correct legal rule in a reasonable way.

47

Even assuming that Porter's version of the events in his affidavit were true and: (1) the violent events that took place at multiple prisons would have been softened by some beneficial context, and (2) the house that he ran away into was his mother's, the Court finds that there is a low probability that at least one person the jury would have come to a different decision on Porter's future dangerousness considering the evidence proffered by the prosecution including: the number and nature of Porter's violent unadjudicated acts and criminal convictions, audiotapes of portions of two telephone conversations between Porter and an unidentified female recorded during Porter's incarceration, which the Commonwealth introduced because they were "directly relevant to the issue of the defendant's lack of remorse" and included Porter bragging that he was a "good shot," and the testimony of Officer Reaves's wife and sister—each describing the devastating impact of Officer Reaves's death upon his extended family. *Porter I*, 661 S.E.2d at 424. Additionally as the Warden points out, any mitigation evidence relying on the testimony of inmates would be subject to heavy impeachment and scrutiny. Further, any attempt to provide context for the multitude of violent incidents would also have the effect of highlighting Porter's record of disobedience and violence. Porter would also have had to subject himself to cross-examination to the extent that he relies on facts highlighted in his affidavit. *See infra* Claim Fourteen. As such, Porter cannot meet the prejudice prong of *Strickland*.

In sum, the state habeas court did not unreasonably apply the facts or the law.

## X.  Claim Ten: Ineffective Assistance Claim Regarding Prison Investigation

The state habeas court held that:

> In Claim (III)(F)(1), petitioner alleges he was denied the effective assistance of counsel because counsel failed to present accurate evidence of petitioner's experience in juvenile detention and the conditions under which he resided. Petitioner alleges "the prosecution painted juvenile detention as offering Porter a wealth of benefits that he rejected," and contends that counsel should have established that the juvenile detention facilities were "violent, overcrowded, stressful, and unsanitary." Relying on a 1992 report, and affidavits from a former Norfolk Detention Center Supervisor and a fellow inmate, petitioner alleges that treatment and rehabilitation were impossible due to the conditions, and that the juveniles were in the facilities, "first and foremost, for punishment."

The Court holds that Claim (III)(F)(1) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland.* The record, including the trial transcript, demonstrates that the Commonwealth argued that petitioner was committed to several juvenile detention centers, which included "all the services that can be offered." Further, petitioner does not allege that he was denied any specific support services. To the contrary, the affidavit submitted by petitioner from Lanett W. Brailey, a teacher at one of the juvenile correctional centers in which petitioner resided, indicates that petitioner was recommended for, and received, special education classes. Petitioner fails to allege how the sentencing outcome would have been different had counsel presented information concerning the general conditions of these facilities. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

In Claim (III)(F)(2), petitioner alleges he was denied the effective assistance of counsel because counsel failed to present evidence of the conditions under which petitioner lived while in prison, which would have given a context to jurors for his prison behavior and shown that he acted in the interest of self-preservation. Petitioner contends that counsel should have presented evidence that petitioner lived for four years in stressful and inhumane conditions, and that inmates at Wallens Ridge and Red Onion State Prisons were subjected to being beaten, electrically shocked, and strapped to a bed. Petitioner argues that guards frequently called inmates, including petitioner, by racial slurs. Specifically, petitioner claims that guards harassed him due to his religious beliefs and because he had a female friend of a different race. According to petitioner, prisoners were often punished severely for even minor infractions.

The Court holds that Claim (III)(F)(2) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland.* Other than his claims that he was verbally abused because of his relationship with a woman of another race and his religious beliefs, petitioner does not allege that the evidence he contends counsel should have proffered was related to petitioner's individual experience. This Court has held that "evidence regarding the general nature of prison life" is not admissible even if used to rebut the aggravating factor of future dangerousness. *Bell v. Commonwealth,* 264 Va. 172, 201, 563 S.E.2d 695, 714 (2002) (internal quotation marks and alteration omitted), *cert. denied,* 537 U.S. 1123, 123 S. Ct. 860, 154 L.Ed.2d 805 (2003). Furthermore, petitioner fails to allege how the sentencing outcome would have been different had the jury understood that petitioner's violent acts in prison were fueled by petitioner's alleged need to act in the interest of self-preservation given the general nature of prison life or petitioner's having been taunted. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

In Claim (III)(F)(3), petitioner alleges he was denied the effective assistance of counsel because counsel failed to present evidence of petitioner's successful adaptation to prison life. Petitioner asserts that he was well regarded by fellow inmates who considered him to be generous and able to avoid trouble. Petitioner received a report from a counselor at Red Onion that he was a satisfactory worker as a "Houseman," and was a respectful employee. Petitioner contends that this information, had it been presented to jurors, would have

lessened his moral culpability and tended to show that he did not pose a future danger to society if sentenced to life imprisonment.

The Court holds that Claim (III)(F)(3) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland*. During the penalty phase, counsel argued that petitioner's incarceration for life was appropriate because petitioner had been in the penitentiary for seven years and had incurred only two infractions, and that in all of his previous convictions he had either pleaded guilty or cooperated against a codefendant. Petitioner has not established that additional testimony from fellow inmates, who would be subject to cross-examination, or the admission of one prison record indicating that in an annual review petitioner received a satisfactory work report, but also stating that petitioner needed to "abstain from socially inappropriate behavior," would have increased the likelihood of the jury sentencing petitioner to life imprisonment. Thus, petitioner has failed to demonstrate that counsel's performance was deficient or that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

*Porter II*, 722 S.E.2d at 546-47.

## A.  Reasonable Application of the Facts?

Porter contends that the state habeas court made an unreasonable finding of fact when it dismissed the first two portions of the claim—regarding juvenile detention and prison conditions—based on a finding that Porter failed to allege *Strickland* prejudice for these portions. *Id.* at 546.

### i.  Juvenile Detention Evidence

Porter argues that the state habeas court unreasonably found that Porter had failed to allege prejudice regarding "how the sentencing outcome would have been different had counsel presented information concerning the general conditions of these facilities." *Porter II*, 722 S.E.2d at 546. There is little, however, that indicates that the findings of the state habeas court were unreasonable. While Porter disagrees with the state habeas court's interpretation of the evidence and notes that the court did not address the specific evidence that Porter proffered, (*see* Am. Pet. 67), the holding of the state habeas court does not indicate that it did not review the evidence; merely that it classified some of the evidence as "information concerning the general conditions" of Porter's confinement. *Porter II*, 722 S.E.2d at 546. Porter has not met his burden to show that the state habeas court made an unreasonable factual finding.

### ii.  Prison Conditions

Porter claims that the state habeas court made an erroneous finding regarding his prison experiences. Porter notes that he proffered evidence in an attempt to place his violent acts in context. To that effect, Porter cited to Department of Corrections records; interviews with inmates and professionals who investigated, reported on, or sued over the conditions at the prisons; and publicly available reports, news articles, and court documents. (Am. Pet. 145) (citing SH 4834-40, 4893-99, 4956-5099, 5122-89, 5204-10, 5233-38, 5243-44, 5282-83, 53465458, 5480-84, 5492-5500, 7678-96, 7805-49, 7901-8044). Porter also cited to evidence that guards harassed and dehumanized inmates by calling them racial slurs. (*Id.*) (citing SH 4834-35, 4893-95, 5123-24, 5132, 5143, 5205, 5347, 5481, 5494, 5524-25). Porter also cited to evidence detailing abuse that was typical in the jails. (*See id.* at 145-46). Porter then describes how guards directed racial and religious slurs at him and avers that correctional officer Adkins told him to "[g]et off your flying carpet and eat, bitch" before Porter attacked him. (*Id.*)

Porter's argument is, in effect, one based on the state habeas court's application of *Strickland*. The state habeas court did not mention that Porter proffered at least some mitigation as to why he attacked correctional officer Adkins. Porter does not present a case with substantially similar facts that contradicts the state habeas court's finding that the applicable evidence did not bear on Porter's character, prior record, or the circumstances of his offense. To the extent that the state habeas court made a finding, Porter has not met his burden to show that the state habeas court made an unreasonable factual finding and there is no indication that the state habeas court did not consider the entire record before it. This argument will be further discussed in the section below on the state habeas court's application of the law.

### iii.  Evidence Regarding Porter's Adaptability

Porter contends that the state habeas court erred when it refused to consider the context of Porter's good behavior. Porter essentially contests the state habeas court's interpretation of his mitigation evidence. Porter does not present a case with substantially similar facts that

contradicts the state habeas court's finding. Porter's argument is, in effect, one based on the state habeas court's application of *Strickland*. To the extent that the state habeas court made a finding, Porter has not met his burden to show that the state habeas court made an unreasonable factual finding. This argument will be further discussed in the section below on the state habeas court's application of the law.

### B.  Reasonable Application of the Law?

#### i.  State Habeas Court's Individual Assessment of Porter's Claims

Porter contends that the state habeas court improperly split the evidence of his experience in various juvenile detention centers, experience in prison, and his positive adaptation to prison into three separate claims. As such, Porter argues that the state habeas court improperly applied *Strickland* because it found that Porter had failed to allege prejudice for the first two claims when he asserts that he did. (*See* Fed. App. 148).

In Porter's state habeas claim, he stated that his counsel was on notice but unreasonably failed to investigate and present accurate evidence of his prior correctional experiences and his good adjustment to incarceration. (*See id.* at 143). Porter then forecasted that he could prove at an evidentiary hearing certain facts and split his state habeas claim into three sets of evidence— juvenile detention conditions, prison conditions, and his adaptation to prison life. (*See id.* at 143-48). However, it is only in the section on his successful adaptation on prison life that Porter mentioned prejudice. (*See id.* at 148). Porter stated that:

> Counsel's failure to present information in DOC files, to investigate leads contained in those files, and to share related public information about the DOC facilities, undermines confidence in the jurors' sentencing decisions. Jurors would have seen Porter's 'unadjudicated criminal conduct' in a new light that greatly lessened his moral culpability. They would have heard insightful testimony about Porter's character and successful adaptation to prison.

(*Id.*) There is little indication that Porter meant the aforementioned phrase to refer to his sections regarding juvenile detention or prison conditions. These statements could easily be interpreted as referring to evidence of a work report from a counselor at Red Onion State Prison

that Porter alleges that his trial court counsel neglected to present to the jury. As such, the state habeas court reasonably split Porter's claim and held that Porter failed to allege prejudice for the first two portions of this claim. It must be noted that Porter bears the burden to present persuasive and legally sufficient claims. As such, Porter cannot satisfy the prejudice requirement of *Strickland* regarding these portions.

### ii. Juvenile Detention Evidence

For the sake of argument, the Court will endeavor to assess this claim as if Porter had alleged prejudice in each separate portion. Porter argues that the state habeas court unreasonably found that Porter failed to allege prejudice regarding "how the sentencing outcome would have been different had counsel presented information concerning the general conditions of these facilities." *Porter II*, 722 S.E.2d at 546. Porter implies that the state habeas court refused to consider his evidence of the appalling conditions at the juvenile detention facilities in which he was housed as a child.

The state habeas court then went on to essentially hold that Porter did not meet the performance prong of *Strickland* because he could not meet his burden to show that such evidence was sufficiently valuable as mitigation evidence. The Court is inclined to agree with the state habeas court regarding its prejudice analysis.

There is no indication that the state habeas court refused to consider Porter's evidence. In any event, while the evidence regarding Porter's juvenile detention may provide some context and some mitigation as evidence pertaining to moral culpability, as the state habeas court notes, the mitigation evidence is lessened by certain facts. Porter was not denied any rights or services in the juvenile detention centers and was actually assigned special education classes. The contextual evidence of "Dickensian conditions" in the juvenile detention centers in which Porter was housed is not enough to counter the strength of the aggravating evidence. As such, the Court holds that Porter has not demonstrated that there is a reasonable probability that, but for counsels' alleged error, the result of the proceeding would have been different.

Regarding the performance prong, Porter alleges that his trial counsel failed to investigate and present accurate evidence of his correctional experiences as a juvenile. Porter's trial counsel stated that they assigned investigators on the defense team to thoroughly review and report on any additional information regarding each prior conviction and unadjudicated bad act. (Fed. App. 442). Because these facts are disputed, the Court will rest its analysis on the prejudice prong of *Strickland*.

### iii.  Prison Conditions Evidence

Porter implies that the state habeas court refused to consider his evidence regarding the inhumane conditions of the prisons in which he was incarcerated, thus, in some way improperly applying the *Strickland* test. Porter infers that the state habeas court appeared to have discounted Porter's prison conditions related evidence altogether. (*See* Am. Pet. 67) (citing *Porter II*, 722 S.E.2d at 546).

In determining prejudice, the state habeas court was required to evaluate the mitigation evidence available, including evidence adduced in the habeas proceeding, and weigh it against the evidence in aggravation. *See Emmett v. True*, CIV.A. No. 7:05-CV-00329, 2006 WL 482417, at *13 (W.D. Va. Feb. 27, 2006) (citing *Williams*, 529 U.S. at 397-98). However, "as a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-787 (2011).

Porter cites to *Skipper v. South Carolina* for the proposition that the state habeas court improperly dismissed Porter's evidence as generalized prison conditions evidence, thus, depriving Porter of the opportunity to present evidence of the context of his good adjustment in exceptionally difficult circumstances. (*See* Am. Pet. 67) (citing *Skipper v. South Carolina,* 476 U.S. 1, 7 n.2 (1986)). The Supreme Court of Virginia acknowledges that a defendant is always entitled to present relevant mitigating evidence in a capital case. *Lawlor v. Commonwealth*, 738

S.E.2d 847, 881-82 (Va. 2013) (citing *Skipper*, 476 U.S. at 4; *Simmons v. South Carolina*, 512 U.S. 154, 164 (1994)). In *Morva v. Commonwealth*, the Supreme Court of Virginia noted that it has previously held that "the United States Constitution does not limit the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." 683 S.E.2d 553, 564-65 (Va. 2009) (quoting *Burn*, 541 S.E.2d at 893). The Supreme Court of Virginia has firmly established, however, that to be admissible, evidence relating to a prison environment must connect the specific characteristics of the particular defendant to his future adaptability in the prison environment. *Juniper*, 626 S.E.2d at 424. Such evidence must also be peculiar to the defendant's character, history, and background in order to be relevant to the future dangerousness inquiry. *Id.* at 423-24. As such, the Supreme Court of Virginia has held that conditions of prison life and the security measures utilized in a maximum security facility are not relevant to the future dangerousness inquiry unless such evidence is specific to the defendant on trial and relevant to that specific defendant's ability to adjust to prison life. *Id.* at 423-24.[11]

In characterizing the remainder of Porter's evidence as "evidence regarding the general nature of prison life" and citing to *Bell v. Commonwealth*, 563 S.E.2d 695, 714 (Va. 2002) in support of the proposition that such evidence would not be admissible even if used to rebut the aggravating factor of future dangerousness, the state habeas court appears to have applied this jurisprudence to Porter's mitigation evidence because it related, at least in part, to general prison conditions and was not just evidence related to "context" or "moral culpability." There is no indication that the Supreme Court of Virginia's application of these standards are unconstitutional.

---

[11] Such holdings typically have been expressed where a petitioner attempted to use "evidence of restrictions on a prisoner's physical capacity to commit violence due to generalized prison conditions" in order to mitigate future dangerousness. *Lawlor*, 738 S.E.2d at 882. Porter attempts as much in the next section where he argues that the state habeas court should have granted his motion to appoint Dr. Cunningham as his mitigation expert.

To the extent that Porter argues that the state habeas court refused to weigh such evidence as it relates to context or moral culpability, the state habeas court explicitly stated that "petitioner fails to allege how the sentencing outcome would have been different had the jury understood that petitioner's violent acts in prison were fueled by petitioner's alleged need to act in the interest of self-preservation given the general nature of prison life or petitioner's having been taunted." *Porter II*, 722 S.E.2d at 546. Porter's assumption that the state habeas court simply discounted his mitigation evidence also ignores a more reasonable reading of the state habeas court's holding: that Porter's counsel could not have rendered deficient representation by failing to proffer evidence that would have been inadmissible at trial. Porter, thus, has not met his burden on the performance prong of *Strickland*.[12]

In any event, Porter has not satisfied the prejudice prong of *Strickland*. Much like the context evidence regarding Porter's experience in various juvenile detention facilities, while Porter's proffer of his experiences in various prisons may provide some context and some mitigation, as stated below, *infra* Claim Fourteen, it is not enough to counter the strength of the aggravating evidence. *See Porter I*, 661 S.E.2d at 424. As such, the Court holds that Porter has not demonstrated that there is a reasonable probability that, but for counsels' alleged error, the jury would not have found that Porter was a future danger to society.

### iv.  Evidence Regarding Porter's Adaptability

The Court finds that Porter has not satisfied the prejudice prong of *Strickland*. Porter must mitigate strong aggravating evidence, including: (1) Porter's prior convictions, (2) audiotapes of portions of two telephone conversations between Porter and an unidentified female recorded during Porter's incarceration, which the Commonwealth introduced because they were "directly relevant to the issue of the defendant's lack of remorse" and included Porter

---

[12] As stated previously, Porter's trial counsels' strategic decision not to present such evidence is afforded heavy deference. As stated in Claim Nine, Porter's trial counsel performed an adequate investigation of Porter's prison experiences. It follows that their decision not to use such evidence was reasonable.

bragging that he was a "good shot," and (3) testimony of Officer Reaves's wife and sister—each describing the devastating impact of Officer Reaves's death upon his extended family. *Porter I*, 661 S.E.2d at 424. As the state habeas court noted, Porter's evidence of his successful adaptation to prison life would be weakened by the fact that any additional testimony from fellow inmates, would be subject to impeachment on cross-examination. Additionally, the impact of the work report referred to by Porter would be weakened by the fact that the report also stated that Porter needed to "abstain from socially inappropriate behavior." *Porter II*, 722 S.E.2d at 547. Porter's contention that he would have been viewed by the jury in a different light ignores the fundamental fact that he has an extensive history of violent conduct in prison. As such, Porter cannot satisfy the prejudice prong of *Strickland*.

As stated previously, Porter's trial counsels' strategic decision not to present such evidence is afforded heavy deference. Porter's trial counsel performed an adequate investigation. *See supra* Claim 9. Their decision not to use such evidence was reasonable in light of its minimal, and possibly counterproductive, effect as mitigation evidence. Thus, Porter cannot meet the performance prong of *Strickland* and the state habeas court did not unreasonably apply the applicable law.

## XI.    Claim Eleven: Whether Porter's Rights Were Violated Under the 8th and 14th Amendments When he was Denied the Assistance of a Risk Assessment Expert

The Supreme Court of Virginia held, in part, that:

> After the circuit court had appointed a mental health expert and a neuropsychological expert to assist in Porter's defense, Porter filed the Prison Expert Motion requesting that Dr. Mark D. Cunningham be appointed "as an expert on the assessment of the risk of violence by prison inmates and, in particular, the risk of future dangerousness posed by the defendant if incarcerated in a Virginia penitentiary for life." The circuit court denied the motion and Porter assigns error to that ruling because it did not allow him "to rebut the Commonwealth's allegation that the defendant constitutes a continuing threat to society, and also to establish, as a mitigating factor, that the likelihood of further serious violence by the defendant was low."
>
> . . . .
>
> Porter's Prison Expert Motion for appointment of Dr. Cunningham is notable for an essential, but missing, element. At no place in the motion does he

proffer that Dr. Cunningham's statistical analysis of a projected prison environment will "focus . . . on the particular facts of [his] history and background, and the circumstances of his offense." *Burns*, 261 Va. at 340, 541 S.E.2d at 893; *see* Code §§ 19.2–264.2 and Code § 19.2–264.4(C). Nothing in Porter's motion is a proffer of an "individualized" or "particularized" analysis of Porter's "prior criminal record," "prior history", his prior or current incarceration, or the circumstances of the crime for which he had been convicted. *See id.*, *Juniper*, 271 Va. at 427, 626 S.E.2d at 424, *Bell*, 264 Va. at 201, 563 S.E.2d at 714, *Burns*, 261 Va. at 339–40, 541 S.E.2d at 893.

Porter's proffer in the motion was that Dr. Cunningham would testify as to a statistical projection of how prison restrictions could control an inmate (situated similarly to what he would project Porter to face) in a likely prison setting. Nothing in this proffer relates to the essential statutory elements in Code §§ 19.2–264.2 and 19.2–264.4 that focus the future dangerousness inquiry on the defendant's prior history, prior criminal record and/or the circumstances of the offense. Additionally, nothing in Porter's proffer analyzes our application of this statutory directive to the "defendant's character, history and background." Not only is the Prison Expert Motion devoid of any reference that the proffered evidence would be "individualized" or "particularized" to Porter, his post conviction Motion for a New Trial was similarly silent.

. . . .

Porter's proffer in the Prison Expert Motion fails to address the statutory factors under Code § 19.2–264.2 and 19.2–264.4(C) as being individualized and particularized as to Porter's prior history, conviction record and the circumstances of the crime. As our precedent would render inadmissible the statistical speculation he does offer, Porter has failed to show the "particularized need" necessary to meet the *Husske* test. "In light of the inadmissibility of the evidence that [Porter] sought to introduce through the expert, he also failed to establish how he would be prejudiced by the lack of the expert's assistance." *Bell*, 264 Va. at 201, 563 S.E.2d at 715. Accordingly, we conclude that the circuit court did not abuse its discretion in denying the Prison Expert Motion.

*Porter I*, 661 S.E.2d at 434, 437, 440, 442 (internal footnotes omitted).

## A.  Reasonable Application of the Law and Facts?

The Constitution requires that indigent defendants be provided with the "basic tools for an adequate defense"; namely, that such individuals receive the tools necessary to subject the prosecution's evidence to "meaningful adversarial testing." *See United States v. Cronic*, 466 U.S. 648, 656 (1984). Typically, "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985). The Supreme Court of Virginia has established a separate but related test for

non-psychiatric experts. Under *Husske v. Commonwealth of Virginia*, the appointment of non-psychiatric experts is only required if an indigent defendant has made a "particularized showing of the need for the assistance of such experts." 476 S.E.2d 920, 925 (Va. 1996).[13] Further, "a determination of future dangerousness revolves around an individual defendant and a specific crime. Evidence regarding the general nature of prison life in a maximum security facility is not relevant to that inquiry, even when offered in rebuttal to evidence of future dangerousness." *Burns v. Commonwealth*, 541 S.E.2d 872, 893 (Va. 2001). The "particularized need" standard set forth in *Husske* has repeatedly been held to be within the federal constitutional standard articulated in *Ake. Yarbrough*, 490 F. Supp. 2d at 719-20 (collecting cases supporting the proposition that the *Husske* standard passes constitutional muster).

The Virginia Capital punishment statute requires the jury to make a two-stage determination. The jury first decides whether the prosecutor has established one or both of the statutory aggravating factors. Va. Code §§ 19.2–264.4(C), (D). If the jury finds neither aggravator satisfied, it must impose a sentence of life imprisonment. *Id.* If the jury finds one or both of the aggravators established, however, it has full discretion to impose either a death sentence or a sentence of life imprisonment. *Id.* At trial, the jury found that Porter was likely to

---

[13] The Supreme Court of Virginia stated that

> [A]n indigent defendant's constitutional right to the appointment of an expert, at the Commonwealth's expense, is not absolute. We hold that an indigent defendant who seeks the appointment of an expert witness, at the Commonwealth's expense, must demonstrate that the subject which necessitates the assistance of the expert is likely to be a significant factor in his defense, and that he will be prejudiced by the lack of expert assistance. An indigent defendant may satisfy this burden by demonstrating that the services of an expert would materially assist him in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial. The indigent defendant who seeks the appointment of an expert must show a particularized need: Mere hope or suspicion that favorable evidence is available is not enough to require that such help be provided. This particularized showing demanded is a flexible one and must be determined on a case-by-case basis. The determination whether a defendant has made an adequate showing of particularized necessity lies within the discretion of the trial judge.

*Husske*, 476 S.E.2d at 925-26 (internal citations omitted).

59

"commit criminal acts of violence that would constitute a continuing serious threat to society." Va. Code § 19.2-264.4(C).

The Supreme Court of Virginia found that Porter's proffer in his Prison Expert Motion was that Dr. Cunningham would testify as to a statistical projection of how prison restrictions could control an inmate in a likely prison setting. *Porter I*, 661 S.E.2d at 440. Porter attempts use this Court as another venue to challenge the status quo of Supreme Court of Virginia jurisprudence regarding risk assessment experts. (*See* Am. Pet. 71) ("[T]he state court limited the universe of admissible mitigating evidence to the defendant's character, prior record, and circumstances of the offense. That limitation is unconstitutional."). Porter does not point to any Supreme Court cases that invalidate the relevant Virginia precedent and, thus, this claim fails.

## DEFAULTED CLAIMS

### XII.     Claim Twelve: *Brady* Claim Regarding Jim Downey
#### A. Background Facts

Porter represents that Downey's testimony was vital to the prosecution's case against him in the sentencing phase of his trial. Downey was reportedly the only witness offered by the prosecution who claimed to have suffered serious physical injury as a result of an encounter with Porter. At the closing and rebuttal arguments of sentencing, the prosecutor reportedly emphasized Porter's "brutal" assault on Downey and the threats that Downey claimed Porter made to get Downey to drop the case. (SH App. 4134-35, 4225). Jim Downey testified that Porter brutally assaulted him in jail with a metal mop wringer in an argument over a cupcake. The assault left Downey with permanent injuries. (*Id.* at 3425-27, 3432-33). Porter now alleges that one prosecutor, Assistant Commonwealth's Attorney Linda Bryant, had an undisclosed agreement with Downey that she would make his probation violation "go away" if he agreed to testify. Porter concludes that the prosecution hid this purported agreement in violation of *Brady.*

### B.  Analysis

The record before the Court contains conflicting testimony in which Porter relies heavily on the testimony of Downey and the Warden relies heavily on the testimony of the prosecutors, particularly Linda Bryant. Even if the Court were to take Downey's word over Bryant's and find that Porter had been diligent as to his *Brady* claim, there is no evidence of prejudice. Downey was used primarily during the sentencing phase of Porter's conviction. Porter essentially argues that Downey's testimony was especially potent aggravation evidence. However, the prosecution also presented other powerful aggravation evidence including: (1) Porter's prior convictions; (2) evidence of several other violent incidents in prison between Porter and fellow inmates and prison guards; (3) audiotapes of portions of two telephone conversations between Porter and an unidentified female recorded during Porter's incarceration; and (4) testimony of Officer Reaves's wife and sister. The evidence regarding Downey was a small part of the evidence presented to the jury by the prosecution in favor of a finding of dangerousness. Specifically, while it is true that Downey was the only witness that was physically attacked by Porter, the evidence of his injuries went to Porter's history as a violent inmate and was, thus, cumulative to the rest of Porter's history of violence while imprisoned. As such, there was not a "reasonable probability" that, had the evidence been disclosed to the defense and Downey's testimony impeached, a juror would have decided differently.[14]

---

[14] The Warden avers that *Brady* does not apply to the extent that Porter asserts a continuing right to exculpatory evidence post-conviction. It is true that "[a] criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man." *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009). Under the *Osborne* framework, "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." *Herrera v. Collins,* 506 U.S. 390, 399 (1993). However, it is also equally true that *Brady* applies to "evidence favorable to an accused that is material to guilt or to punishment." *Cone v. Bell,* 556 U.S. 449, 451 (2009). Downey was used primarily during the penalty phase of Porter's conviction. Porter represents that Downey was the only witness who claimed to have suffered serious injury as a result of Porter's conduct and that the prosecutors used him to impeach Porter's character. Because Porter challenges the prosecution's use of Downey during the penalty phase of his trial, *Brady* applies.

To whatever extent Porter seeks to state a claim under *Napue v. Illinois*, 360 U.S. 264 (1959), he has neither identified any testimony that he can allege is false or impliedly false.

### XIII.   Claim Thirteen: Ineffective Assistance Claim Regarding Testifying In the Sentencing Phase

Porter first argues that the state habeas court prevented his habeas counsel from representing him effectively and presenting this meritorious claim by establishing a page limitation of sixty pages, thereby providing cause to excuse the default of this claim. Pursuant to *Cronic*, a *per se* Sixth Amendment violation may arise where "assistance provided by defense counsel is fatally compromised" to the point where a petitioner has been deprived of assistance of counsel despite actually having counsel. *United States v. Smith*, 640 F.3d 580, 589 (4th Cir. 2011). This constructive denial of counsel arises in situations where the ability of a defendant's counsel to present an adequate defense has been effectively destroyed. *See id.* at 590 (discussing cases where courts have determined that defendant and his counsel's communication had so deteriorated as to prevent the mounting of an adequate defense). The Fourth Circuit expressly "cautioned against 'broaden[ing] the per-se prejudice exception to *Strickland*,' warning that it would 'add an extra layer of litigiousness to ineffective assistance law.'" *Id.* (quoting *Glover v. Miro*, 262 F.3d 268, 277 (4th Cir. 2001)). Porter does not direct the Court to any case in which page limitations of the sort complained of by him implicated concerns of the type delineated in *Cronic*. Porter's argument regarding page limitations is not enough to satisfy the "cause" requirement of *Martinez v. Ryan*. 132 S. Ct. at 1315.

For the sake of argument, the Court will assess Porter's *Martinez* claim in earnest. Regarding the performance prong of Porter's *Strickland* claim, Porter argues that his trial counsel did not advise him of his right to testify during the sentencing phase of his trial. The Warden contends that Porter's trial counsel *did* advise him of this right and that they made a conscious decision to have Porter testify and show his remorse at the guilt phase of the trial. (Fed App. 443, ¶ 17, and 447, ¶ 11). As the Warden points out, Porter's affidavit in support of his

position contains inaccuracies. First, Porter argues in his affidavit, that "[n]o one ever told me that the right not to testify was accompanied by a right to testify." (SH App. 8238). However, immediately prior to Porter's testifying in the guilt phase the trial judge asked if trial counsel were ready "to talk with Mr. Porter about his right to or not testify." (*Id.* at 2924).

Generally, an evidentiary hearing is required unless it is clear from the pleadings, files, and records that a movant is not entitled to relief. *See United States v. Witherspoon,* 231 F.3d 923, 925-26 (4th Cir. 2000); *Raines v. United States*, 423 F.2d 526, 529 (4th Cir. 1970). When a movant presents a colorable Sixth Amendment claim showing disputed facts involving inconsistencies *beyond the record*, a hearing is mandated. *See United States v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992); *Raines*, 423 F.2d at 530 ("There will remain . . . a category of petitions, usually involving credibility, that will require an evidentiary hearing in open court."). The record reflects that Porter's trial counsel explicitly stated

> We advised Porter of his right to testify in both the guilt/innocence and penalty phases of his trial. We also discussed the need to express remorse to the jury. As a matter of trial tactics, we chose not to wait for the penalty phase to do so, but elected to have Porter express his remorse in the guilt/innocence phase of the trial.

(Fed. App. 443, ¶ 17). Such determinations a credibility assessment between Porter and his counsel. *Raines*, 423 F.2d at 530 ("When the issue is one of credibility, resolution on the basis of affidavits can rarely be conclusive, but that is not to say they may not be helpful."). However, as seen below, a hearing is not necessary because Porter cannot meet the prejudice prong of *Strickland*.

At first instance, it must be noted that there is some question as to whether Porter has failed to meet his burden to argue that he was prejudiced by his inability to testify at sentencing. Porter merely argues that, had he been able to testify, he would have presented the jury with testimony consistent with his sworn affidavit and expressed his remorse over Reaves's death. (Am. Pet. 78); (SH App. 8238-75). In any event, Porter cannot establish prejudice.

Porter's testimony consisted of nearly forty pages of mitigation evidence in which he touches upon his early life, experiences in school, criminal past, and his time in prison. Without going into too much detail, Porter described his upbringing in poverty, living in dangerous neighborhoods. Porter detailed how he was periodically beaten by his mother's boyfriends, including George Avant and William Wilson. Porter reported how he watched his mother being physically beaten by her various boyfriends. He detailed how he was beaten by his mother and Cora Gaston. He reported being neglected by Cora Gaston and sent back and forth between caregivers due to lack of interest. Porter details his experiences in school and juvenile detention. Porter detailed his drug dealing experience as an adolescent. He reports that a police officer punched him in his face while he attempted to flee the scene of a crime. He asserts that he ran into his mother's, and not a stranger's, house during the arrest at black stone court. Porter attempts to mitigate his history of violence in prison by asserting that he fought Downey because of homosexual advances. Porter also details how he was tortured, harassed, beaten, denigrated, and called racial and anti-Muslim slurs by prison staff at Wallens Ridge State Prison. Porter attempts to mitigate his attack of a prison guard at Wallens Ridge State Prison. Porter contends that he was placed in long periods of segregation at Red Onion State Prison. He also states that he was called racial slurs at that prison. Porter reports that the guards threatened prisoners with rubber "stinger rounds." (*Id.* at 8269). Finally, Porter reports that he was beaten and threatened while being housed at the Norfolk City Jail while he awaited his trial.[15] Porter also states that he was beaten in the bullpen of the trial court prior to trial.

Even in light of Porter's affidavit, he cannot satisfy the prejudice prong of *Strickland*. Porter was able to express his remorse in the guilt phase of the trial and his trial counsel was able to advise the jury of this testimony during the sentencing phase of the trial. (SH App. 4204). Any further testimony would have been cumulative to an extent. Further, the prosecutors undoubtedly would have elicited evidence probative of his remorselessness including powerful

---

[15] Although the Court does not refer to every detail of Porter's affidavit, the Court considered the entirety of the affidavit.

audiotapes of portions of two telephone conversations between Porter and an unidentified female recorded during Porter's incarceration, which included Porter bragging that he was a "good shot."

At least some of the testimony in Porter's affidavit would not be admissible.[16] Other portions of his affidavit would have contradicted his statements that his mother did a "wonderful job" raising him. (Fed. App. 453) (citing Commonwealth's expert report). Moreover, Porter's testimony would have contradicted his mother's testimony that Porter never suffered any physical abuse. As stated in other sections, Porter ignores the negative implications of subjecting himself to cross-examination on the stand. In weighing the positive and mitigating aspects of Porter's testimony, it is incumbent upon the Court to also weigh the negative and aggravating facts that would have been presented to the jurors. Porter would have had to explain the bad acts that led him to state that he "posed too much of a challenge to the women who raised him," and that he "intentionally violated the rules of the household" as part of his "philosophy of reciprocal retribution." (*Id.* at 451). Porter likely would have given extended testimony about his extensive criminal history and his violent conduct in both juvenile detention facilities and in prison. Specifically, Porter would have been asked about his consistent history of violent conduct against both fellow prisoners and corrections officers. Such evidence is "a double-edged sword that might as easily have condemned [the petitioner] to death as excused his actions." *See Moody*, 408 F.3d at 151. While, Porter's proposed testimony would have provided more context and perhaps made him slightly less morally culpable, it is unlikely that it would have created a reasonable probability that at least one juror would have concluded that the mitigating evidence outweighed the aggravating evidence on the issue of future dangerousness.

---

[16] As stated in the previous claims, at least some of the evidence proffered by Porter would not be admissible at trial because it is in derogation of various rules of criminal procedure or would not be remotely relevant to future dangerousness. Further, some of the information Porter cites to is repetitive and cumulative of information actually presented to the jury.

Assuming he can assert a *Martinez* claim, Porter cannot establish prejudice related to his trial counsels' actions and, thus, his state habeas counsels' actions were not constitutionally deficient under *Martinez.*

## XIV.    Claim Fourteen: Ineffective Assistance Claim Regarding Risk Assessment Proffer

In a motion for the pretrial appointment of Dr. Cunningham to provide risk assessment testimony, Porter's trial counsel indicated that Dr. Cunningham would testify as to a statistical projection of how prison restrictions could control an inmate in a prison setting. The motion included, among other attachments, a declaration from Dr. Cunningham that was submitted in another case, *Gray v. Commonwealth,* 645 S.E.2d 448, 452 (Va. 2007). The trial court denied the motion, and the Supreme Court of Virginia held that Porter had failed to establish that the proposed assessment would be an "individualized" or "particularized" analysis of his history, prior criminal history, or the circumstances of the crime. *Porter I*, 661 S.E.2d at 440-441. The Virginia Supreme Court specifically noted that Porter did not explicitly state that Dr. Cunningham would perform the same type of risk assessment as he did in *Gray*. *Id.* at 441. Porter now argues that his trial counsel's failure to "make a simple, self-evident proffer fell well below the minimum norms expected of an attorney under *Strickland*." (Am. Pet. 80). Porter argues that this failure prejudiced him because Dr. Cunningham was necessary as a key piece of mitigating evidence regarding his criminal history.

### A.  Performance Prong of *Strickland*

Porter cannot satisfy the prejudice prong of *Strickland*. Even assuming that Porter's trial counsel had argued that Dr. Cunningham would provide testimony similar to the testimony he provided in *Gray*, the Supreme Court of Virginia indicated that the proffer Dr. Cunningham prepared for *Gray* was itself not sufficiently individualized to be admissible under its precedent. *See Porter I*, 661 S.E.2d at 441 n.15. The Virginia Supreme Court stated that:

> the tenor of the *Gray* Declaration raises the same issues already discussed with regard to our precedent in *Burns* and *Bell*. Even though Dr. Cunningham has adopted the use of key words like "individualized assessment," the analysis appears to be of the same genre of the rejected proffers of how security measures in a future incarceration may affect a defendant's ability to commit more violent acts. . . . Our precedent is clear that such evidence is not relevant either in rebuttal or mitigation as to the future dangerousness factor.

*Id.* In *Morva v. Commonwealth*, a defendant moved for an expert using a proffer very similar to that in *Gray*. 683 S.E.2d at 566. There, the defendant attempted to utilize Dr. Cunningham to provide risk assessment testimony regarding a statistical analysis of individualized characteristics that reportedly had been shown to reduce the likelihood of future violent behavior in prison, including the defendant's prior behavior while incarcerated, age, level of educational attainment, and appraisals of his security requirements during prior incarceration. *Id.* The proffer in *Morva* is virtually identical to the proffer in *Gray*. *See Porter I*, 661 S.E.2d at 441 n.15 ("For example, he states in the *Gray* Declaration that '[b]ecause risk is always a function of context or preventative interventions, increased security measures can act to significantly reduce the likelihood of Mr. Gray engaging in serious violence in prison.'"); (SH App. 4729) ("This individualized assessment of Mr. Gray will be based on his prior behavior while in [prison], appraisals of his security requirements during prior incarceration, his age, his level of educational attainment, and other features and characteristics regarding him."). Porter could not have been prejudiced by his trial counsel's actions because, even if his counsel had argued that Dr. Cunningham would provide the testimony described in his declaration pursuant to *Gray*, the trial court would have been within its rights to reject such testimony.[17] There is not a reasonable certainty that, but for Porter's trial counsels' failure to object at trial, Porter would

---

[17] Porter's argument that his trial counsel should have attempted to use Dr. Cunningham in the exact way that he was used in *Gray* additionally ignores the fact that the defendant in *Gray* and Porter were not similarly situated. The defendant in *Gray* did not have any record of violence while incarcerated and Dr. Cunningham was able to extrapolate the future dangerousness of Mr. Gray based on this trend of nonviolence. *Gray*, 645 S.E.2d at 455. Porter, on the other hand had a number of violent altercations in both juvenile detention and while incarcerated in multiple jails.

It must be noted that Porter received, among others, a mental health expert (SH App. 186) and a neuropsychological expert, (*id.* at 254), that comported with the constitutional requirements as described in *Ake*. 470 U.S. at 83.

have received a favorable post-conviction ruling from the Supreme Court of Virginia providing him with relief. Thus, Porter cannot meet the performance prong of *Strickland*.

### B.  Prejudice Prong of *Strickland*

As stated previously, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Porter has not met his burden to overcome this deference. Porter has not expressly proffered exactly what Dr. Cunningham, or another expert like him, would testify to if Porter's counsel not been purportedly deficient. Porter has essentially argued that Porter's trial counsel failed "to make a simple, self-evident proffer," implying that Porter's counsel should have done what the Virginia Supreme Court said that he did not. To the extent that Porter argues that his trial counsel should have stated that Dr. Cunningham would provide testimony similar to the testimony he provided in *Gray*, he cannot meet the performance prong of *Strickland*.

In the motion for a risk assessment expert, Porter's trial counsel argued, in part, that Dr. Cunningham should have been allowed to testify as to a statistical projection of how prison restrictions could control Porter in a likely prison setting by utilizing two arguments. First, Porter's trial counsel argued that his motion did not run afoul of Virginia precedent prohibiting testimony on the general nature of prison life or prison society. (*See* SH App. 4716). Second, Porter argued that the Supreme Court of Virginia misinterpreted federal constitutional law when it held that the structure of an inmate's life in maximum security prison was irrelevant to rebut evidence of future dangerousness. (*Id.*) (citing *Burns v. Commonwealth*, 541 S.E.2d 872, 893 (Va. 2001)). Neither of these arguments indicates that Porter's trial counsel somehow misunderstood the applicable standard as Porter now implies. To the contrary, the risk assessment expert motion indicates that Porter's trial counsel appears to have been acutely aware of the applicable precedent. Additionally, while Porter argues that his trial counsel failed to make a "simple" and "self-evident" proffer that Dr. Cunningham would testify to evidence

68

regarding his personal background and history, he is not entirely correct. The Supreme Court of Virginia noted and dismissed as overly vague Porter's trial counsel's related argument that Dr. Cunningham would:

> be able to opine in a scientific matter based on an individualized assessment of Mr. Porter, which includes prior behavior while he was incarcerated in the past, to include the 76 unadjudicated bad acts that the Commonwealth has noticed; appraisals of past security requirements while he was incarcerated; and his age; his level of education and comparative review of the statistical data regarding similarly-situated inmates.

*Porter I*, 661 S.E.2d at 441-42. The record, thus, reflects that Porter's trial counsel at least made a basic argument that Dr. Cunningham's testimony would be individualized, an argument similar to one used and rejected in a subsequent case. *See Morva,* 683 S.E.2d at 563.

The true question is whether Porter's trial counsel rendered constitutionally deficient representation by effectively attempting to challenge the Virginia standard precluding evidence related to prison security and violence. Porter argues that his trial counsel should have simply attempted to use Dr. Cunningham for the same type of testimony that the Supreme Court of Virginia allowed in *Gray*. It is true that Dr. Cunningham's testimony was allowed in *Gray*. 645 S.E.2d at 455. However, in *Gray*, Dr. Cunningham provided an individualized assessment based on a defendant's prior behavior while in prison, appraisals of his security requirements during incarceration, his age, level of education, and other features interpreted in light of group statistical data regarding similarly situated inmates. (SH App. 4729). As the Supreme Court of Virginia noted in *Porter I*, Dr. Cunningham's declaration in *Gray* was, at least, in part the same type of proffer regarding how security measures could affect future dangerousness. *See Porter I*, 661 S.E.2d at 441 n.15. Porter's trial counsel did not render constitutionally deficient representation by attempting to introduce a similar proffer when the Virginia Supreme Court had not wholly rejected Dr. Cunningham's proffer in *Gray*.

Moreover, Porter argues in Claim Eleven that the trial court and the Virginia Supreme Court erred when they refused to allow him to use Dr. Cunningham to testify using group

statistical information. (Am. Pet. 68-72). In his amended petition Porter presents a variety of arguments, virtually identical to those of his trial counsel in his motion for a risk assessment expert. (*See* SH App. 4712-19). It is unclear to this Court how virtually identical arguments could be considered both persuasive in one context and constitutionally deficient in another. It cannot be true that attorneys who make sophisticated constitutional arguments in an effort to challenge existing standards in a particular state render constitutionally deficient representation when at least a colorable argument exists for challenging such precedent. *Cf. United States v. Bourgeois*, 537 F. App'x 604, 657 (5th Cir. 2013) (Dr. Cunningham successfully retained, but not used, as an expert); *United States v. Caro*, 461 F. Supp. 2d 478, 481 (W.D. Va. 2006), *aff'd*, 597 F.3d 608 (4th Cir. 2010) (same).

In sum, Porter cannot satisfy the requirements of *Strickland* and, thus, cannot show that his habeas counsel was deficient pursuant to *Martinez*.

## XV.    Claim Fifteen: Ineffective Assistance Claim Regarding Failure to Object During Closing Argument

The Supreme Court of Virginia held that:

> Porter contends that the circuit court erred during the penalty phase of the trial when it made "prejudicial" comments and "intemperate" curative instructions. Specifically, Porter argues the circuit court "erred by making prejudicial comments concerning the definition of 'society' during defense counsel's closing argument; by stating prejudicial, intemperate, and one-sided 'curative' mid-argument instructions on this point; and by denying the defendant's motion for a mistrial following this incident."
>
> The record shows that the circuit court interrupted Porter's counsel during closing argument in order to instruct the jury that society meant "[e]verybody, anywhere, anyplace, anytime" in response to comments from counsel that "society" meant prison society. When Porter's counsel again made similar remarks, a discussion at the bench occurred which led the court to comment to the jury that "society" was a "definitional word" that was not "complex" and "pretty simple" to understand. At no point during either interruption did Porter's counsel object to the court's comments. At the conclusion of his closing arguments, Porter's counsel moved for a mistrial based on the court's comments, which motion the court denied. The next day, Porter filed a written mistrial motion, which the court also denied.
>
> Porter contends that the court's comments violated his Sixth Amendment right to have counsel present a summation of the evidence to the jury and denied him a fair opportunity to rebut the Commonwealth's allegation that he would be a

continuing threat to society. Porter maintains that the court's comments prejudiced him as the jury could have interpreted the comments as a form of rebuttal from the court in which the court appeared to agree with the Commonwealth's contention that Porter was a continuing threat to society.

We do not consider the merits of Porter's contentions because the record shows that he failed to timely object to any of the circuit court's comments. Rule 5:25. *See also Reid v. Baumgardner*, 217 Va. 769, 774, 232 S.E.2d 778, 781 (1977) (citing *Russo v. Commonwealth*, 207 Va. 251, 256–57, 148 S.E.2d 820, 824–25 (1966)) (finding that an objection must be made at the time words are spoken and the objection is waived if not timely made).

*Porter I*, 661 S.E.2d at 442.

Porter brings a *Martinez* claim, averring that his state habeas counsel was ineffective for failing to argue that he was prejudiced by his trial counsels' failure to immediately object to the trial court's curative instructions. As stated above, *see supra* Claim XIV, Porter's arguments regarding page limitations are insufficient to show "cause" exists to assert a *Martinez* claim. In any event, the Court will address Porter's claim on its merits for the sake of argument.

Porter argues that he was prejudiced by his trial counsels' failure to immediately object to the trial court's curative instructions regarding the proper definition of "society" under Virginia Code § 19.2-264.4 because the Supreme Court of Virginia refused to consider the merits of Porter's contentions. *Porter I*, 661 S.E.2d at 442. Porter's trial counsel did not, for whatever reason, object to the jury instructions after some extended discussion of the merits of the trial judge's position. (SH App. 4167-72). The Court does not have an affidavit containing Porter's trial counsels' logic regarding these actions. However, in Porter's motion for a mistrial, his trial counsel did note that Porter was not attempting to re-define society at the time. (SH App. 564). Porter's trial counsel instead moved for a mistrial due to the perceived prejudicial effect of multiple instructions to the jury that were adverse to Porter and purportedly did not allow him to adequately respond to the prosecutor's evidence regarding the probability that Porter was a continuing threat. (*Id.* at 564-65). The Motion for Mistrial serves as evidence that Porter's trial counsel made a conscious decision not to object to the trial court's jury instructions regarding society because he was not attempting to redefine society. As stated previously, counsel's

strategic decisions are accorded considerable deference and there is a strong presumption that they fell within the wide range of objectively reasonable assistance. Porter's trial counsels' actions were reasonable in light of the fact that the instructions related to "prison society" were not objectionable.[18]

In his amended petition, Porter reasons that his trial counsel's attempt to ask the jury to "focus" on "prison society" was somehow correct. (Am. Pet. 83) ("[P]rison society is obviously a segment of our society at large and it is commonsensical to think about that portion of society closest to someone, such as neighbors or family members, when assessing a person's dangerousness to others."). To the contrary, in Porter's trial counsels' Motion for Mistrial, he argued that the mere implication that Porter had made a "prison society" based argument was improper. (SH App. 565). In any event, it appears that the trial judge did not make any curative instructions that were objectionable. *See, e.g., Pannell v. Commonwealth*, CIV A No. 706-CV-00600, 2007 WL 1047063, at *2 (W.D. Va. Apr. 3, 2007) (concluding that a petitioner provided no valid basis upon which his counsel could have objected to a judges jury instruction). The Court finds that there is no reasonable certainty that the jury's ultimate finding on the issue of dangerousness would not have resulted if Porter's trial counsel had objected to the trial judge's jury instructions on the definition of "society."

Porter contends that the trial court's instructions were prejudicial regarding his counsel's request that juror's "step into Porter's shoes," (SH App. 4174), or his counsel's statement that it was "ironic" that the prosecutors were asking the jury to sentence Porter to death, (*id.* at 4163). Porter cannot meet the performance prong of *Strickland* because such instructions were not objectionable because they were not contested as inaccurate statements of the law by either

---

[18] The trial court sustained the Commonwealth's objections to Porter's misstatement of the "society" at issue under § 19.2-264.4 because "society" means society in general and is not limited to prison society. *See Porter I*, 661 S.E.2d at 437-39; *Lovitt v. Commonwealth*, 537 S.E.2d 866, 879 (Va. 2000), *cert. denied*, 534 U.S. 815 (2001) (because "[t]he statute does not limit this consideration to 'prison society' when a defendant is ineligible for parole, and we decline Lovitt's effective request that we rewrite the statute to restrict its scope."). The trial court's instructions each were aimed at assuring that the applicable standard was clear to the jury.

party. It must be noted that Porter made similar arguments in his Motion for Mistrial that was denied by the trial court.[19] There is not a reasonable certainty that, but for Porter's trial counsels' failure to object at trial, Porter would have received a favorable post-conviction ruling from the Supreme Court of Virginia providing him with relief. Thus, Porter cannot meet the prejudice prong of *Strickland*.

In sum, Porter cannot satisfy *Strickland* or *Martinez* and this claim will be dismissed.

### XVI.   Claim Sixteen: Ineffective Assistance Claim Regarding Valorie Arrington

Porter bases his *Martinez* claim on a theory that his habeas counsel should have brought an ineffective assistance of counsel claim regarding his trial counsels' failure to interview Valorie Arrington at the guilt phase of this trial. Valorie Arrington states that the prosecutors agreed to help get her boyfriend released from jail, and that they then discussed her testimony. Arrington claims that her boyfriend was released shortly thereafter, and she subsequently testified at Porter's trial. Porter argues that evidence of a *quid pro quo* agreement between Valorie Arrington and the Commonwealth would have impeached her by showing a bias or interest in testifying for the prosecution. Porter further maintains that this evidence would also have impeached the other four women who testified about the events in Arrington's apartment, particularly April Phillips who also denied knowledge of the shooting at first. Porter claims that the alleged *quid pro quo* is highly relevant to Claim Five, in which he argues that trial counsel failed to sufficiently rebut Latoria Arrington's testimony, because the jury may have found Latoria less credible if they knew of her mother's *quid pro quo*.

As stated above, *see supra* Claim XIV, Porter's arguments regarding page limitations are insufficient to show "cause" exists to assert a *Martinez* claim. In any event, the Court will

---

[19] To the extent that Porter challenges the jury instruction(s), it is unclear whether this Court has a proper role in assessing the validity of the trial court's jury instructions. "A state court's ruling on matters of state law which do not implicate federal constitutional protections, such as the trial court's determination of what evidence to admit, do not present claims cognizable under § 2254." *Moore v. Johnson*, No. 7:08CV00526, 2009 WL 2474101, at *20 (W.D. Va. Aug. 12, 2009) (citing *Estelle v. McGuire*, 502 U.S. 62, 72 (1991)). A federal habeas court may grant relief only upon finding that the alleged court error under state law "by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

address Porter's claim on its merits for the sake of argument.

The Court finds that no prejudice took place at trial. Even if Porter's contentions about a *quid pro quo* arrangement between the prosecution and Valorie Arrington were true, at least three other witnesses that were not in the apartment with Latoria Arrington—Melvin Spruill, Selethia Anderson, and Simone Coleman—saw Porter approach, have a brief encounter with, shoot, and kill Officer Reaves. Moreover, the prosecution would have been able to utilize the remaining unimpeached witnesses in Valorie Arrington's apartment prior to the murder to establish that Porter knew that Officer Reaves was on duty prior the murder. Valorie Arrington does not directly implicate the other witnesses in the apartment in her new testimony. Additionally, other witnesses saw him flee the scene of the crime, there is no reasonable probability that the tainting of Valorie Arrington's testimony, or even the testimony of the other people in the apartment, would have changed the outcome of the guilt phase of the trial in the face of so many other witnesses and other evidence. *See United States v. Robinson*, No. 2:07-CR-00014, 2012 WL 2526985, at *7 (W.D. Va. June 29, 2012) (finding that there was no prejudice under *Strickland* because there was no reasonable probability that a missing witness's testimony would have changed the outcome of the trial in the face of surveillance camera footage, verified by multiple officers' eye witness testimony).

As such, the Court need not address whether Porter's habeas counsel's actions were reasonable under the performance prong of *Strickland*.[20] 466 U.S. at 697 (holding that a determination need not be made concerning the attorney's performance if it is clear that no prejudice would have resulted had the attorney been deficient).

### XVII.   Claim Seventeen: *Brady* Claim Regarding Valorie Arrington

Based on a new affidavit from Valorie Arrington dated January 29, 2013, Porter contends that Valorie Arrington entered into a *quid pro quo* with the prosecution to testify after

---

[20] Porter does not appear to argue that Valorie Arrington's testimony should have been used in the sentencing phase of Porter's trial.

initially denying any knowledge of Porter. (Fed. App. 590-591). The Warden argues that there was no such inducement. The Warden argues that the prosecutor's sworn statement refutes Valorie Arrington's accusation on multiple grounds. (Resp't's Mem. Supp. Mot. to Dismiss Ex. 5, at ¶ 5). Even assuming that the newly uncovered facts about Valorie Arrington's testimony are true, there is no indication that this evidence was affirmatively concealed by the prosecution or that Porter's counsel could not have discovered this information by interviewing Valorie Arrington pursuant to a "diligent investigation." *See Zant*, 499 U.S. at 498. Additionally, the Court finds that, even if Porter's contentions about a *quid pro quo* arrangement between the prosecution and Valorie Arrington were true, as stated in the preceding claim, no prejudice is present because several other witnesses saw Porter shoot and kill Officer Reaves.

## XVIII.  Cumulative Error and Prejudice

Porter argues that the evidence, viewed cumulatively, establishes a reasonable probability that at least one juror would have concluded that the mitigating evidence outweighed the aggravating evidence had Porter's sentencing hearing comported with fundamental notions of fairness. In support Porter argues that:

> Claim XIV establishes that *every* aspect of Porter's sentencing was infused with constitutional deficiency. Trial counsel failed to investigate the prosecution's aggravating evidence (Claim IX) and the prosecution itself withheld material impeachment evidence of a penalty-phase witness (Claim XII); trial counsel failed abysmally in investigating and developing mitigation evidence relating to his past (Claim VIII: childhood and Claim X: correctional experiences) even as Porter was denied crucial mitigation evidence from a risk assessment expert on his future dangerousness (Claims XI and XIV), and Porter was denied his own right to testify in mitigation (Claim XIII); and then, after the presentation of evidence, Porter was even denied the ability to make legitimate, relevant arguments to the jury in an effort to save his life (Claim XV).

(Pet'r's Reply 43). Typically, courts find that there is no cumulative prejudice where no prejudice has taken place in separate claims: "[h]aving rejected each of petitioner's individual claims, there is no support for the proposition that such actions when considered collectively have deprived petitioner of his constitutional right to effective assistance of counsel." *Elliott*, 652 S.E.2d at 481 (quoting *Lenz v. Warden*, 593 S.E.2d at 305); *see also Mueller v. Angelone*, 181

F.3d 557, 586 n.22 (4th Cir. 1999). In any event, the Court finds that even assuming that Porter's counsels' actions were unreasonable pursuant to Claims X and XIV, whatever cumulative prejudice that exists in this matter does not amount to a successful *Strickland* or *Martinez* claim or invalidate the trial.

### XIX.    Certificate of Appealability

An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a Certificate of Appealability. 28 U.S.C. § 2253(c)(1)(A); *see* Rule 11(a) of the Rules Governing § 2254 Proceedings. A Certificate of Appealability should issue only if the petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). Specifically, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see Rose v. Lee*, 252 F.3d 676, 683 (4th Cir. 2001). "While the existence of the death penalty is not in itself grounds for the grant of a certificate of appealability, in such a serious context any doubt as to whether one should issue must be resolved in the petitioner's favor." *Longworth v. Ozmint*, 302 F. Supp. 2d 535, 571 (D.S.C. 2003) (citing *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000)). As such, the Court GRANTS a certificate of appealability regarding all claims because Porter has colorable arguments regarding each claim.

### XX.    Porter's Second Motion for Leave to Conduct Discovery

On April 22, 2014, Porter moved for leave to investigate: (1) undisclosed exculpatory statements by government witnesses; (2) possible police misconduct related to Claim Sixteen; and (3) the prosecutor's alleged violation of its constitutional obligations under Claim Seventeen. This Motion will be DENIED AS MOOT.

//

//

## XXI.   Conclusion

For the reasons above, the Court will GRANT the Motion to Dismiss and DENY AS MOOT Porter's Second Motion for Leave to Conduct Discovery

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record. An appropriate Order shall issue.

_____/s/_____
James R. Spencer
Senior U. S. District Judge

ENTERED this ___21st____ day of August 2014.