## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

THOMAS ALEXANDER PORTER,   )
                               )
     Petitioner,             )
                               )
v.                           )     Civil Action No. 3:12CV550–HEH
                               )
IVAN GILMORE,            )
                               )
     Respondent.         )

### MEMORANDUM OPINION
**(Denying Petition After Second Remand)**

Thomas Alexander Porter filed this petition for habeas corpus under 28 U.S.C.

§ 2254 ("2254 Petition," ECF No. 22), challenging his capital murder conviction and

death sentence for the 2005 killing of a Norfolk police officer.[1]  The matter is before the

Court on the second remand by the United States Court of Appeals for the Fourth Circuit,

and Amended Claim I.[2]  (ECF No. 221.)  For the reasons stated below, Amended Claim I

will be dismissed and the § 2254 Petition will be denied.

## I. PROCEDURAL HISTORY

### A.    First Remand

On October 9, 2012, Porter filed his § 2254 Petition challenging his capital murder

conviction and death sentence for the 2005 shooting of a Norfolk police officer.  By

Memorandum Opinion and Order entered on August 21, 2014, the Court granted

---

[1] The Court has amended the caption to reflect Porter's current custodian.

[2] On the second remand, this case was reassigned to the undersigned because the judge who
previously handled the case retired.

Respondent's Motion to Dismiss the § 2254 Petition. *See Porter v. Davis*,

No. 3:12CV550–JRS, 2014 WL 4182677, at *1 (E.D. Va. Aug. 21, 2014).  On October

16, 2014, the Court denied Porter's Rule 59(e) Motion. *See Porter v. Davis*, No.

3:12CV550–JRS, 2014 WL 5317863, at *1 (E.D. Va. Oct. 16, 2014).  Porter appealed.

On October 20, 2015, the United States Court of Appeals for the Fourth Circuit

dismissed Porter's appeal and remanded the matter back to this Court. *See Porter v.*

*Zook*, 803 F.3d 694, 695 (4th Cir. 2015) ("*Porter I*").  The Fourth Circuit observed that,

"[a]mong the multiple claims Porter presented to the district court was one alleging that a

juror[3] in his case was 'actually biased,' in violation of his right to trial by an impartial

jury." *Id.* (citing *Smith v. Phillips*, 455 U.S. 209, 215 (1982)).  The Fourth Circuit noted

that, "[b]ecause the district court did not resolve [the actual bias] claim, its decision was

not a final order over which we have jurisdiction" and remanded the matter to this Court.

*Id.*

Thereafter, by Memorandum Order entered on October 29, 2015, the Court

directed the parties to submit further briefing that set forth all of the facts, law, and

argument with respect to the actual bias claim. (ECF No. 88.)  By Memorandum Opinion

and Order entered on April 25, 2016, the Court found:

> (1) that Porter exhausted his actual bias claim by fairly presenting the same
> to the Supreme Court of Virginia; (2) that the Supreme Court of Virginia
> decided the merits of the actual bias claim;[4] and, (3) that under either the

---

[3] The juror's name is Bruce Treakle.

[4] The Court explained: "As reflected below, it is fairly apparent simply by reviewing the
procedural history that Porter raised the actual bias claim before the Supreme Court of Virginia
and that the Supreme Court of Virginia resolved the merits of the claim when it rejected a

deferential standard set forth in 28 U.S.C. § 2254(d)(1)–(2), or a *de novo* standard of review, the actual bias claim lacks merit and may be dismissed without conducting an evidentiary hearing.

*Porter v. Zook*, No. 3:12CV550, 2016 WL 1688765, at *1 (E.D. Va. Apr. 25, 2016). By

Memorandum Opinion and Final Order entered on September 22, 2016, the Court denied

Porter's Rule 59(e) Motion. *Porter v. Zook*, No. 3:12CV550, 2016 WL 5338508, at *1

(E.D. Va. Sept. 22, 2016.) Porter again appealed.

## B.     Second Remand

On January 23, 2018, the Fourth Circuit affirmed in part, vacated in part, and

remanded the matter back to this Court with instructions. *See Porter v. Zook*, 898 F.3d

408, 414 (4th Cir. 2018) ("*Porter II*"). This time, the Fourth Circuit observed that,

> After he pursued a direct and collateral review in state court, Appellant filed the operative 28 U.S.C. § 2254 petition in the district court, raising a host of challenges to his conviction and sentence. Chief among them was a claim that one of the jurors was biased against him. Specifically, when asked at voir dire whether any jurors had relatives in law enforcement, the juror did not disclose that his brother was a law enforcement officer in the jurisdiction adjacent to Norfolk.
>
> The district court dismissed the § 2254 petition. Appellant filed a plenary appeal of that dismissal, and we dismissed the appeal and remanded for further consideration of Appellant's actual bias claim, which the district court failed to address in the first instance. On remand, the district court dismissed Appellant's actual bias claim as a matter of law without holding an evidentiary hearing. We now consider that decision and the dismissal of his other claims.
>
> Although we affirm the majority of Appellant's claims, we are constrained to remand once again on the juror bias issue. In dismissing the actual bias claim, the district court failed to recognize the applicability of Supreme Court precedent requiring a hearing in these circumstances; erected inappropriate legal barriers and faulted Appellant for not overcoming them; and ignored "judicially-recognized factors" in determining whether a hearing

---

separate ineffective assistance of counsel claim." *Porter v. Zook*, No. 3:12CV550, 2016 WL 1688765, at *1 n.3 (E.D. Va. Apr. 25, 2016).

is necessary. *United States v. Henry*, 673 F.3d 285, 291 (4th Cir. 2012). We likewise conclude that the district court erred in *Porter I* by dismissing Appellant's separate but related juror bias claim brought pursuant to *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1944).

*Id.* (internal citations to this case omitted).

The Fourth Circuit also determined that Porter's actual bias claim "was not heard 'on the merits'" by the state court, and "[a]s such, this court and the district court are not bound by the deference afforded in § 2254(d), but rather, may conduct our review of the actual bias issue de novo." *Id.* at 425 (citation omitted)). With respect to the *McDonough* claim, the Fourth Circuit found that because the state "court addressed this issue on the merits . . . we review under the deferential AEDPA standard." *Id.* at 430. However, "[e]ven under this deferential standard, the state habeas court unreasonably applied clearly established federal law" when it concluded that, because Juror Bruce P. Treakle ("Juror Treakle") indicated that he had a nephew in law enforcement, he "did not fail to 'honestly' answer the relevant voir dire question." *Id.* at 430–31. Therefore, the Fourth Circuit, "affirm[ed] in part, vacate[d] in part, and remand[ed] with instructions that the district court allow discovery and hold an evidentiary hearing on Appellant's two separate juror bias claims." *Id.* at 414.

### C.     Proceedings After Second Remand

By Order entered on November 13, 2018, the Court and the parties agreed that the close of discovery would be April 5, 2019, and that the evidentiary hearing would be held on May 1, 2019. (ECF No. 119.) On January 14, 2019, the parties entered into a Joint Order Regarding Discovery, in which the parties agreed to issue a broad subpoenas duces

tecum to Juror Treakle, the juror who indicated that he had a brother in law enforcement,

Pernell R. Treakle, the brother who worked for the Chesapeake Sheriff's Office, and the

Chesapeake Sheriff's Office. (ECF No. 122.)  On March 15, 2019, the Court heard

arguments on a Motion for Discovery filed by Porter pertaining to items of discovery

removed from the January 14, 2019 Joint Discovery Order.  During the hearing, "the

parties agreed to meet and to narrow the broad scope of Petitioner's discovery requests

without the Court's intervention." (ECF No. 138, at 1.)  Accordingly, by Order entered

on March 19, 2019, "based upon the parties' joint representation, the Court DENIE[D]

Petitioner's Motion as MOOT, and the Court [would] await the submission of a joint

discovery order that resolves the matter." (*Id.*)  The Court further explained that, "[i]n

the event the parties are unable to successfully narrow the scope of the requested

discovery, Petitioner may refile his Motion for the Court's reconsideration." (*Id.*)  On

March 22, 2019, the Court granted Porter's request to issue an additional subpoena duces

tecum to the City of Chesapeake. (ECF No. 141.)

At the request of the parties, on April 4, 2019, the Court issued a second

Scheduling Order that extended the close of discovery to July 3, 2019, and moved the

evidentiary hearing to August 8, 2019. (ECF No. 144.)  On May 6, 2019, the Court

granted the parties' Third Joint Order Regarding Discovery allowing Porter to obtain

documents from the Chesapeake Sheriff's Office, the Norfolk Police Department, and the

Chesapeake Police Department. (ECF No. 147.)  On May 23, 2019, Porter filed a Motion

for Discovery seeking criminal records from the Alexandria and Arlington County police

departments, and the Virginia Department of State Police, for a second brother of Juror

5

Treakle, Ronald Treakle. (ECF No. 153.) Also, on May 23, 2019, the Court granted the parties' Joint Order for Deposition of Juror Treakle. (ECF No. 155.) On July 1, 2019, Porter conducted a lengthy deposition of Juror Treakle. (ECF No. 240–1.)

On June 18, 2019, the Court conducted a hearing on the Motion for Discovery of the criminal records of Ronald Treakle. "[B]ased on the arguments of counsel and for good cause shown, the Court GRANT[ED] petitioner Thomas Alexander Porter leave to conduct discovery" with respect to the subpoena duces tecum to the Alexandria and Arlington police departments, and to the Virginia Department of State Police. (ECF No. 165, at 1.) On August 2, 2019, and at the request of the parties, the Court issued a third Scheduling Order extending the date for the close of discovery until October 11, 2019, allowing Porter the opportunity to file a motion amend Count I, and continuing the evidentiary hearing until February 12, 2020. (ECF No. 188.)

By Order entered on September 10, 2019, the Court granted Petitioner's Motion for Leave to Conduct Depositions of Calvin Treakle, a third brother of Juror Treakle, and his sister, Cheryl Treakle Ball, Ronald Treakle, and to re-depose Juror Treakle. (ECF No. 195.) The second deposition of Juror Treakle was supposed to be limited to asking about the criminal histories of his family members. (*Id.*; *see also* ECF No. 191.) However, Porter again repeatedly asked questions specifically pertaining to his brother Pernell's employment with the Chesapeake Sheriff's Office. (ECF No. 240–2.)

**D.    Amended Petition**

On October 18, 2019, Porter filed a Motion to Amend Claim I (ECF No. 200),

which the Warden opposed.  (ECF No. 210.)  In granting the Motion to Amend Claim I,

over the Warden's opposition, the Court explained as follows:

> The United States Court of Appeals for the Fourth Circuit has twice remanded this case to the district court.  In its first opinion, the Fourth Circuit instructed the district court to consider Petitioner's claim of actual juror bias, upon finding that this Court did not resolve that claim.  In its second opinion, the Fourth Circuit found "the district court erred in dismissing the actual bias claims . . . without discovery and a hearing, and it also erred . . . by dismissing the *McDonough* claims without a hearing," and it remanded "so that [Petitioner], once and for all, may be able to investigate his bias claims."
>
> Following the Fourth Circuit's remand in *Porter II*, this Court set an evidentiary hearing for Petitioner's juror bias claims, which is presently scheduled for February 12, 2020.  In the August 2, 2019 Scheduling Order, this Court extended the date for close of discovery to October 11, 2019, and gave Petitioner until October 18, 2019, to file his motion to amend Count I of the Amended Petition.
>
> In his Motion, Petitioner seeks to amend Claim I based on new evidence uncovered through discovery that allegedly provides factual support for his juror bias claims, specifically that Juror Bruce Treakle failed to provide honest answers to not one (as initially claimed) but three voir dire questions.  The Warden argues that Petitioner's Motion, and new sub-claims presented, exceed the parameters of the instructions from the Fourth Circuit's opinion remanding this action, and that the proposed amendments are futile because they are procedurally defaulted and barred by the statute of limitations.
>
> This Court agrees with Petitioner that his proposed amendments to Claim I are within the scope of the Fourth Circuit's mandate—instructing this Court to provide Petitioner with the opportunity of discovery and an evidentiary hearing.  In *Porter I*, with respect to the actual bias claim at issue, the Fourth Circuit stated that "the district court may consider any argument or defense properly raised by [Petitioner] or the Warden, and may conduct an evidentiary hearing or any other proceedings it deems necessary to resolve the claim."  In *Porter II*, the Fourth Circuit foreshadowed that Petitioner may discover additional factual support through discovery to bolster his juror bias claims when it remanded this action to this Court to conduct an evidentiary hearing.

Similarly, this Court rejects the Warden's arguments that the proposed amendments are futile. . . .

As discussed, the Fourth Circuit has made clear that Petitioner should be given the opportunity to bolster Claim I. Furthermore, the Court finds that Petitioner does not seek to add new claims but only to amend his existing juror bias claims. . . . The Court finds that Petitioner is only seeking to supplement this broad allegation of juror misconduct with the additional information that he has now been able to obtain through recent discovery, an opportunity he was previously not afforded. . . .

Accordingly, upon finding that Petitioner's requested amendments are both within the scope of the Fourth Circuit's mandate and his existing juror bias claims, and because he has only recently been afforded the opportunity to obtain this information through court-ordered discovery, this Court rejects the Warden's arguments that these amendments would be futile. . . .

(ECF No. 214, at 1–4 (internal citations omitted) (footnotes omitted).) The Court granted

the Motion to Amend and ordered Amended Claim I filed. (*Id.* at 5.) Amended Claim I

is summarized as follows:

Claim I:   "Porter's rights to a fair trial by an impartial jury and to be tried based only on evidence presented were violated by the participation of a biased juror who failed to disclose material information in response to **three voir dire questions**." (ECF No. 221, at 6 (emphasis in original)). Porter argues that he is entitled to relief:

(a) under *McDonough v. Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984) "because of Juror Treakle's misconduct and;"

(b) "separately, because Juror Treakle was biased against Porter." (*Id.*)[5]

On February 12, 2020, the Court held an evidentiary hearing on Amended Claim I.

At the beginning of the hearing, the Warden renewed its objection to the alleged

expansion of the claim beyond the Fourth Circuit's remand to include evidence that Juror

---

[5] As the Fourth Circuit recognized, Porter did not raise a claim of implied bias in his federal petition, *see Porter II*, 898 F.3d at 420 n.5. In Amended Claim I, Porter only raises a claim of actual bias. (ECF No. 221, at 30–40.)

Treakle failed to disclose material information with regard to two additional voir dire questions. In allowing this evidence, the Court explained:

> In reading over the remand order very, very carefully, as well as the comments by Judge Shedd, it seems to be my mandate here is to conduct an evidentiary hearing and to rule upon all related issues. I don't think the Fourth Circuit wants this case back a third or fourth time.
> So to the extent that it's arguably within the scope of the evidentiary hearing that I'm conducting, and in any way touches on any of the issues, I'm going to allow it to come in because I want to bring finality to this case for everybody involved.

(ECF No. 243, at 6.) The Court heard testimony from the following individuals: (1) Pernell Treakle; (2) Eric J. Lautenschlager, an alternate juror from Porter's trial; (3) Calvin Treakle; and (4) Juror Treakle by two videotaped depositions.[6] At the conclusion of the hearing, the Court permitted the parties to file post-hearing briefs. The matter is now ripe for disposition.

## II.   FACTUAL AND PROCEDURAL BACKGROUND REGARDING THE BIAS CLAIMS

Porter was charged and ultimately convicted of the capital murder of Stanley Reaves, a Norfolk Police Officer. *See Porter v. Commonwealth*, 661 S.E.2d 415, 419–24 (Va. 2008). Porter moved for a change of venue from the Circuit Court for the City of

---

[6] The Court only learned that Juror Treakle would not be appearing in person through Porter's counsel on February 7, 2020. (ECF No. 236.) The Court was never asked by counsel to compel Juror Treakle's attendance, nor could it. Under Federal Rule of Civil Procedure 45, Juror Treakle was beyond the Court's subpoena power to command him to attend a hearing because he lived more than 100 miles away and not in the Commonwealth of Virginia. Therefore, under Federal Rule of Civil Procedure 32, Juror Treakle was considered an unavailable witness and the use of the deposition during the hearing was permitted.

Norfolk to the Circuit Court for the County of Arlington,[7] which was granted. *Id.* at 423.

Accordingly, Porter's trial was transferred to the Circuit Court for the County of

Arlington ("Circuit Court"). *Id.*

### A.   Pertinent Voir Dire

#### 1.   Voir Dire with Respect to Law Enforcement Officers

The Court initially divided the venire into two groups. Juror Treakle was the

afternoon group. At the beginning of voir dire, the Circuit Court informed the venire that

Porter was charged with the capital murder of a Norfolk police officer. (State Habeas

Record ("SH") 1197, 1201.) Juror Treakle and the rest of the venire assured the Circuit

Court that they were not aware of any bias or prejudice against the Commonwealth or the

accused. (SH 1202.) The prosecutor informed the venire, "I want to ask you a few

questions, and most of these questions, if the answers is in the affirmative, you are going

to let me know, raise your hand so I can chart your name and put down who is answering

affirmatively." (SH 1204.)

---

[7] The Fourth Circuit noted that:

> As was to be expected, Officer Reaves's senseless killing provoked widespread mourning and outrage in Norfolk and the surrounding communities. The killing also generated extensive media coverage, both during the manhunt for Porter and after his apprehension and indictment. Citing concerns about the ability to empanel an impartial jury in Norfolk, Porter filed a motion for a change of venue, to which the Commonwealth consented.

*Porter I*, 803 F.3d at 696.

Defense counsel subsequently asked the venire:

Have you, any member of your family or close personal friend worked for or with any law enforcement organization, either as an employee or on a volunteer basis?      . . . .
      . . . [I]s anyone here, or a member of your close personal family, worked in law enforcement in any capacity as a volunteer or an employee?

(SH 1224–25.) Counsel did not ask the venire to identify the jurisdiction where the family member or friend worked although the jurors volunteered that information. A number of jurors raised their hands and then the following exchange occurred:

MR. MIGLIOZZI:  I'm going to start in the back row.  Mr. Treakle.

MR. TREAKLE:  My nephew is an Arlington County police officer.

MR. MIGLIOZZI:  Your nephew?

MR. TREAKLE:  Yes.

MR. MIGLIOZZI:  In this county here?

MR. TREAKLE:  Yes.

MR. MIGLIOZZI:  Do you think, with that being the case, that that would impair your ability to sit on this jury and render a fair and impartial verdict in this case?

MR. TREAKLE:  No.

(SH 1225–26.)

As reflected in the exchange below, the attorneys trying the case and who were most familiar with the facts were content with a general reassurance from the venire person that any relationship he or she had with law enforcement officials would not impair his or her ability to render a fair and impartial verdict:

MS. VU:  My godmother works for the Department of Defense.  Godmother.

MR. MIGLIOZZI: Department of Defense. Okay. Your godmother?

Ms. VU: Yes.

MR. MIGLIOZZI: As a law enforcement official?

MS. VU: No. Financial.

MR. MIGLIOZZI: Mr. Dodge.

MR. DODGE: My father-in-law is a retired former United -- Assistant United States Attorney in the Southern District of California. And I have two close personal friends who are corrections officers for the State of Connecticut.

MR. MIGLIOZZI: Is that in the penitentiary side?

MR. DODGE: Medium-grade state prison.

MR. MIGLIOZZI: That being the case, do you feel that your association with those persons you mentioned will in any way affect your ability to sit on a jury involving a case that the judge has already explained to you, the facts in this case, in rendering a fair and impartial judgment?

MR. DODGE: No, not at all.

MR. MIGLIOZZI: Yes. Sir. Mr. Weinberg.

MR WEINBERG: My wife is with the Office of General Counsel with the Federal Communications Commission, and she works on fraud cases involving funding that flows through the FCC.
    Additionally, my former employment, I worked in the Congress, and we had some advisory responsibilities over some law enforcement activities in the Department of State and Inspectors General, things like that.

MR. MIGLIOZZI: So you were in a supervisory capacity role?

MR. WEINBERG: Well, in the sense that we had oversight. I did oversight work for the bank security people, for example.

MR. MIGLIOZZI: Any of those situations -- do you believe that any of those situations would in any way impair your ability to sit on this particular case and render a fair and impartial judgment?
MR. WEINBERG: No, sir.

MR. MIGLIOZZI: Thank you. All right. Mr. Sharp.

MR. SHARP: My uncle is a retired NYPD officer.

MR. MIGLIOZZI: Okay. Knowing that, and that this involves the alleged shooting of a police officer, would you have any -- do you believe that those facts and that relationship would impair your ability to sit and render a fair and impartial verdict in this case?

MR. SHARP: No.

MR. MIGLIOZZI: Mr. Hurley.

MR. HURLEY: I was a consultant to the U.S. Department of Housing & Urban Development, and part of my job was to develop security plans for public housing projects. And I was in charge of the law enforcement and in charge of keeping the places safe.

MR. MIGLIOZZI: Okay. Same question as everyone else. Do you think that that would impair your ability to sit in a case such as this?

MR. HURLEY: No.

MR. MIGLIOZZI: Thank you. Mr. Delaney.

MR. DELANEY: My cousin is a prison guard in Erie, Pennsylvania, but it doesn't impair my ability.

MR. MIGLIOZZI: And I will go down the front row. Mr. Zacate.

MR. ZACATE: Yes. My cousin is a Metropolitan police officer, D.C.

MR. MIGLIOZZI: Same question to you. Do you think that would affect your ability to sit --

MR. ZACATE: No.

MR. MIGLIOZZI: -- on this jury?

MR. ZACATE: No.

MR. MIGLIOZZI: All right. Any more hands?

(SH 1226–29.) None of the jurors who answered in the affirmative were struck for cause

on this basis.  (Feb. 26, 2007 Tr. 196–203, 215–23, 245–58, 268, 281, 299, 313–14.)

### 2. Voir Dire with Respect to Victims of Violent Crimes and Arrests or Prosecutions

The prosecutor also asked the venire the following:

MR. DOYLE:  [M]y next question is whether you, any member of your immediate family or close friends has ever been the victim of a violent crime?

(SH 1205.) A number of jurors raised their hands.  The following exchange occurred:

MR. DOYLE:  Mr. Weinberg.

MR. WEINBERG:  "Violent" is a --

THE COURT:  If you're comfortable explaining in open court, you can just go ahead and explain it.  If it's something you would like to do it privately, we can do it privately.  Would you like to do it privately?

MR WEINBERG:  I'd like to.

THE COURT:  If that's the case, then we'll make an asterisk and come back to that later.  Okay?

MR. DOYLE:  Anyone else?

(No response.)

MR. DOYLE:  I'll ask a few follow-up questions to that in a moment.

(SH 1205–06.) One juror asked, "What is a 'violent crime?'"  (SH 1206.)  The

prosecutor explained, and several jurors volunteered answers:

MR. DOYLE:  Crime against a person.  In other words, an assault or a robbery.  It could be a homicide.

MR. DELANEY:  Mugging?  My brother was mugged.

MR. DOYLE:  You're Mr. Delaney?

14

MR. DELANEY:  Yup.

MR. DOYLE:  Your brother was robbed?

MR. DELANEY:  He was mugged.

MR. DOYLE:  Mugged.  How long ago did that happen?

MR. DELANEY:  Seven years or so.

MR. DOYLE:  Was someone arrested for the crime?

MR. DELANEY:  No.

MR. DOYLE:  Would the fact that your brother was mugged affect your ability to sit as a juror and be fair and impartial in this case?

MR. DELANEY:  No.

MR. HURLEY:  I was robbed once.

MR. DOYLE:  How long ago did that occur?

MR. HURLEY:  Several years.

MR. DOYLE:  I want to ask you the same sort of question.  Was anyone arrested?

MR. HURLEY:  No.

MR. DOYLE:  Would the fact that that happened to you, would that affect your ability to be fair and impartial juror for both sides?

MR HURLEY:  No.

MR. DOYLE:  Anyone else?

THE JURORS:  (Shaking heads.)

(SH 1206–07.) Juror Treakle did not respond to this question. However, none of the

jurors who answered in the affirmative were struck for cause on this basis. (Feb. 26,

2007 Tr. 179–81, 215–23, 245–58, 268, 281, 299, 313–14.)

The prosecutor next asked the venire about family members with arrests and

prosecutions:

> MR. DOYLE: Have you or any family member of your immediate family or close
> friend ever been arrested or prosecuted for the alleged commission of a criminal
> offense?

> THE JURORS: (Shaking heads.)

(SH 1207.) After the prosecutor moved on to the next question, one juror noted that her

father had been arrested, but not convicted, in Colorado six years prior. (SH 1208.)

Another juror indicated that her brother had been arrested and charged with "criminal

crimes recently," in Buffalo, New York. (SH 1208.) A third juror, volunteered that her

"brother has an addiction," and a fourth, Juror Hurley, noted that he "was arrested once

when he was 17" at a "prom picnic." (SH 1208.) After inquiring of the prosecutor

whether "we [were] talking about criminal like violent crimes or" any crime and the

prosecutor answered, "[a]ny crime," a fifth juror volunteered that he was arrested for

"provid[ing] alcohol to minors" more than twelve years prior. (SH 1210.) Finally, a

sixth juror volunteered that he "had a DWI about two years ago." (SH 1210.) Each juror

who was asked about impartiality indicated that these incidents would not affect their

ability to sit and be fair to both sides. (SH 1207–10.)[8] Juror Treakle also did not answer

---

[8] Juror Hurley was not asked whether he could remain fair and impartial despite being arrested at
a prom picnic. (SH 1209–10.)

this question. Once again, none of the jurors who answered in the affirmative were struck for cause on this basis. (Feb. 26, 2007 Tr. 181–84, 215–23, 245–58, 268, 281, 299, 313–14.)

### 3. General Assurances About Impartiality

Additional voir dire provided assurance that the jurors, including Juror Treakle, could remain impartial in deciding the appropriate punishment despite the fact the case involved the capital murder of a police officer. Specifically, the Circuit Court broke the venire down into groups of four persons to pose specific questions about their abilities to fairly decide a capital case. During that questioning, Juror Treakle repeatedly assured the Circuit Court that he could remain impartial and follow the Circuit Court's instructions, even though the case involved the capital murder of a police officer. (SH 1285–94.) For example, the Circuit Court reminded Juror Treakle that the case involved the capital murder of a police officer (SH 1285), and defense counsel asked, "If you should convict the defendant, Mr. Porter, of capital murder, could you follow the Court's instructions and consider voting for a sentence of less than the death penalty?" (SH 1292.) Juror Treakle responded, "Yes." (SH 1292.) Thereafter, defense counsel asked:

> If after you have already found that Mr. Porter is guilty beyond a reasonable doubt of the willful, deliberate and premeditated killing of a police officer, you were then presented with evidence in aggravation that there was a probability that Mr. Porter would commit criminal acts of violence that would constitute a serious threat to society, could you follow your instructions and consider voting against the death penalty and in favor of a life sentence without parole?

(SH 1293.) Juror Treakle responded in the affirmative. (SH 1293–94.) Juror Treakle and the three other venire persons were also asked, "[D]o any of the four of you know of

any reason why you could not or would not be able to fairly and impartially determine the

facts of the case or abide by the instructions of the Court on the sentencing issues?" (SH

1290.) All four jurors responded in the negative. (SH 1290.)

## B.  Porter's Allegations Pertaining to the Trial

Porter offers the following summary of trial as the basis for his claims:

> Officer Reaves and his family lived in Chesapeake, where Pernell Treakle served as a deputy sheriff. Just after Officer Reaves's shooting, law enforcement from around the Tidewater area participated in the manhunt for Porter. Hundreds of officers from over a dozen law enforcement agencies, including the Chesapeake Police Pipe and Drum Corps, attended Officer Reaves's funeral, while other watched live television broadcasts. Officer Reaves's wife thanked the Chesapeake Police Department for its support following her husband's death.
>
> Officer Reaves's death was felt throughout the community, especially in Chesapeake where the city was still mourning the loss of Michael Saffran, a Chesapeake Police Officer killed in the line of duty just three weeks before Officer Reaves. Soon after Officer Reaves was killed, the Police Emerald Society of Tidewater hosted a joint fundraiser for the Reaves and Saffran families. About six months later, Officer Reaves and Saffran were remembered at Peace Officers Memorial Day services in Norfolk and Chesapeake. An honor guard of law enforcement officers from the Norfolk and Chesapeake Police Departments and Chesapeake Sheriff's Office attended the memorial in Chesapeake. A local newspaper published photos of the memorial services, including one of a law enforcement officer comforting Officer Reaves's daughter and another showing a Chesapeake Sheriff's Office deputy escorting Officer Saffran's widow.
>
> At trial, the prosecution depicted Porter as a serial criminal who threatened people with weapons, trafficked in drugs, and assaulted women, law enforcement officers, and other inmates. Many law enforcement officers testified at Porter's trial about violent encounters with Porter. . . .
>
> Prosecutors presented testimony from Officer Reaves's widow, Treva Reaves, and his sister, Christa Blackwell. Each woman testified about the devastating effect Officer Reaves's death had on their family. Treva Reaves was the prosecution's first witness. As the Fourth Circuit observed on appeal, "[h]er testimony set the tone for the entire trial." . . . She told the jury, "My husband had a very honorable job, and I was so proud to be able to say that I was married to a police officer."

18

During closing argument, the prosecutor told the jury, "[T]his is a case about service. October 28, 2005, was the last day that Stanley Reaves put that name tag on, put that badge on his chest and walked out on the streets of Norfolk . . . to put himself between citizens and danger." The prosecutor urged jurors to sentence Porter to death because he posed a "future danger to anyone else who may encounter him in any similar fashion whatsoever as . . . Reaves did." The prosecutor reminded jurors about "the deputy sheriffs who were assaulted" by Porter, the correctional officer who was "dragged through the meal slot, and slammed against . . . [Porter's cell] door," and other acts of violence and resistance that Porter allegedly committed against law enforcement officers. . . .

(ECF No. 221, at 8–10 (internal citations omitted) (alterations in original) (third and fourth omission in original)).

## C.   State Habeas Investigation

Following Porter's conviction and direct appeal, members of Porter's state habeas team interviewed individuals who were members of Porter's jury. (SH 6214; *see also* ECF No. 221, at 10.) On May 30, 2009, Maryl Sattler and Dawn Davison spoke to Juror Treakle. (SH 6214.) During the state habeas proceedings, Porter submitted an affidavit from Sattler memorializing her conversation with Juror Treakle:

Ms. Davison . . . explained to Mr. Treakle that we were there representing Thomas Porter, and that we were interviewing jurors as part of our review of the entire case. Mr. Treakle indicated that he understood and was willing to speak with us. He explained that he had to pick up his wife at 3:00 p.m., so he would only be available for a few minutes.

Ms. Davison asked Mr. Treakle which of the witnesses made the greatest impression on him during the trial. Without hesitation, Mr. Treakle replied that he found the officer's wife (Treva Reaves) to be a very powerful witness. He indicated that he found her testimony moving and very emotional for him because his brother is a sheriff's officer in Norfolk.[9] We

---

[9] As reflected below, Juror Treakle's brother, Pernell Treakle, actually worked for the Sheriff's Office in Chesapeake, Virginia. From his deposition testimony, it is not clear whether Juror Treakle simply misspoke or whether he simply did not know the exact identity of his brother's employer.

were very surprised by this statement because we had read his voir dire prior to the interview and Mr. Treakle had never said anything about this brother. When Ms. Davison asked for clarification, Mr. Treakle repeated that his brother works for the sheriff's department "down in Norfolk." Mr. Treakle said sitting through Mrs. Reaves's testimony had been difficult for him. He expressed sympathy for law enforcement officers, and emphasized that they put their lives on the line every day for the community.

We only spoke with Mr. Treakle for a short while. At approximately 2:45 p.m., Mr. Treakle said that he wished he could speak with us longer, but he did not want to be late to pick his wife up from work at 3:00 p.m. We thanked him for his time and left his home.

("Sattler Affidavit," SH 6215 (punctuation and spacing corrected) (paragraph numbers omitted).)

On June 18, 2009, Ms. Davison also obtained an affidavit from Juror Treakle's brother, Pernell Treakle. (SH 5491.) Pernell stated that he is a Deputy Sheriff with the Chesapeake Sheriff's Office in Chesapeake, Virginia and had been employed in that position for the past nine years. (SH 5491.)

### D.      Facts Discovered Pertaining to Voir Dire After Second Remand and Pertinent Testimony

After the Court permitted expansive discovery, Porter discovered that Juror Treakle had additional family members in law enforcement beyond his brother and nephew, and that, Juror Treakle had neglected to disclose that he had family members who had committed criminal acts or had been the victim of a violent crime. Thus, Porter contends that Juror Treakle was not a fair and impartial juror because he concealed material information with respect to three voir dire questions.

### 1.   Family Background

Juror Treakle currently lives in Burlington, North Carolina where he has lived

since November 2014. (Joint Stipulation of Facts ("JSF") 1, ECF No. 238.) Juror

Treakle lived in Arlington, Virginia for about thirty years until 2013. (*Id.*) Juror

Treakle's brother, Calvin, lived on the same street as Juror Treakle from 1989 to 1996,

and at times, their other brother Ronald, lived with Calvin. (*Id.* at 3.) Juror Treakle

would often host cookouts or family would drop by. (ECF No. 240–1, at 66–68; ECF

No. 243, at 80.)

### 2.   Family in Law Enforcement

Discovery revealed that Juror Treakle actually had five family members who were

or had been in law enforcement.

#### a.   Kevin Treakle

Kevin Treakle, Calvin's son, lives in Arlington and was employed as an Arlington

County police officer for about eighteen years. (JSF 5.) Juror Treakle knew that Kevin

was an Arlington County police officer, and revealed this information during voir dire.

(SH 1225–26; ECF No. 240–1, at 113.) The reason that Juror Treakle only mentioned his

nephew, Kevin, was a police officer during voir dire was "[b]ecause [he saw] Kevin

almost every day . . . [and] because we are close, and I didn't think about nobody else."

(ECF No. 240–1, at 94.)

#### b.   Pernell Treakle

Pernell Treakle has worked as a deputy sheriff for the Chesapeake Sheriff's Office

since July 10, 2000. (JSF 4.) Pernell worked in the jail as a booking deputy and then as a

transportation deputy, and he now works as a courtroom security officer. (ECF No. 243, at 18–19.) Juror Treakle knew that Pernell had worked in the jail at some point, but was generally not aware of Pernell's responsibilities in his role as a deputy sheriff. (ECF No. 240–1, at 14.) Indeed, Juror Treakle initially disclosed that his brother was employed in Norfolk not Chesapeake. (SH 6215.) Juror Treakle and Pernell did not talk about Pernell's work as a deputy sheriff. (ECF No. 243, at 23, 54, 56.) In recent years, Juror Treakle and Pernell would call one another every two weeks, but Juror Treakle had only visited Pernell's house once or twice in twenty years. (ECF No. 240–1, at 106–07; ECF No. 243, at 15.) When Juror Treakle lived in Arlington, at the time of Porter's trial, Juror Treakle and Pernell spoke on the phone about once every three months. (ECF No. 243, at 15.)

Pernell joined the Honor Guard in 2004. The Honor Guard would attend memorial services for fallen officers. (ECF No. 243, at 25–26.) Pernell attended a memorial service for an Officer Saffran, a Chesapeake officer, which only included Chesapeake police officers. (ECF No. 243, at 26–28.) Pernell did not recall attending any memorial services for any fallen officers from the Norfolk Police Department. (ECF No. 243, at 28.) Pernell had no recollection of the shooting death of Norfolk Police Officer Stanley Reaves, and therefore could not have talked about it with Juror Treakle. (ECF No. 243, at 29, 50.) Pernell did not discuss Officer Saffran's death with his brother either. (ECF No. 243, at 50.)

Juror Treakle told Pernell that he had been summoned for jury duty. (ECF No. 243, at 46–47, 54.) Pernell told Juror Treakle that "if he told the jury committee that

he had a brother that was a police officer he might not get selected to serve on it." (ECF No. 243, at 46–47; *see* ECF No. 243, at 54–55.)[10] Juror Treakle did not know what case he would serve on or if he would even be selected as a juror at that point. When asked whether Juror Treakle told him "anything about the case that he was going to" serve on, Pernell interrupted counsel for the Warden and stated: "Absolutely not." (ECF No. 243, at 55.) Pernell did not talk with Juror Treakle "at all" while he was serving on the jury and did not discuss the trial with him after its conclusion. (ECF No. 243, at 55.) Juror Treakle did not talk with family about the case once the trial had started. (ECF No. 240–1, at 96, 129.) The Court finds that Juror Treakle and Pernell did not discuss the Porter case at any time.

Juror Treakle steadfastly thought that he mentioned that his brother Pernell was a deputy sheriff in Chesapeake during voir dire. (ECF No. 240–1, at 50, 82, 122; ECF No. 240–2, at 73, 98–99, 106.) Juror Treakle indicated that he "might have made -- made a mistake by being nervous and forgot to mention his name. That could be possible," but that he was not sure what happened. (ECF No. 240–1, at 82; *see* ECF No. 240–2, at 73.) Juror Treakle "knew [Pernell] was a police officer" (ECF No. 240–1, at 82), and he did not intentionally omit mention of Pernell. (ECF No. 240–2, at 99.) Rather, Juror Treakle's nondisclosure of his brother was inadvertent. Juror Treakle did not "remember thinking about [his] brother, Pernell, when [he] was sitting in the courtroom." (ECF No. 240–1, at 86; *see* ECF No. 240–1, at 123.) Pernell's employment as a sheriff's deputy

---

[10] Contrary to Pernell's testimony, Juror Treakle indicated that he only told his wife that he had been called for jury duty. (ECF No. 240–1, at 96.)

would not "have impair[e]d [Juror Treakle's] ability to . . . render a fair and impartial"

verdict.  (ECF No. 240-1, at 122; *see* ECF No. 240-2, at 100–01.)

c.    **Juror Treakle's Cousins**

Juror Treakle's cousin, Herbert Gibbons, Sr., who is the husband of Juror

Treakle's cousin, Percetia, was employed as a police officer with the Philadelphia Police

Department.  (JSF 5.)  Juror Treakle's first cousin once removed, Herbert Gibbons, Jr.

was likewise a police officer with the Philadelphia Police Department.  (*Id.*)  Juror

Treakle knew he had a "distant cousin," in law enforcement, but that he "[didn't] stay in

contact with them, not at all."  (ECF No. 240-1, at 50–51.)  Juror Treakle knew that

"Herbert Gibson" worked for the Philadelphia Police Department, and that he had a "first

cousin [who] worked for the FBI" whose name he was not sure of because "I get them

sisters mixed up all -- because I don't -- don't associate with them all that much."  (ECF

No. 240-1, at 51.)  Juror Treakle had known that both Herbert Gibbons, Sr. and his son

were on the police force in Philadelphia "[e]ver since [he] was a kid."  (ECF No. 240-1,

at 56–57.)

Finally, Juror Treakle's first cousin, Catherine Treakle, worked for the Federal

Bureau of Investigation for at least thirty years in an administrative capacity, rather than

as an agent.  (ECF No. 240-1, at 51, 60–61; *see also* ECF No. 243, at 41, 52.)  Juror

Treakle initially thought this cousin's name was Carolyn, but then after counsel's

prompting, identified that it was Catherine who worked for the FBI because he "heard

that she retired, so [he] figure[d she worked there] 30 years."  (ECF No. 240-1, at 51, 60–

61.)  At the time of Porter's trial, Juror Treakle knew that these family members worked

24

in law enforcement.  Juror Treakle only saw or spoke to these cousins "every three or four years" at large family funerals.  (ECF No. 240–1, at 109–10.)  Pernell Treakle also had limited contact with these cousins.  (ECF No. 243, at 52–53.)  Juror Treakle did not think about these cousins "at all" during trial (ECF No. 240–1, at 85, 111, 123; ECF No. 240–2, at 74–75, 99–100), "because [they] . . . don't have that close [of a] relationship." (ECF No. 240–1, at 86.)  Juror Treakle indicated that "[i]f I had thought about it, I would definitely mention it, but I just -- I didn't -- I didn't do it on purpose.  I just didn't think about them at all."  (ECF No. 240–2, at 74–75; *see* ECF No. 240–1, at 85–86, 100.) Hearing the other jurors' responses to this question did not jog Juror Treakle's memory that he had forgotten to mention his brother or his cousins.  (ECF No. 240–1, at 83–85.) The additional cousins in law enforcement did not affect Juror Treakle's ability to sit on the jury and render a fair and impartial judgment.  (ECF No. 204–2, at 101–03.)  Juror Treakle did not intentionally conceal that he had cousins in law enforcement to secure a place on the jury as he just did not think of them during voir dire.

### d.    Eric Lautenschlager's Affidavit and Testimony

During the state habeas proceedings, Lautenschlager provided an affidavit to Porter's counsel stating that after the jury had been empaneled, but before deliberations, a juror mentioned that he had a brother in law enforcement.  (*See* ECF No. 243, at 59.) Lautenschlager was selected as an alternate juror on the Porter trial.  (ECF No. 243, at 62.)  Counsel for Porter contacted Lautenschlager, and Lautenschlager signed an affidavit from them in 2009 that stated that "[s]ometime after we were sworn in as jurors . . . [he] was surprised to learn that some jurors had close family members who were law

enforcement officers or themselves had training in the mental health field." (ECF No. 243, at 65.)  Lautenschlager "recall[ed] being shocked when one of the jurors said he had a brother who was a law enforcement officer." (ECF No. 243, at 65.)  Lautenschlager did not recall which juror made this statement and he did not identify the juror in his 2009 affidavit.  (ECF No. 243, at 68; *see* SH 5231.)

### 3. Family Members with Arrests or Criminal Prosecutions or Victims of Violent Crimes

Juror Treakle has four members of his family who have been arrested or criminally prosecuted.  First, in 2001, Calvin Treakle was prosecuted in federal court for making false claims for overtime payments while working for the Department of Defense.  (JSF 5.)  Calvin pled guilty and was sentenced to six months of home confinement and three years of probation.  (*Id.*)  Calvin testified that he told Juror Treakle about his home confinement and probation back in 2001.  (ECF No. 243, at 96–97.)

Ronald Treakle was often in trouble with the law and was arrested approximately sixteen times between 1983 to 2006, in Arlington and Alexandria.  (JSF 5.)  Two of Ronald's arrests involved physical assaults on his brother Calvin, when the two lived together in Arlington.  (*Id.*)  On November 30, 1989, Ronald was arrested for malicious wounding after threatening Calvin with a knife and punching him in the face.  (*Id.*)  On February 21, 1996, Ronald was arrested for punching Calvin in the face multiple times. (*Id.* at 5–6.)  These events occurred when Calvin and Juror Treakle lived on the same street in Arlington.

Juror Treakle's niece, Ylindo, was sentenced to six years of incarceration, with five years suspended, and six years of probation for one count of cocaine distribution in 1997, in Arlington. (*Id.* at 6.) At the time of Juror Treakle's deposition, Juror Treakle indicated that Ronald lived with Ylindo. (ECF No. 240–1, at 15–16.) Juror Treakle was not close with Ylindo, and he estimated that the two were in contact around once every two months. (ECF No. 240–1, at 98–99.) Juror Treakle agreed that he was not "keeping up with her day-to-day life" and would have learned information about her from other family members. (ECF No. 240–1, at 99, 101.) Juror Treakle was aware that Ylindo had been arrested but was not aware of the crime or whether she had served time in jail. (ECF No. 240–1, at 42–46, 119.) Juror Treakle was vaguely aware that Ylindo had been on probation and would have likely heard it through his sister, Cheryl, Ylindo's aunt. (ECF No. 240–1, at 47–48.) Pernell was not aware that Ylindo had been arrested. (ECF No. 243, at 37.)

Prior to the Porter trial, Juror Treakle's son had been charged with drug offenses when he was a juvenile. The drug offenses were handled in juvenile court, and Juror Treakle recalled that his son served some time in jail, and was placed on probation. (ECF No. 240–1, at 19–20, 49.) Pernell also knew that Juror Treakle's son had been arrested. (ECF No. 243, at 36.) Juror Treakle knew that his brother, Calvin, had been arrested or prosecuted for billing for unworked overtime when he worked for the government, but did not think he "did any time" but "was just put on probation." (ECF No. 240–1, at 21–23.) Juror Treakle was not sure about the year that occurred because "[he] wasn't paying much -- get in detail with that at all . . . ," but he agreed it could have been in 1999. (ECF

27

No. 240–1, at 26–27.) Juror Treakle knew that Calvin was on probation during that time. (ECF No. 240–1, at 29.) Juror Treakle remembered when Calvin lost his job because Calvin initially told him "he retired early." (ECF No. 240–1, at 117.) Later, Calvin told Juror Treakle that he was on probation and on home confinement, but that they "didn't discuss it no more." (ECF No. 240–1, at 30–31, 115–16, 118.) Pernell Treakle only learned about Calvin's conviction within the last year. (ECF No. 243, at 30, 51.)

Juror Treakle also knew that his brother Ronald had been arrested or prosecuted for criminal activity, and spent time in jail, but he did not know the details about the offenses or when they may have occurred. (ECF No. 240–1, at 30–32, 40.) Juror Treakle would hear about Ronald through other family members, but he did not learn of Ronald's activities through Ronald or his own personal observation. (ECF No. 240–1, at 32, 40, 103–04.) Juror Treakle stated he had no recollection of Ronald's arrests because he "didn't keep up with his activities at all." (ECF No. 240–1, at 34–35.) Juror Treakle indicated that when he was around twenty-five years old, Ronald "started getting in a whole lot of trouble. That's when we separate[d] a little bit." (ECF No. 240–1, at 102–03.) Juror Treakle was only in contact with Ronald when he would stop by Juror Treakle's occasionally. (ECF No. 240–1, at 104.)

Juror Treakle heard that Ronald attacked Calvin. (ECF No. 240–2, at 9.) Juror Treakle "[did not] think it was assault. I think it was just a big disagreement." (ECF No. 240–2, at 10.) Ronald "didn't remember anything about the incident . . . [he] just knew they had . . . confronted each other," either from Calvin himself or another family member. (ECF No. 240–2, at 9–10, 81–82.) Juror Treakle was not familiar with the

28

details of the incident in 1989, but he believed that Calvin may have told him that Ronald punched him in the face.[11] (ECF No. 240–2, at 16, 19; *see* ECF No. 240–2, at 83–86, 88.) Juror Treakle learned days later that Calvin had called the police. (ECF No. 240–2, at 82.) Juror Treakle never called this an assault, although counsel repeatedly referred to it as such in his questioning. Juror Treakle did not know whether the incident led to Ronald's arrest because he "was being arrested quite a few times." (ECF No. 240–2, at 19; *see* ECF No. 240–2, at 82.) Similarly, Juror Treakle did not know specifically about the second incident in 1986, but he believed "[i]t could have happened." (ECF No. 240–2, at 24–25; *see* ECF No. 240–2, at 86, 88.) Juror Treakle was not a witness to either of the confrontations between Calvin and Ronald. (ECF No. 240–2, at 83.) Pernell Treakle also generally knew that Ronald had been arrested and knew about an "altercation" between Calvin and Ronald, but he was not aware that Ronald had been arrested for the altercation. (ECF No. 243, at 31–32.) Pernell explained that Ronald developed mental health issues while he was serving in the military. (ECF No. 243, at 33–34.) The record fails to establish conclusively whether Juror Treakle was subjectively aware that his brother was a victim of a violent crime.

Juror Treakle did not know the specifics about any of Ronald's arrests, and he explained that, to his knowledge, no one in his family would have bailed Ronald out of jail. (ECF No. 240–2, at 33, 37–38, 42–45, 50–52, 55, 58–59, 89–91.) He explained that "Ronnie did drugs. He did a little bit of everything, and -- and we just tried to talk to

---

[11] The incident report reflected that Calvin sustained an eye injury from a punch to the right eye. (ECF No. 240–2, at 15.)

him. He just wouldn't listen to us at all. . . . we just left him alone because you didn't want to see him getting upset." (ECF No. 240–2, at 30.) Juror Treakle did not keep up with Ronald's arrests and tried to distance himself from Ronald because he had a family (ECF No. 240–2, at 65, 77); however, the specific arrests did not "surprise" him (ECF No. 240–2, at 43), and he was not "curious about why [his] brother had been arrested . . . [b]ecause he always got in trouble." (ECF No. 240–2, at 110.)

Juror Treakle did not volunteer that he had family members who had committed crimes during voir dire because he did not think about his family at that time, and "[i]t just slipped [his] mind because we don't talk about their -- their criminal history or their personal problems." (ECF No. 240–1, at 89; see ECF No. 240–1, at 90–91; ECF No. 240–2, at 67–69.) Juror Treakle did not mention his son because he "was just a juvenile, so [he] . . . didn't think about" it. (ECF No. 240–1, at 89; see ECF No. 240–2, at 69–70.) With respect to his brother Ronald, Juror Treakle "just blocked Ronnie out of my mind, you know, for -- long before this jury" (ECF No. 240–2, at 69), and he "didn't think about Ronnie at all." (ECF No. 240–2, at 91.) Juror Treakle did not intentionally or deliberately fail to provide information pertaining to family members who had been arrested or prosecuted for crimes or had been victims of violent crimes during voir dire. (ECF No. 240–2, at 72, 92.) During voir dire, Juror Treakle "didn't think about nothing containing my family at all. I know I had never been in trouble. That's all. I was just concerned about myself." (ECF No. 240–2, at 91.) Juror Treakle admitted that he did not think very hard about this voir dire question (ECF No. 240–2, at 70, 72), and with respect to the other jurors' answers, he "probably heard what they were saying, but I just

didn't comprehend . . . what they were saying." (ECF No. 240–1, at 93.) Juror Treakle assured counsel that if he had thought about and volunteered the incidents between his brothers, or the crimes Ronald had committed, this would have in no way affected his ability to sit on the jury and be fair and impartial. (ECF No. 240–2, at 93–97.)

Moreover, Juror Treakle's parents were killed in a car accident by a drunk driver in 1977, when he was 17. (JSF 3; ECF No. 240–1, at 63–64.) Juror Treakle's aunt told him about the accident, but he did not know if the driver had been prosecuted. (ECF No. 240–1, at 63–64.) Juror Treakle did not disclose this during voir dire. Through Juror Treakle's responses to counsel's limited questioning, and based on his demeanor, the record reflects that Juror Treakle did not view his parents as being a victim of a violent crime. Thus, Juror Treakle did not knowingly omit this incident during voir dire.

With respect to the various voir dire questions, his failure to disclose information "wasn't deliberate at all." (ECF No. 240–2, at 104.) Juror Treakle agreed that he had not thought very hard about the answers to each of his questions. (ECF No. 240–2, at 104.)

### 4.    Juror Treakle's Testimony About Post-Trial Interview

Juror Treakle recalled Ms. Sattler and Ms. Davidson coming to his home in 2009. (ECF No. 240–1, at 69–71.) Juror Treakle remembered telling them that he found Officer Reaves's wife to be a very powerful witness. (ECF No. 240–1, at 73.) Juror Treakle indicated that he "might have" or "probably did say that," about his statement that "he found her testimony moving and very emotional for him because his brother's a sheriff's officer in Norfolk." (ECF No. 240–1, 74.) Juror Treakle may have gotten the jurisdiction where Pernell was employed incorrect "[b]ecause we don't talk about the

jobs, you know, so I didn't know what jurisdiction he worked at at that time." (ECF

No. 240–1, at 74.) Juror Treakle agreed that he told them that sitting through Ms.

Reaves's testimony was difficult for him, and "that he expressed sympathy for law

enforcement officers and emphasized that they put their lives on the line every day for the

community." (ECF No. 240–1, at 75.)

## III. ANALYSIS OF THE ACTUAL BIAS CLAIM

### A.    The Fourth Circuit's Opinion

In its remand of the actual bias claim, the Fourth Circuit found fault in this Court's

conclusions in several respects.  As a preliminary matter, the court explained as follows:

> A court is not, however, "obliged to hold an evidentiary hearing any time that
> a defendant alleges juror bias." *Billings v. Polk*, 441 F.3d 238, 245 (4th Cir.
> 2006).  But in determining a hearing was not warranted here, the district court
> failed to recognize the applicability of a significant bias decision, *Williams
> v. Taylor*, 529 U.S. 420 (2000). . . .
>     This case falls squarely within the confines of *Williams*.  Juror Treakle
> remained silent regarding the fact that his brother was a law enforcement
> officer, in the neighboring jurisdiction no less.  In addition, Juror Treakle told
> counsel after the verdict that he felt "sympathy for law enforcement officers"
> and found Mrs. Reaves's testimony "moving" and "very emotional" *because*
> of the fact that he has a brother who worked as a law enforcement officer.
> J.A. 1719.  Mrs. Reaves was the state's first witness.  Her testimony set the
> tone for the entire trial.  Moreover, the jury venire was told that the victim
> was a law enforcement officer and that the case originated in Norfolk.  To
> withhold information that one's brother was an officer in the adjacent
> jurisdiction certainly "suggest[s] . . . an unwillingness to be forthcoming"
> and at the very least, "disclose[s] the need for an evidentiary hearing."  The
> district court failed to recognize the applicability of *Williams* and therefore
> erred in dismissing Appellant's actual bias claim without a hearing.

*Porter II*, 898 F.3d at 426 (alterations in original) (first omission added) (parallel

citations omitted).  With respect to the substantive determination that Porter failed to

establish that Juror Treakle was actually biased, the Fourth Circuit found that:

The district court also erred by erecting legal hurdles out of whole cloth and then faulting Appellant for not overcoming them: (1) it placed an insurmountable burden on counsel conducting voir dire; (2) it held Appellant to an evidentiary standard that is both unwarranted and scarcely possible without the chance for discovery; and (3) it made assumptions adverse to Appellant about Juror Treakle's answers without the benefit of Juror Treakle's in-court testimony.

First, the district court stated, "[C]ounsel . . . did not ask Treakle . . . to identify *every* member of his family who had a connection to law enforcement" and "did not engage in any searching scrutiny of how each individual law enforcement relationship may play out with respect to the particular evidence to be introduced." *Porter III*, 2016 WL 1688765, at *11 (emphasis supplied). And it categorized counsel's voir dire as seeking merely "a general assurance . . . that [one's] connection to law enforcement personnel would not impair his or her ability to remain impartial." *Id.*

This analysis is erroneous. Counsel specifically asked, "Ha[s] . . . any member of your family . . . worked for any law enforcement organization" as "an employee"? *Id.* at 2. We have held that if a juror is asked a specific question which encompasses two answers, a juror "fail[s] to answer honestly a material question on voir dire" if he only mentions one of them. *Conaway v. Polk*, 453 F.3d 567, 585 (4th Cir. 2006). Moreover, the district court places a burden on trial counsel uncontemplated by the Supreme Court or this court—that counsel must keep asking questions until the juror gives a complete answer, without knowing whether the answer is complete. Indeed, counsel had no opportunity to ask whether Juror Treakle could be impartial even though his *brother* was an officer *in the jurisdiction adjacent to the scene of the crime.* In other words, defense counsel had no chance to "engage in any searching scrutiny" of Juror Treakle's relationship with his brother because he did not know about it. *Porter III*, 2016 WL 1688765, at *11. Counsel is entitled to expect that when venire panel members take an oath to answer truthfully all questions put to them in voir dire, they will indeed tell the *whole* truth.

. . . .

Third, at the motion to dismiss stage, a district court must "accept a petitioner's well-pleaded allegations as true, and . . . draw all reasonable inferences therefrom in the petitioner's favor." *Conaway*, 453 F.3d at 582. However, here the district court ignored this standard and made assumptions adverse to Appellant about Juror Treakle's answers at voir dire. For example, the district court called Juror Treakle "honest" (twice) and "forthright." *Porter III*, 2016 WL 1688765, at *12–13. He found that Juror Treakle "did not intentionally conceal the fact that he had a brother who was a deputy sheriff." *Id.* at *12. These determinations are not only contrary to the legal standard, but should be properly made *after an evidentiary hearing.*

*See Teleguz v. Zook*, 806 F.3d 803, 811 (4th Cir. 2015) (explaining earlier remand was appropriate for the district court to make credibility determinations at "an evidentiary hearing"). The district court *assumed* Juror Treakle did not purposely lie based on the cold record as opposed to the efficacy of a live hearing. It reasoned, "[Appellant]'s suggestion that [Juror] Treakle volunteered information about his nephew, who was a police officer, but not about his brother, who was a deputy sheriff, for fear of losing his place on the jury suggests a cageyness that is refuted by the record." *Porter III*, 2016 WL 1688765, at *11. But the "record" to which the district court refers is woefully undeveloped and incomplete. Appellant has not had a chance to develop the record and prove that Juror Treakle, rather than somehow simply forgetting his brother, purposely omitted or concealed his relationship.

 The dissent's logic suffers from the same fatal flaw. It states, "There is no evidence in the record that Treakle was aware of the community's feelings or that he had ever spoken to his brother about the case," and "Pernell's affidavit does not suggest any communication between the brothers." *Post* at 447 n.4. But Appellant was never given a chance to ask Juror Treakle or his brother these crucial questions. Thus, "the dissent ignores a critical component underlying the Supreme Court's concern in cases involving juror bias—that without a hearing, a criminal defendant is deprived of the opportunity to uncover facts that could prove a Sixth Amendment violation. *Barnes v. Joyner*, 751 F.3d 229, 250 (4th Cir. 2014).

*Porter II*, 898 F.3d at 426–28 (alterations in original) (third omission added). Porter has now "had a chance to develop the record and prove that Juror Treakle, rather than somehow simply forgetting his brother, purposely omitted or concealed his relationship" and has been "given a chance to ask Juror Treakle [and] his brother these crucial questions." *Id.* at 428. As explained below, after discovery and the receiving of evidence, Porter fails to establish that Juror Treakle was actually biased.

## B. The Distinction between Extrinsic and Intrinsic Influences on Jurors

 "[T]he Sixth Amendment, made applicable to state criminal proceedings through the Fourteenth, affords an accused the right to trial by an impartial jury." *Conaway v. Polk*, 453 F.3d 567, 582 (4th Cir. 2006) (citations omitted). "If 'even one [partial] juror

is empaneled' and the death penalty is imposed, 'the State is disentitled to execute the

sentence.'" *Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir 2002) (citing *Morgan v. Illinois*,

504 U.S. 719, 727 (1992)). The Supreme Court has held "that the remedy for allegations

of juror partiality is a hearing in which the defendant has the opportunity to prove actual

bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982). While *Smith* does

> not stand for the proposition that *any time* evidence of juror bias comes to
> light, due process requires the trial court to question the jurors alleged to have
> bias. *Smith* states that this "may" be the proper course, and that a hearing "is
> sufficient" to satisfy due process. *Smith* leaves open the door as to whether
> a hearing is always required and what else may be "sufficient" to alleviate
> any due process concerns.

*Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003) (citation omitted). "In

deciphering what due process requires, [the courts] distinguish[] between an extraneous

contact that may have affected a jury's ability to remain fair and impartial and an intrinsic

influence from a juror's pre-existing bias." *United States v. McClinton*, 135 F.3d 1178,

1186 (7th Cir. 1998).[12] "The distinction between internal and external jury influences is

critical because, unlike external influences, which "*necessitate a thorough judicial*

*inquiry*, no such obligation is imposed with regard to an internal jury influence.'" *Barnes*

*v. Joyner*, 751 F.3d 229, 245–46 (4th Cir. 2014) (quoting *Wolfe v. Johnson*, 565 F.3d 140,

161 (4th Cir. 2009)).

Thus, when substantial extraneous contacts may have affected a jury's ability to be

fair, due process mandates a hearing. *McClinton*, 135 F.3d at 1186 (citing *Willard v.*

---

[12] Courts use the terms external contacts and external influences interchangeably.

*Pearson*, 823 F.2d 1141, 1148 (7th Cir. 1987)); *see Hurst v. Joyner*, 757 F.3d 389, 398–

400 (4th Cir. 2014) (alteration in original) (remanding for an evidentiary hearing, when,

during trial for a capital defendant, juror "asked her father where she 'could look in the

Bible for help and guidance in making [her] decision for between life and death'" and he

directed her to an "'eye for an eye' verse, which she consulted in private the night before

returning the verdict"); *Barnes*, 751 F.3d at 244 (holding that "a defendant is entitled to a

hearing when he or she presents a credible allegation of communications or contact

between a third party and a juror concerning the matter pending before the jury").  The

foregoing rule favoring post-trial hearings "applies only to prejudicial extraneous

contacts, not to preexisting juror bias." *United States v. Benabe*, 654 F.3d 753, 780 (7th

Cir. 2011) (citing *McClinton*, 135 F.3d at 1186; *Artis v. Hitachi Zosen Clearing Inc.*, 967

F.2d 1132, 1141 (7th Cir. 1992)); *Robinson v. Polk*, 438 F.3d 350, 363–64 (4th Cir. 2006)

(emphasizing the importance of distinguishing between internal and external influences

upon a jury) [13]; *Stockton v. Virginia*, 852 F.2d 740, 744 (4th Cir. 1988) (distinguishing

between "juror impairment or predisposition" and the more serious danger of an

"extraneous communication").[14]  "A post-verdict inquiry into intrinsic juror influences is

almost never justified." *Benabe*, 654 F.3d at 780 (citing Fed. R. Evid. 606(b); *Tanner v.*

---

[13] In *Robinson*, the Fourth Circuit concluded that no evidentiary hearing was warranted when one juror read passages from the Bible to other jurors because the Bible was not deemed to be an external influence.  438 F.3d at 363–64.

[14] Examples of extrinsic influences include, "an attempt to bribe a juror, a juror's application for a job in the district attorney's office, and newspaper articles and media attention." *Williams v. Bagley*, 380 F.3d 932, 945 (6th Cir. 2004) (citation omitted).

*United States*, 483 U.S. 107, 117–20 (1987); *Arreola v. Choudry*, 533 F.3d 601, 606 (7th

Cir. 2008)); *see Marquez v. City of Albuquerque*, 399 F.3d 1216, 1223 (10th Cir. 2005)

(internal quotation marks omitted) (citation omitted) ("A juror's personal

experience . . . does not constitute extraneous prejudicial information.").[15] Rather, the

proper "tool for examining an intrinsic influence like juror bias . . . is . . . voir dire."

*McClinton*, 135 F.3d at 1186 (citations omitted).  Nevertheless, "[f]or voir dire to

function, jurors must answer questions truthfully." *Dyer v. Calderon*, 151 F.3d 970, 973

(9th Cir. 1998).  A court in assessing potential bias "must be tolerant, as jurors may

forget incidents long buried in their minds, misunderstand a question or bend the truth a

bit to avoid embarrassment." *Id.*

### C.     Rule 606(b)

Rule 606(b)(1) provides, in pertinent part:

> During an inquiry into the validity of a verdict  . . . a juror may not testify
> about . . . the effect of anything on that juror's or another juror's vote; or
> *any juror's mental processes concerning the verdict or indictment.*  The
> court may not receive a juror's affidavit or evidence of a juror's statement
> on these matters.

Fed. R. Evid. 606(b)(1) (emphasis added).  There are three exceptions to this rule: "[a]

juror may testify about whether:  **(A)** extraneous prejudicial information was improperly

---

[15] Throughout the proceedings, Porter has consistently failed to distinguish between a claim of
juror partiality based on external contacts and a claim of juror partiality based on intrinsic bias.
*See, e.g., Barnes*, 751 F.3d at 249–53 (remanding habeas matter to conduct an evidentiary
hearing with respect to claim that juror called her pastor following closing argument to discuss
attorney's arguments that quoted the Bible regarding the propriety of the death penalty); *Billings
v. Polk*, 441 F.3d 238, 245–46 (4th Cir. 2006) (dismissing claim pertaining to an intrinsic
influence without conducting a hearing).  The Fourth Circuit also failed to distinguish between
extrinsic and intrinsic bias in its remand.

brought to the jury's attention; **(B)** an outside influence was improperly brought to bear

on any juror; or **(C)** a mistake was made in entering the verdict on the verdict form."

Fed. R. Evid. 606(b)(2). This rule embodies the recognition that "the proper functioning

of the jury system requires that the courts protect jurors from being 'harassed and beset

by the defeated party in an effort to secure from them evidence of facts which might

establish misconduct sufficient to aside a verdict.'" *United States v. Moten*, 582 F.2d

654, 664 (2d Cir. 1978) (quoting *McDonald v. Pless*, 238 U.S. 264, 267 (1915)); *see*

*Fullwood v. Lee*, 290 F.3d 663, 679–80 (4th Cir. 2002) (citations omitted) (observing that

Rule 606(b) is designed "to protect the finality and integrity of verdicts and to guard

against the harassment of jurors").

In its remand, the Fourth Circuit explained as follows with respect to Rule 606(b):

> The Supreme Court has held, "Rule 606(b) applies to juror testimony
> during a proceeding in which a party seeks to secure a new trial on the ground
> that a juror lied during voir dire." *Warger v. Shauers*, 135 S. Ct. 521, 525
> (2014). However, the Court also recognized, "[I]f jurors lie in voir dire in a
> way that conceals bias, juror impartiality is adequately assured by the parties'
> ability . . . to employ nonjuror evidence even after the verdict is rendered."
> *Id.* at 529. The Sattler Affidavit, as well as other nonjuror evidence,[16] is
> being offered here in order to demonstrate actual bias.

---

[16] Juror Treakle's brother submitted an affidavit explaining that he was a law
enforcement officer in Chesapeake at the time of the murder. *See* J.A. 1721. Other
evidence demonstrates that the victim in this case, Officer Reaves, and his family
lived in the Chesapeake area, *see id.* at 1861; Chesapeake was mourning the death
of another officer, Michael Saffran, similarly killed in the line of duty, *see id.* at
1858 (local police detective, who attended both Officer Saffran's and Officer
Reaves's funerals, stating, "Once you hear an officer has been killed everyone
knows and the ripples run through every law enforcement agency[.]"); some
Chesapeake law enforcement officers participated in the manhunt for Appellant
when he fled after killing Officer Reaves, *see id.* at 1652, 1851–52; and after her
husband's death, Mrs. Reaves wrote a letter in the Virginia Pilot, the local
newspaper stating, "We wish to acknowledge with heartfelt thanks the . . . support

Additionally, after discovery, should Juror Treakle be called to testify in an evidentiary hearing, Appellant ought to be able to ask questions regarding external prejudicial information or "whether any outside influence was improperly brought to bear," *Barnes*, 751 F.3d at 257 (quoting *Tanner v. United States*, 483 U.S. 107, 117 (1987))—for example, pressure from Appellant's family or from members of the Chesapeake police. Thus, although Rule 606(b) may prevent certain testimony from being solicited in an evidentiary hearing, it would not preclude Appellant or other jurors from testifying altogether.

*Porter II*, 898 F.3d at 428–29 (footnote number altered from original) (parallel cites omitted).

## D.   No Extrinsic Bias

"It is clearly established . . . that an external influence affecting a jury's deliberations violates a defendant's right to an impartial jury." *Barnes*, 751 F.3d at 240 (citations omitted). An external influence, is "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury, [and] is for obvious reasons, deemed presumptively prejudicial." *Remmer v. United States*, 347 U.S. 227, 229 (1954). In order "to be entitled to the . . . presumption [of prejudice] and a . . . hearing, a 'defendant must first establish both that an unauthorized contact was made and that it was of such a character as to reasonably draw into question the integrity of the verdict." *Barnes*, 751 F. 3d at 244 (citations omitted); *see also United States v. Cheek*, 94 F.3d 136, 141 (4th Cir. 1996) ("The party who is attacking the verdict bears the burden of introducing competent evidence that the

---

during the sudden loss of Officer Stanley C. Reaves.  We are so appreciative of the Norfolk and Chesapeake Police Departments . . . ," *id.* at 1861.

extrajudicial communications or contacts 'were more than innocuous interventions.'").[17]
In this case, Porter's claim of extrinsic bias falters at the outset because he fails to establish that "an unauthorized contact was made." *Barnes*, 751 F.3d at 244 (citations omitted).

Contrary to the Fourth Circuit and Porter's suggestion, after discovery and the taking of evidence, where Porter was "able to ask questions regarding external prejudicial information or 'whether any outside influence was improperly brought to bear,'" *Porter II*, 898 F.3d at 429 (citation omitted), Porter has failed to establish any evidence of external influence on Juror Treakle. Rather, the evidence conclusively demonstrates that Juror Treakle was not influenced by any extrinsic source, and Porter's allegations are

---

[17] In granting an evidentiary hearing, the Fourth Circuit explained: "Appellant ought to be able to ask questions regarding external prejudicial information or 'whether any outside influence was improperly brought to bear,' *Barnes*, 751 F.3d at 257." *Porter II*, 898 F.3d at 429. Thus, the Fourth Circuit determined that Porter was entitled to a hearing on extrinsic bias without *either* prong of the test set forth in *Barnes* being met. Porter established neither that an unauthorized contact was made nor that its character could reasonably draw into question the integrity of the verdict, a showing required for a hearing. Generally, once a petitioner has demonstrated both elements, he is entitled to the presumption of prejudice and a hearing. *Barnes*, 751 F.3d at 241; *see also id.* at 251 (explaining that if Petitioner's allegations raise[d] a genuine concern on juror impartiality . . . due process therefore require[s the Court] to remedy this allegation by ordering a hearing in which [Petitioner] would . . . enjoy[] a presumption of prejudice"). Once prejudice is presumed, "[t]he burden then shifts to the prevailing party to prove that there exists no 'reasonable possibility that the jury's verdict was influenced by an improper communication.'" *Cheek*, 94 F.3d at 141 (citations omitted); *see Remmer*, 347 U.S. at 229.

    In the instant case, Porter failed to "present[] a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury," that would "entitle[ him] to an evidentiary hearing." *Barnes*, 751 F.3d at 242. Thus, he failed to make a "threshold showing that improper external influences came to bear on the decision-making process of a juror." *See id.* at 243 n.12 (citing *United States v. Sandalis*, 14 F. App'x 287, 289 (4th Cir. 2001)). Nevertheless, the Fourth Circuit determined he was entitled to a hearing. As discussed above, Porter is not entitled to a presumption of prejudice here, as he has failed to demonstrate "an unauthorized contact was made." *Barnes*, 751 F. 3d at 244.

nothing more than unvalidated conjecture and speculation. Porter's theory fails at each link of the chain. He argues that Officer Reaves's death was highly publicized in Hampton Roads, that Pernell Treakle was a sheriff's deputy in a neighboring city and, that Pernell Treakle clearly must have known about an officer's death in an adjacent city first, simply because he was in law enforcement, second, because he was in the Honor Guard and the Honor Guard attended funerals for law enforcement, and third, because the death was so highly publicized Pernell must have heard about it. Next, Porter alleges that Juror Treakle must have spoken with his brother Pernell about the subject of Porter's trial, and because Pernell clearly knew of the murder of Officer Reaves, he certainly conveyed information about this to Juror Treakle while Juror Treakle was serving on the jury. As the evidence clearly establishes, not a single element of this theory holds true.

First, Porter offers no evidence that Juror Treakle heard or saw anything about Porter's crimes prior to the trial. During voir dire, Juror Treakle indicated that he had not heard anything about Porter's case. (SH 1202.) Nothing in the record calls into question this sworn assurance. Second, Porter did not hear anything about the case from his brother, Pernell. Pernell Treakle did attend the memorial service of Officer Saffran, a Chesapeake police officer, but he did not discuss this officer's death or any memorial service for the officer with Juror Treakle. Pernell did not recall anything about Officer Reaves's death. Therefore, Pernell could not have discussed Officer Reaves's death with Juror Treakle. Moreover, Pernell and Juror Treakle did not discuss Pernell's duties as a deputy sheriff or his work generally. Indeed, the Sattler Affidavit reflects that Juror Treakle was not even sure in which jurisdiction Pernell worked. Although Juror Treakle

mentioned to Pernell that he had been called for jury duty, that was prior to the start of

the trial and before Juror Treakle knew the nature of the case. Juror Treakle and Pernell

did not speak to one another after the trial began, and they did not discuss the Porter case

at any time.

Quite simply, this is not an instance where there is clear evidence of a third-party

contact with a juror, thus necessitating a determination by the Court as to whether it was

prejudicial. *See Barnes*, 751 F.3d at 239 (seated juror asked for religious guidance from a

third-party about the morality of imposing the death penalty and relaying this advice to

the rest of the jury); *Stockton*, 852 F.2d at 743 (where an individual approached jurors at

a restaurant and told them "they ought to fry the son of a bitch"); *Hurst*, 757 F.3d at 398–

400 (where a juror asked her father for a Bible verse and was read the verse about an "eye

for an eye"); *Fullwood*, 290 F.3d at 676 (juror's husband "'was strongly pro-death

penalty' and [she] . . . told other jurors that her husband 'was constantly telling [her]

during the trial and during deliberations that she should convict [Fullwood] and sentence

him to death.'" (alterations in original)). Rather, Porter puts forth no evidence that Juror

Treakle had unauthorized third-party communications with his brother or anyone else

about the matter pending before the jury, and the Court concludes there was none. Thus,

Porter fails to demonstrate that Juror Treakle was actually biased because of an external

contact.[18]

---

[18] Porter fails to argue and there is no evidence in the record that Juror Treakle had an external contact with Kevin Treakle or his cousins in law enforcement. With respect to Juror Treakle's failure to provide honest answers to the voir dire questions pertaining to his family committing crimes or being a victim of violent crimes, Porter fails to explain, and the Court fails to discern,

### E.    Porter's Claim Involves Potential Intrinsic Bias

Porter contends that Juror Treakle withheld material information in response to three voir dire questions.  First, Porter contends that Juror Treakle omitted material information about four additional family members in law enforcement.  With respect to the failure to offer that his brother was also a law enforcement officer, the Court previously concluded as follows:

> Porter contends that Bruce Treakle's affinity for his brother "impacted Treakle's perception of the evidence and his ultimate decisions to convict and sentence Porter to death." (Porter Reply 2, ECF No. 96.)  As the evidentiary cornerstone of this claim, Porter relies upon Bruce Treakle's post-verdict comments that, *inter alia*, "he found the officer's wife (Treva Reaves) to be a very powerful witness,"  (SH 6215), and Treakle's explanation that he found Treva Reaves's "testimony moving and very emotional for him because his brother is a sheriff's officer in Norfolk." (SH 6215.)  However, as explained more fully below, none of the above statements may be used to establish Juror Treakle's purported bias. *See* Fed. R. Evid. 606(b). "[T]he 'firmly established' *general* rule is that juror testimony *may not* be used to impeach a jury verdict. . . . The only exception to this rule is for external influence . . . ." *Robinson*, 438 F.3d at 365 (citations omitted).  Indeed, as explained below, Porter's pursuit of this evidence from Bruce Treakle frustrates the very purpose of Federal Rule of Evidence 606(b).

*Porter v. Zook*, No. 3:12CV550, 2016 WL 1688765, at *10 (E.D. Va. Apr. 25, 2016).

Similarly, Porter's contention that Juror Treakle omitted material information in response to the voir dire questions about family members who had been arrested or convicted of crimes or had been victims of violent crimes, again involves potential intrinsic bias.

---

how Juror Treakle could be actually biased because of some external contact.  Moreover, "[j]urors' personal experiences do not constitute extraneous information; it is unavoidable they will bring such innate experiences into the jury room." *Warger v. Shauers*, 574 U.S. 40,  44 (2014) (citation omitted).

## F.    Establishing Intrinsic Bias after the Verdict

Whether a juror was actually biased is a factual question.[19] *See Gonzales v.*

*Thomas*, 99 F.3d 978, 986 (10th Cir. 1996) (citation omitted).  "Actual bias" is "the

existence of a state of mind that leads to an inference that the person will not act with

entire impartiality." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997) (citing

*United States v. Wood*, 299 U.S. 123, 133 (1936)).  "To establish actual bias after a trial,

a party must prove that a juror was not 'capable and willing to decide the case solely on

the evidence before [him].'" *United States v. Sampson*, 820 F. Supp. 2d 151, 163 (D.

Mass. 2011) (alteration in original) (quoting *McDonough Power Equip., Inc v.*

*Greenwood*, 464 U.S. 548, 554 (1984)).  "Determining whether a juror is biased or has

prejudged a case is difficult, partly because the juror may have an interest in concealing

his own bias and partly because the juror may be unaware of it." *Smith*, 455 U.S. at 221–

22 (1982) (O'Connor, J., concurring).  Intrinsic bias "include[s] the general body of

experiences that jurors are understood to bring with them to the jury room." *Warger v.*

*Shauers*, 574 U.S. 40, 51 (2014) (citing *Tanner*, 483 U.S. at 117–19).  "[A] juror is not

impartial if his experiences, opinions, predispositions, biases, prejudices, interests, or

---

[19] "The bias of a prospective juror may be actual or implied, that is, it may be bias in fact or bias conclusively presumed as a matter of law." *Fitzgerald v. Greene*, 150 F.3d 357, 365 (4th Cir. 1998) (quoting *United States v. Wood*, 299 U.S. 123, 133 (1936)).  As discussed previously, Porter has not raised a claim of implied bias, nor would such a claim be viable in this case. Implied bias "is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial under the circumstances." *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988).  Juror Treakle's family in law enforcement, family who were arrested for crimes dissimilar to Porter's, and family who were victims of violent crimes, are not exceptional. *See infra* Part IV.B.

relationships 'would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions under oath." *Sampson*, 820 F. Supp. 2d at 162 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)).  Juror bias can come to light "by express admission or by proof of specific facts showing such a close connection in the circumstances at hand that bias must be presumed." *United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988) (citation omitted).  One may demonstrate that a juror was intrinsically biased by a combination of, *inter alia*: (1) the juror's admissions of bias on voir dire; (2) a juror's inaccurate or incomplete answers on voir dire; (3) non-juror evidence of bias; and (4) an examination of the juror's actions during the trial.  *See, e.g., United States v. Lawhorne*, 29 F. Supp. 2d 292, 312 (E.D. Va. 1998).  A postconviction hearing into potential bias "permits counsel to probe the juror's memory, his reasons for acting as he did, and his understanding of the consequences of his actions," and "also permits the trial judge to observe the juror's demeanor under cross-examination and to evaluate his answers in light of the particular circumstances of the case." *Smith*, 455 U.S. at 209, 222 (O'Connor, J., concurring).

### G.    Analysis of Actual Bias Claim

#### 1.    Family In Law Enforcement

The record fails to demonstrate that Juror Treakle "deliberately omitted material information in response to questions asked on *voir dire*." *Billings v. Polk*, 441 F.3d 238, 246 n.4 (4th Cir. 2006) (citations omitted).  Defense counsel asked whether, "anyone here, or a member of your close personal family, worked in law enforcement in any capacity as a volunteer or an employee?" (SH 1225.)  Juror Treakle readily volunteered

that he had a nephew who was a police officer in Arlington County, where the trial was being conducted. (SH 1225.) Juror Treakle further assured defense counsel such a circumstance would not impair his ability to sit and render a fair and impartial verdict. (SH 1225–26.)

Porter faults Juror Treakle for failing also to volunteer that he had another relative, a brother who worked in law enforcement for the Chesapeake Sheriff's Office, and three additional cousins who work in law enforcement. As a preliminary matter, trial counsel did not ask Juror Treakle, who was the first member of the venire to respond to the question, to identify every member of his family who had a connection to law enforcement. Furthermore, counsel did not ask Juror Treakle if he had additional family members in law enforcement. As the Court previously noted, "a juror's failure to elaborate on a response that is factually correct but less than comprehensive" is not necessarily indicative of deceit where no follow-up question is asked. *Porter I*, 803 F.3d at 697 (citing *Billings*, 441 F.3d at 245; *Fitzgerald v. Greene*, 150 F.3d 357, 363–64 (4th Cir. 1998)). Nevertheless, the Fourth Circuit suggests that it was incumbent upon Juror Treakle to have volunteered *all* of his additional family members in law enforcement, and by not doing so, he may have "purposely omitted or concealed his relationship." *Porter II*, 898 F.3d at 428. Porter fails to establish that Juror Treakle was intentionally dishonest.

With respect to Juror Treakle's cousins, a father and a son who served on the police force in Philadelphia, and another cousin who worked for the FBI, Juror Treakle was not close with these cousins, rarely saw them, and he did not think of these cousins

46

"at all" during voir dire or trial. Juror Treakle did not intentionally conceal that he had

cousins in law enforcement to secure a place on the jury as he just did not think of them

during voir dire or trial.

Juror Treakle also did not intentionally conceal his brother Pernell's employment

in law enforcement to secure a place on Porter's jury. First, Juror Treakle readily

admitted that he had a close family relative in law enforcement. Second, Juror Treakle

freely admitted to Porter's habeas counsel that his brother Pernell worked in law

enforcement.[20] Third, Juror Treakle steadfastly believed that he had mentioned or

thought he had mentioned his brother during voir dire. Juror Treakle's nondisclosure of

his brother was inadvertent. *See United States v. Fulks*, 454 F.3d 410, 432 (4th Cir.

2006) (finding no actual bias when juror "honestly believed" that she had disclosed her

husband's murder in jury questionnaire but inadvertently did not). Porter's suggestion

that Juror Treakle volunteered information about his nephew, who was a police officer,

but not about his brother, who was a deputy sheriff, for fear of losing his place on the jury

is not supported by the record. Juror Treakle's circumstances are thus distinguishable

from those instances where the record indicated that a juror *purposely concealed*

information about his or her relationship to law enforcement officials, the prosecutor, or

prosecution witnesses, in order to secure a place on the jury. *See Conaway*, 453 F.3d at

---

[20] Porter indicates that Juror Treakle was the juror who admitted to an alternate juror, Eric Lautenschlager, that he had a brother in law enforcement. (ECF No. 221, at 32 (citing SH 5231).) To the extent this can be considered here, this too reinforces the notion that Juror Treakle was not attempting to conceal his relationship with a brother in law enforcement.

588; *Scott*, 854 F.2d at 699–700; *Williams v. Netherland*, 181 F. Supp. 2d 604, 608–10

(E.D. Va. 2002).[21] Here, Juror Treakle's answer was not "misleading, disingenuously

technical, or otherwise indicative of an unwillingness to be forthcoming." *Billings*, 441

F.3d at 244 n.2; *see also Williams*, 181 F. Supp. 2d at 608–10. Thus, Porter fails to

demonstrate that Juror Treakle deliberately omitted material information.

---

[21] The *Conaway* and *Williams* cases relied on heavily in *Porter II* are factually distinct from the immediate case as they involved an *intentional* failure by a juror to disclose a relationship with an individual *involved in the case*, and a resulting finding of *implied*, not actual, bias. In *Conaway*, on remand, the district court determined that the juror was impartial due to implied bias. *Conaway v. Polk*, No. 1:98CV1117, 2008 WL 4790107, at *9 (M.D.N.C. Oct. 24, 2008). The evidence reflected that the juror had lied during voir dire in his response to whether he knew any of the witnesses or if any family member had dealings with the District Attorney in order to remain on the jury. *Id.* at *3. The juror indicated that he knew the sheriff, but did not indicate that, one of the key witnesses, a co-defendant, whose testimony implicated Conaway and exculpated himself, was his double first cousin. *Id.* at *1–2. During the evidentiary hearing, the evidence demonstrated that the juror and the double first cousin were extremely close, "like brothers," *id.* at *3, and the juror knew that the witness was the son of his cousin but failed to reveal that during voir dire or during the trial, even after family members confronted him about the inappropriateness of him serving on the jury because of his relationship to the witness. *Id.* at *3–4. The district court determined that, because the juror knew he was related to the co-defendant witness and he concealed that family relationship to remain on the jury, "[u]nder these exceptional circumstances," bias was implied. *Id.* at *9–10.

In *Williams*, the jury forewoman failed to disclose during voir dire: 1) that her ex-husband and father of her four children was a sheriff, and a witness for the Commonwealth who testified about the homicide investigation; 2) that the prosecutor had previously represented her in divorce proceedings from the witness; 3) that her family watched and read media coverage of the criminal case and discussed it with her pretrial; and 4) that she knew the victim's brother. 181 F. Supp. 2d at 606–08. During the evidentiary hearing, the juror indicated that she did not consider herself "related" to her ex-husband, *id.* at 608, she did not believe that the attorney "had represented her since the divorce was uncontested," *id.* at 609, and, based on the judge's question about whether "you" had read or heard any media reports on the case, she did not feel obligated to tell the court that her family clearly had followed the coverage and discussed it with her. *Id.* The district court found after hearing the juror's responses and observing her demeanor that the juror was "intelligent" and "assertive" and her silence with respect to the related questions was intentionally false and misleading and could not be categorized as an "honest mistake." *Id.* at 608–10, 615. The district court found that the juror was not impartial under *McDonough* and that the circumstances dictated a finding of implied bias. *Id.* at 616–17.

However, "a showing that a juror was actually biased, regardless of whether the juror was truthful or deceitful, can also entitle a defendant to a new trial." *Jones*, 311 F.3d at 310; *see Conner v. Polk*, 407 F.3d 198, 209 (4th Cir. 2005) (Luttig, J. dissenting). In remanding this case previously, the Fourth Circuit observed that, regardless of whether Juror Treakle acted honestly on voir dire, another "factor that may give rise to distinct concerns about actual bias is a personal relationship that colors a juror's perspective on a case." *Porter I*, 803 F.3d at 698 (citing *Fields v. Woodford*, 309 F.3d 1095, 1103–06 (9th Cir. 2002); *Scott*, 854 F.2d at 698–700). During his testimony, counsel asked Juror Treakle questions about his relationship with his brother and his cousins and whether the fact that his brother was a sheriff's deputy in Chesapeake or his cousins were in law enforcement would have affected his ability to sit on the jury and be fair and impartial. Juror Treakle answered definitively each time that it would not. The Court observed his demeanor during counsel's questioning, and finds Juror Treakle's repeated assurances that he could be impartial despite his family in law enforcement entirely credible.

Juror Treakle stated during voir dire that the fact that he had a nephew in law enforcement would not affect his ability to be fair and impartial. Juror Treakle's nephew was someone who he was very close with and saw nearly every day. Counsel conducting voir dire were satisfied by the response that Juror Treakle would be fair and impartial. In contrast, Juror Treakle and his brother Pernell only spoke by phone every few months. It is unclear why Porter believes that Juror Treakle's assurances that he could be fair and impartial despite his nephew would not equally be extended to a brother with whom he had more limited contact. Furthermore, the record establishes that the mere fact that

49

Juror Treakle's brother was a sheriff's deputy in a neighboring city had no influence on

Juror Treakle's ability to be fair and impartial. *See Fulks*, 454 F.3d at 420 (finding no

actual bias when juror confirmed in post-conviction hearing that her husband's murder,

that she failed to reveal in juror questionnaire, had no influence on her deliberations in

death penalty case).

Before the Court is Juror Treakle's sworn assurance that he could remain impartial

despite the facts that the case involved the murder of a police officer and he had a close

relative who was a police officer, and his additional assurance that his brother's or his

cousins' employment does not change that answer. Porter insists that Juror Treakle's

assurance of impartiality has been called into question by his post-trial comments

indicating that he was particularly moved by the testimony of Officer Reaves's widow.

However, "[a]s is reflected in Federal Rule of Evidence 606(b), requests to impeach jury

verdicts pursuant to post-trial contact with jurors generally are disfavored." *United States

v. Sandalis*, 14 F. App'x 287, 289 (4th Cir. 2001) (footnote omitted) (citing *United States

v. Gravely*, 840 F.2d 1156, 1159 (4th Cir. 1998)); *see Robinson*, 438 F.3d at 365

("According to at least a century of Supreme Court jurisprudence . . . the 'firmly

established' *general* rule is that juror testimony *may not* be used to impeach a verdict."

(citation omitted)). Thus, "when a party seeks to attack or support a verdict, Rule 606(b)

prohibits all inquiry into a juror's mental process in connection with the verdict."[22]

---

[22] The Court previously explained:

> Porter insists that it is premature to require him to substantiate his actual bias claim
> with any admissible evidence. (Porter Reply 1 (citation omitted).)   Rather, he

*Cheek*, 94 F.3d at 143 (citing *Tanner*, 483 U.S. at 117–22; *Gosier v. Welborn*, 175 F.3d

504, 510–11 (7th Cir. 1999) (barring under Rule 606(b) evidence discovered after trial

that juror only voted for death penalty when he could not persuade any other juror to vote

for lenience); *Stockton*, 852 F.2d at 743–44).[23]   When Porter's counsel elicited Juror

Treakle's thoughts about his mental processes in connection to the verdict or the sentence

he personally decided upon, Porter was improperly "delving into" evidence barred by

Rule 606(b). *See Cheek*, 94 F.3d at 143 (citations omitted).   Similarly, the Court is

barred under Rule 606(b) from considering the testimony from the alternate juror, Eric

---

contends that, at this stage, the disposition of his claim is governed by the standards applicable for a motion to dismiss and the Court must accept his "well-pleaded allegations as true, and ... draw all reasonable inferences in his favor." (*Id.* (quoting *Conaway*, 453 F.3d at 582)).   Porter's contention, while accurate, is woefully incomplete.

   Porter has failed to substantiate his claim with competent evidence that tends to show Bruce Treakle was biased.   The prohibition of Rule 606(b) extends to the forecast of evidence in affidavits when assessing the necessity of an evidentiary hearing.   *See Bacon v. Lee*, 225 F.3d 470, 485 (4th Cir. 2000) (concluding no evidentiary hearing was warranted regarding juror bias claim where the forecasted evidence of juror bias pertained to racial jokes allegedly made during deliberations (citing Fed. R. Evid. 606(b); *Tanner*, 483 U.S. at 121; *Gosier v. Welborn*, 175 F.3d 504, 510–11 (7th Cir. 1999))).   In *Gosier*, the federal habeas petitioner sought to impugn his state death sentence with an affidavit from a juror regarding the juror's failure to follow the trial court's instructions.   175 F.3d at 510. As the Seventh Circuit observed in rejecting a similar claim:   "It would be altogether inappropriate for a federal court to entertain the kind of evidence [the petitioner] proffers just because this is a collateral attack, when neither a federal nor a state court allows a verdict to be challenged directly using evidence of this kind.   His current effort to reconstruct the jury's deliberations is simply forbidden." *Id.* at 511.

*Porter*, 2016 WL 1688765, at *13.

[23] In contrast, in both *Conaway* and *Williams*, the petitioners were able to substantiate the allegations of juror bias with evidence or allegations of discoverable evidence that did not run afoul of the prohibitions of Rule 606(b).

Lautenschlager, that he was shocked that members of the jury mentioned after they were empaneled that they had family in law enforcement and that one juror indicated that he had a brother in law enforcement. *See Warger*, 574 U.S. at 42 ("Rule 606(b) precludes a party from seeking a new trial from using one juror's affidavit of what another juror said in deliberations to demonstrate the other juror's dishonesty during *voir dire*."); *Tanner*, 483 U.S. at 125–28 (finding juror testimony concerning drug and alcohol use by members of the jury was not admissible in a post-verdict evidentiary hearing under Rule 606(b) but could be sought through non-juror evidence).[24]  Rather,

> the suitability of an individual for the responsibility of jury service, of course, is examined during voir dire. Moreover, during trial the jury is observable by the court, by counsel, and by court personnel. Moreover, jurors are observable by each other, and may report inappropriate juror behavior to the court *before* they render a verdict.

*Robinson*, 438 F.3d at 362–63 (quoting *Tanner*, 483 U.S. at 127).[25]  Simply put, "the Sixth Amendment's guarantees do not require judicial consideration of juror allegations regarding influences internal to the deliberation process." *Id.* at 363.

Even if the Court was not prohibited from considering Juror Treakle's post-verdict mental impression of the trial evidence, Juror Treakle's innocuous statements fail to demonstrate that he was biased. *See Bacon v. Lee*, 225 F.3d 470, 485 (4th Cir. 2000) (finding statements amongst jurors pertaining to race of defendant and his lover had no

---

[24] Lautenschlager was permitted to testify, "as to 'whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.'" *Fullwood*, 290 F.3d at 680 (citing Rule 606(b)). As already discussed above, discovery and the evidentiary hearing did not bear out any such evidence.

[25] Notably, Lautenschlager was not so shocked by this information that he felt compelled to bring it to the Court's attention before the verdict was rendered.

"substantial and injurious effect or influence in determining the jury's verdict" (citation omitted)). Juror Treakle merely indicated that he "found the officer's wife (Treva Reaves) to be a very powerful witness" and that "he found her testimony moving and very emotional for him because [of] his brother['s]" employment. (SH 6215.) Juror Treakle also "expressed sympathy for law enforcement officers, and emphasized that they put their lives on the line every day for the community." (SH 6215.)

"[I]t is unavoidable" that jurors will "will bring such innate [personal] experiences into the jury room." *Warger v. Shauers*, 721 F.3d 606, 611 (8th Cir. 2013); *see J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 149 (1994) (O'Connor, J., concurring) (citation omitted) ("Jurors are not expected to come into the jury box and leave behind all that their human experience has taught them."). In addition, "[a]lthough bias in favor of law enforcement officials [i]s inappropriate," "[a] juror's generally favorable impression of law enforcement does not necessarily amount to bias any more than does a juror's personal association with law enforcement." *United States v. Umaña*, 750 F.3d 320, 342 (4th Cir. 2014) (second alteration in original) (citing *United States v. Lancaster*, 96 F.3d 734, 743 (4th Cir. 1996); *United States v. LaRouche*, 896 F.2d 815, 830 (4th Cir. 1990)). Furthermore, the fact that Juror Treakle was moved by Mrs. Reaves's testimony because he had a brother in law enforcement fails to establish that Juror Treakle disregarded his oath to ultimately decide the case on the law and the evidence. *See United States v. Gumbs*, 562 F. App'x 110, 115–16 (3d Cir. 2014) (unpublished) (concluding that district court did not err in failing to remove a juror who had cried when watching video of defendant sexually abusing an eight-year old victim); *Miller v. Webb*, 385 F.3d 666, 680

(6th Cir. 2004) (Gibbons, J., dissenting) ("Expressions of sympathy for a victim, without more, do not demonstrate actual bias where the juror has assured the court that she may decide the case fairly."); *United States v. Jones*, 716 F.3d 851, 857 (4th Cir. 2013) ("Because jurors will have opinions from their life experiences, it would be impractical for the Sixth Amendment to require that each juror's mind be a tabula rasa."). Rather, the Warden called Mrs. Reaves to testify precisely because her testimony would be moving to anyone regardless of whether they had family relationships with law enforcement officers. Clearly, the Commonwealth was successful in that endeavor, but that is insufficient to show that Juror Treakle was actually biased against Porter. *See Porter II*, 898 F.3d at 447 (Shedd, J., concurring in part and dissenting in part).

Moreover, the voir dire here thoroughly explored whether the jurors, including Juror Treakle, could follow the Circuit Court's instructions and remain impartial in imposing a verdict, despite the fact that the case involved the capital murder of a police officer. *Scott v. Mitchell*, 209 F.3d 854, 879 (6th Cir. 2000) ("Allegations of jury bias must be viewed with skepticism when the challenged influence occurred before the jurors took their oath to be impartial."). In the post-conviction hearing, Juror Treakle unequivocally stated that his additional family in law enforcement would not affect his ability to be fair and impartial. *See Fitzgerald*, 150 F.3d at 365. Juror Treakle's testimony is credible. Even after discovery and a hearing, there is simply no evidence that Juror Treakle was anything less than truthful when he answered the questions about whether he could remain impartial. The facts and circumstances here do not lead to an inference that Juror Treakle was partial or failed to follow the Circuit Court's instructions

to decide the case on the law and evidence. Thus, Porter fails to establish that Juror Treakle was actually biased based on his close family relationships with law enforcement officers.

### 2.    Family Members With Arrests or Prosecutions

Porter also contends that Juror Treakle failed to provide material information with respect to the voir dire question about family members with records of arrests or prosecutions. Juror Treakle was silent when asked: "Have you or any family member of your immediate family or close friend ever been arrested or prosecuted for the alleged commission of a criminal offense?" Porter contends that Juror Treakle's silence was a knowingly false response to a material question on voir dire.

As the evidentiary hearing established, Juror Treakle was aware at the time of Porter's trial that his brother Ronald, his brother Calvin, his son, and his niece had been arrested or charged with criminal activity. Juror Treakle knew that his brother had served probation for his false overtime claims, but after Calvin told him about his conviction and probation, they "didn't discuss it no more." (ECF No. 240–1, at 30.) Juror Treakle also knew that his son had served jail time and probation for drug charges when he was a juvenile. Juror Treakle knew generally that Ronald had been arrested and been in jail periodically, and the same with his niece Ylindo, but Juror Treakle did not know the details about their arrests, convictions, or incarcerations. Specifically, Juror Treakle "didn't keep up with [Ronald's] activities at all," because "he couldn't keep up with them." (ECF No. 240–1, at 35.)

Although Juror Treakle's silence with respect to this question provided a false assurance to counsel during voir dire that he did not have family members who had been arrested or prosecuted, Juror Treakle's silence was not a knowingly false response. Juror Treakle did not think about these family members during voir dire. During voir dire, Juror Treakle "didn't think about nothing containing my family at all. I know I had never been in trouble. That's all. I was just concerned about myself." (ECF No. 240–2, at 91.) Juror Treakle did not *intentionally* or *deliberately* fail to provide information pertaining to family members who had committed crimes or had been victims of violent crimes. Juror Treakle did not think about his son because he was a juvenile at the time of his arrest and conviction. Juror Treakle did not knowingly conceal this information. *Cf. Conaway*, 453 F.3d at 588 (juror knowingly concealed familial relationship to a co-defendant who was also a key prosecution witness); *Scott*, 854 F.2d at 699 ("A juror may not conceal material facts disqualifying him simply because he *sincerely* believe[d] he [could] be fair in spite of them."); *Williams*, 181 F. Supp. 2d at 608–10.

Even if the Court determined that Juror Treakle realized during voir dire that his answer should be yes, but he stayed silent with respect to this question, and thus, his silence was knowing, Porter still fails to demonstrate that Juror Treakle was impartial due to his family's history of crime. "[E]ven an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality." *Dyer*, 151 F.3d at 973. Thus, "[i]n assessing a question of bias, [the Court] must examine [Juror Treakle's] motives and the 'reasons that affect a juror's impartiality.'" *Conner*, 407 F.3d at 206–07. "[T]he motives for concealing information may vary, but only those reasons that affect a

juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464

U.S. at 556. "If [Porter] can prove that [Juror Treakle] deceived the court at voir dire, he

. . . [must also] prove that [he] did so because of partiality, rather than for some reason

that is irrelevant to the fairness of the trial." *United States v. Tucker*, 137 F.3d 1016,

1028 (8th Cir. 1998). Porter fails to make this showing.

With respect to Juror Treakle's failure to provide material information about his

brothers', son's, and niece's arrests and prosecutions, "there is no evidence of motive,

much less evidence of motive tending to raise questions as to the juror's impartiality."

*Jones*, 311 F.3d at 313 (finding that juror who answered falsely to voir dire question

about whether she had relatives who had been convicted and provided other inconsistent

answers was not shown to be impartial); *see United States v. Ross*, 263 F.3d 844, 847 (8th

Cir. 2001). *But see Williams*, 181 F. Supp. 2d at 610 (finding juror not a "fair and

impartial juror" despite no evidence of motive, when juror knowingly failed "to provide

complete and accurate responses to a number of questions during *voir dire*").[26] This is

not an instance where Juror Treakle failed to disclose his family's criminal history

_____

[26] As discussed previously, *Williams* is factually distinct from the situation here. In *Williams*, the juror gave several deliberately false and misleading answers that impeded the voir dire process, her explanations for her misrepresentations were questionable, and the prosecutor remained silent. The juror did not reveal that she was previously married to a prosecution witness and he was the father of her children, she failed to reveal that she had been represented by one of the attorneys involved in the trial, she failed to reveal that her children and husband had read or heard about the case from the media and discussed the media coverage with her, and she knew the victim's brother. 181 F. Supp. 2d at 608–10. Those troubling allegations are not present in this case for several reasons. For example, the record does not establish that Juror Treakle knowingly or deliberately provided false answers to multiple questions, Juror Treakle had no personal relationship with anyone involved in Porter's trial, and there is no evidence of external influences here.

because it involved a similar crime to Porter's, or because it invoked a powerful emotional response that was "too painful for [him] to disclose or discuss." *See Sampson*, 820 F. Supp. 2d at 159 (finding juror impartial when she intentionally and "repeatedly lied" about her husband's physical abuse and daughter's drug use and subsequent incarcerations because she "was deeply ashamed, and became distraught when required to think about them" and her "decision to lie rather than reveal these events demonstrate[d] the tremendous emotional impact that they had" on her). Juror Treakle did not "consciously censor[] the information" due to a belief that "it was his place, and not the place of the court or defense counsel, to determine whether his relations were a bar to jury service in this case." *Scott*, 854 F.2d at 699; *see Dyer*, 151 F.3d at 981 (where juror "did not claim to be forgetful" but "steadfastly maintained that she—not the court, nor the defense nor the prosecutor—was the best and only judge of what information was relevant," her lack of candor reflected an inability to render an impartial verdict); *see Williams*, 181 F. Supp. 2d at 608–17. There is no evidence that Juror Treakle's silence with respect to his family member's convictions was driven by his desire to serve on Porter's jury. Rather, Juror Treakle did not think of these individuals during voir dire. Moreover, Juror Treakle assured post-conviction counsel during his testimony that the fact that family members had been arrested or convicted would not have affected his ability to serve on the jury and be fair and impartial. The Court observed Juror Treakle's demeanor during counsel's questioning and finds him credible. In the circumstances before the Court, there is simply no evidence that Juror Treakle had any improper motive, much less any evidence raising questions about his impartiality based on his failure to

58

honestly answer this question. Porter fails to put forth evidence that Treakle was impartial or failed to follow the Circuit Court's instructions to decide the case on the law and evidence due to family members who had been arrested or convicted of crimes.

Porter attempts to slant Juror Treakle's statements about his brother Ronald, as establishing his weariness or exhaustion with someone who, like his brother, or like Porter, has been in continuous trouble with the law throughout his life. Porter argues that these statements reflect Juror Treakle's actual bias against Porter.[27] However, nothing in the record supports an inference that Juror Treakle's experiences with his brother would cause Juror Treakle to be impartial. Instead, contrary to Porter's suggestion, "the fact that the juror had relatives who were subject to arrest and jury trials does not give rise to an inference that the juror was biased against the appellant; indeed, arguably the more common-sense assumption with this background would be biased in *favor* of the accused." *Jones*, 311 F.3d at 313; *see also Ross*, 263 F.3d at 847 (observing that where juror "failed to disclose on her questionnaire and at voir dire the fact that she has been accused of felonies and convicted of a number of misdemeanors . . . if anything, . . . the juror's previous brushes with that law would create a stronger opposite inference—one that she might well be biased in favor of defendants in general"). Juror Treakle testified that when Ronald started getting into trouble, Juror Treakle simply tried to distance

---

[27] Counsel concludes that Juror Treakle was afraid of his brother Ronald. (ECF No. 221, at 18, 30.) Juror Treakle never stated this, nor should it be inferred. Instead, Juror Treakle "distanced himself from [Ronald] because [he] didn't want no confrontation with him" and acknowledged that "it was a . . . legitimate possibility" that Ronald could have become violent "in those situations." (ECF No. 240-2, at 77–78.) At most, Juror Treakle was wary of a *confrontation* with Ronald.

himself from Ronald. Juror Treakle and Pernell also explained that Ronald had served in the military and suffered from mental illness and history of drug use. Juror Treakle indicated that he tried to talk to Ronald at times, but he also purposely tried not to upset him. Thus, the evidence that Porter points to could just as plausibly suggest an inference of empathy for Porter, or even a bias in favor of Porter.

In sum, Porter fails to demonstrate that Treakle was impartial or failed to follow the Circuit Court's instructions to decide the case on the law and evidence. Thus, he fails to establish that Juror Treakle was actually biased based on the fact that family members had been arrested and convicted of crimes.

### 3.   Family Members Who Have Been a Victim of Violent Crime

Porter also contends that Juror Treakle failed to provide material information with respect to the voir dire question about whether he or a family member had been a victim of a violent crime. Juror Treakle was silent again when asked: "[M]y next question is whether you, any member of your immediate family or close friends has even been the victim of a violent crime?" (SH 1205.) Again, Porter contends that Juror Treakle's silence was a knowingly false response to a material question on voir dire because Juror Treakle's brother Ronald had been arrested twice for assaulting their brother Calvin, and because Juror Treakle's parents were killed in a car accident in 1977 by a driver alleged to be drunk.

Standing alone, "[t]he fact that a juror or his relative has been the victim of some crime, unrelated to the offense being tried . . . is only minimally relevant to the question of that juror's impartiality." *United States v. Jones*, 608 F.2d 1004, 1007 (4th Cir. 1979).

The record establishes that Juror Treakle's silence with respect to this question was a "mistaken, though honest response." *See McDonough*, 464 U.S. at 555.[28] Juror Treakle indicated that he knew that his brother Calvin and Ronald had been involved in a "big disagreement" or an altercation. Juror Treakle was not familiar with the details of the incident, when it occurred, or the extent of any injury, but he believed that Calvin may have told him that Ronald punched him in the face. Juror Treakle did not know about a second assault, and he was not a witness to either of the incidents. Juror Treakle was completely unaware of the details surrounding these incidents. Juror Treakle knew Ronald had been arrested many times, but he did not realize that Ronald had been arrested or prosecuted for a fight with his brother. Thus, the evidence does not affirmatively reflect that Juror Treakle was subjectively aware that his brother Calvin had been a victim of a violent crime. *See United States v. Perkins*, 748 F.2d 1519, 1531 (11th Cir. 1984) (requiring court to determine whether juror "was aware of the fact that his answers were false"). Therefore, Porter fails to establish that Juror Treakle knowingly omitted the information about his brother Calvin being the victim of a violent crime.

However, the fact that his brother Calvin had been a victim of an assault at the hands of his brother Ronald would not have affected Juror Treakle's ability to be fair and impartial. To the extent that Juror Treakle should have realized that his brother Calvin

---

[28] The Court recognizes that with respect to the *McDonough* analysis, the Fourth Circuit already concluded for this Court that "not just straight lies, but also failures to disclose" satisfies *McDonough*'s first prong. *See Porter II*, 898 F.3d at 431. However, with respect to the actual bias analysis, the Court finds that Juror Treakle did not knowingly omit information with respect to this question.

had been the victim of a crime, Porter fails to establish that it made him an impartial

juror. *See Fulks*, 454 F.3d at 420 (no evidence of actual bias when juror left question

blank about whether she or a family member had ever been a victim of serious crime,

even though her husband had been murdered, due to her assurance that it had no

influence on her deliberations); *Fitzgerald*, 150 F.3d at 364 (finding no actual bias where

juror whose granddaughter had been molested failed to answer affirmatively during voir

dire to question of whether a family member had been raped but mentioned it during

sentencing phase to push for life sentence). Rather, as discussed previously, Juror

Treakle knew that Ronald had brushes with the law, and it did not surprise Juror Treakle

to hear that Ronald assaulted Calvin. Porter fails to offer any evidence that Ronald's

assaults on his brother Calvin would call into question Juror Treakle's impartiality. As

such, the Court cannot draw an inference that Juror Treakle was actually biased against

Porter due to the assault on his brother.

Juror Treakle also testified that he knew at the time of Porter's trial that his parents

had been killed in a car accident in 1977. Juror Treakle testified that his aunt told him

about the accident, and that he believed "that a drunk driver was speeding or racing

during that Christmas holiday back in 1977." (ECF No. 240-1, at 63–64.) Juror Treakle

did not know if the driver had been prosecuted. Counsel's questioning of Juror Treakle

reflected that his knowledge of the incident was limited, and that he did not view this as a

violent crime. *Cf. Amirault v. Fair*, 968 F.2d 1404, 1405–06 (1st Cir. 1992) (no bias

when juror serving on a rape trial failed to identify that she had been raped forty years

earlier but had "blocked the memory of" it). Thus, once again, Juror Treakle's failure to

answer this question honestly was not intentional but was merely mistaken or a result of a misunderstanding. *See McDonough*, 464 U.S. at 555; *Perkins*, 748 F.2d at 1531. The record reflects nothing more than an inadvertent failure to answer this question in the affirmative. *See Fulks*, 454 F.3d at 433. The fact that Juror Treakle's parents were killed by a drunk driver does not permit an inference that he was actually biased, and therefore, was an impartial juror in Porter's case. Accordingly, Porter has failed to establish that Juror Treakle was impartial due to actual bias.

### H.   No Inference of Bias

Porter contends that "the Court may infer actual bias on the part of Juror Treakle based on his concealment of material information in response to three unambiguous questions." (ECF No. 221, at 32.) The Court recognizes that "[c]ertain false statements that 'might be harmless in isolation' may present a 'much more sinister picture' when viewed as a whole." *United States v. Stewart*, 433 F.3d 273, 304 (2d Cir. 2006) (quoting *Green v. White*, 232 F.3d 671, 678 n.10 (9th Cir. 2000)). "[R]epeated lies in voir dire [may] imply that the juror concealed material facts in order to secure a spot on the particular jury." *Fields v. Brown*, 503 F.3d 755, 770 (9th Cir. 2007) (citation omitted); *see also Dyer*, 151 F.3d at 982–84 (finding *implied* bias because "the magnitude of [the juror's] lies and her remarkable display of insouciance—her expressed feeling that only she would decide what matters—fatally undermines our confidence in her ability to decide [the defendant's] fate"); *Williams*, 181 F. Supp. 2d at 617 (finding *implied* bias because juror intentionally concealed information of "personal[] connect[ion] to several parties in the case," and of her pretrial exposure to media coverage of case). Porter also

contends that Juror's Treakle's dishonest answers on voir dire indicate that he was unwilling or unable to apply the law as instructed by the court to the evidence presented at trial.

However, the Court has determined that Juror Treakle did not repeatedly lie or intentionally conceal material information in his voir dire to secure a spot on the jury. Rather, with respect to two of the questions, Juror Treakle was not aware that his answers were false. He truthfully answered that he had a family member in law enforcement and steadfastly believed that he mentioned his brother. The record establishes that Juror Treakle did not realize or understand that his answer should have been "yes" to the question about family members who had been victims of violent crime. With respect to the question about whether anyone in his family had been arrested or prosecuted, Juror Treakle simply did not think of these individuals and had no motive to lie about the answer to secure a seat on the jury. Thus, Juror Treakle did not engage in a "pattern of lies, inappropriate behavior, and attempts to cover up his behavior" that would "introduce[] 'destructive uncertainties' into the fact-finding process" where bias must be presumed. *Green*, 232 F.3d at 676; *see Dyer*, 151 F.3d at 983–84 ("A juror . . . who lies materially and repeatedly in response to legitimate inquiries about her background introduces destructive uncertainties into the process."); *Williams*, 181 F. Supp. 2d at 610.

Juror Treakle unequivocally stated that his additional family members in law enforcement and his family members who had been arrested or convicted, or had been victims of violent crimes, had no effect on his ability to be fair and partial. The Court finds the facts and circumstances do not permit an inference that Juror Treakle was

actually biased. In sum, nothing here suggests that Juror Treakle was not "capable and willing to decide the case solely on the evidence before" him. *Smith*, 455 U.S. at 217. After an opportunity to conduct extensive discovery and hear from Juror Treakle and his family, Porter has failed to point to any evidence that Juror Treakle was actually biased. Accordingly, Amended Claim I is dismissed with respect to the claim of actual bias.

## IV. ANALYSIS OF THE *MCDONOUGH* CLAIM

Porter asserts that he is also entitled to relief as to Juror Treakle's alleged misconduct pursuant to the test articulated in *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984). The Supreme Court and the Fourth Circuit have maintained that establishing a viable *McDonough* claim is a high standard. *McDonough*, 464 U.S. at 555–56; *Porter I*, 803 F.3d at 697 ("Under [the *McDonough*] test, the bar for juror misconduct is set high . . . ."); *cf. Jones v. Cooper*, 311 F.3d 306, 312 (4th Cir. 2002) ("The mere fact that the juror's relatives had a history of arrests and jury trials certainly does not reach the high standard needed for the implication of bias."). In order to prove a juror bias claim under *McDonough*, the petitioner must establish that (1) "a juror failed to answer honestly a material question on *voir dire*," and (2) "a correct response would have provided a valid basis for a challenge for cause." 464 U.S. at 556. "Additionally, a litigant must show that the fairness of his trial was affected either by the juror's 'motives for concealing the information' or the 'reasons that affect the juror's impartiality.'" *Conaway v. Polk*, 453 F.3d 567, 585 (4th Cir. 2006) (quoting *McDonough*, 464 U.S. at 556). Importantly, the Supreme Court has admonished that "[t]he motives for concealing information may vary, but only those reasons that affect a

juror's impartiality can truly be said to affect the fairness of a trial." *McDonough*, 464 U.S. at 556.

## A. Whether Juror Treakle Was Dishonest During Voir Dire

As to the first element of a *McDonough* claim, the Fourth Circuit has maintained that, "[a]lthough in *McDonough* the juror's incorrect voir dire response was an honest mistake, the *McDonough* test has been applied equally to deliberate concealment and to innocent non-disclosure." *Conner v. Polk*, 407 F.3d 198, 205 (4th Cir. 2005) (citing *Jones*, 311 F.3d at 310). Even still, "*McDonough* provides for relief only where a juror gives a dishonest response to a question actually posed, not where a juror innocently fails to disclose information that might have been elicited by questions counsel did not ask." *Billings v. Polk*, 441 F.3d 238, 245 (4th Cir. 2006) (citing *McDonough*, 464 U.S. at 555); *see also City of Richmond v. Madison Mgmt. Grp., Inc.*, 918 F.2d 438, 459 (4th Cir. 1990) ("[T]he right to challenge a juror is waived by failure to object at the time the jury is empaneled if the basis for objection might have been discovered during *voir dire*. . . ." (quoting *Robinson v. Monsanto Co.*, 758 F.2d 331, 335 (8th Cir. 1985))).

### 1. Family Members in Law Enforcement

In its second remand of this matter, the Fourth Circuit held that the state habeas court's determination that Juror Treakle did not fail to honestly answer the voir dire question pertaining to family members in law enforcement was an unreasonable application of *McDonough. Porter II*, 898 F.3d at 430–31. Unsurprisingly, the parties interpret the Fourth Circuit's finding differently—Porter contends that the Fourth Circuit definitively determined that he satisfied the first prong of the *McDonough* test as to this

voir dire question, while the Warden maintains that the Fourth Circuit instead found that the state habeas court unreasonably applied clearly established law based solely on the allegations in Porter's Amended Petition.  (ECF No. 246, at 13; ECF No. 249, at 19–20).

As the Warden deftly points out, the Fourth Circuit made this determination based solely on the allegations presented in Porter's habeas petition—before the allegations were explored and substantiated through discovery and an evidentiary hearing.  And, in making its determination, the Fourth Circuit relied on *Conaway*, in which the petitioner's claim was also dismissed by the district court before he was afforded an evidentiary hearing.  *See Porter II*, 898 F.3d at 430–31; *Conaway*, 453 F.3d at 585, 589–90.  The Fourth Circuit more specifically stated in *Conaway* that it was unreasonable for the state habeas court to conclude that the petitioner's *allegations* were insufficient to satisfy his *McDonough* claim, and it clarified that it "evaluate[d] the petition under the standards governing motions to dismiss made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure" and was "obliged to accept a petitioner's well-pleaded allegations as true . . . ."  *Conaway*, 453 F.3d at 582, 585; *see also Farabee v. Clarke*, __ F.3d __, 2020 WL 4197527, at *6 (4th Cir. July 22, 2020) ("Where, as here, a district court dismisses a petition without an evidentiary hearing or discovery, we 'evaluate its underlying allegations pursuant to the principles of Federal Rule of Civil Procedure 12(b)(6).'" (footnote omitted) (quoting *Wolfe v. Johnson*, 565 F.3d 140, 160 (4th Cir. 2009))).

Given the Fourth Circuit's explicit reliance on *Conaway* in its most recent remand, and the similarities in the procedural posture in the two cases, the Fourth Circuit's determination in this matter may be appropriately interpreted as finding that Porter's

allegations in his juror bias claims were sufficient to establish the first element of the

*McDonough* test, and it was thus unreasonable for the state habeas court to conclude

otherwise. This conclusion is only amplified by the Fourth Circuit's discussion of

Porter's actual bias claim in the same opinion. *Porter II*, 898 F.3d at 428 ("Third, at the

motion to dismiss stage, a district court must accept a petitioner's well-pleaded

allegations as true . . . . However, here, the district court ignored this standard and made

assumptions adverse to [Porter] about Juror Treakle's answers at voir dire. For example,

the district court called Juror Treakle honest (twice) and forthright. . . . These

determinations are not only contrary to the legal standard, but should be properly made

after an evidentiary hearing." (internal citations, quotations, and emphasis omitted)).

    However, at this point—after extensive discovery and an all-day evidentiary

hearing—Porter was able to substantiate, via admissible evidence, that Juror Treakle

failed to disclose that several members of his family were employed by law enforcement

agencies. The Fourth Circuit has held that the *McDonough* test "applies equally to

deliberate concealment and to innocent non-disclosure," *Jones*, 311 F.3d at 310, and that,

in this case specifically, "Juror Treakle did not candidly answer counsel's question."

*Porter II*, 898 F.3d at 431. Accordingly, this Court, being bound by the Fourth Circuit's

determination, must find that Porter has "demonstrate[d] that [Juror Treakle] failed to

answer honestly a material question on *voir dire*."[29] *See McDonough*, 464 U.S. at 556;

---

[29] On remand, Porter was given copious opportunities to ferret out previously uncovered facts
and information to establish that he had a viable *McDonough* claim. However, while the Fourth
Circuit has already determined that "Juror Treakle did not candidly answer counsel's question,"
*Porter II*, 898 F.3d at 431, Juror Treakle repeatedly made clear—in two separate depositions—

*see also United States v. Fulks*, No. CRIM 402-992-17, 2004 WL 5042206, at *4 (D.S.C.

Dec. 23, 2004) ("Albeit unintentionally, [the juror] failed to disclose her husband's

murder. Thus, the court concludes that [the juror] 'failed to answer honestly a question

on *voir dire*,' satisfying the first prong of *McDonough*." (quoting *McDonough*, 464 U.S.

at 556)), *aff'd*, 454 F.3d 410 (4th Cir. 2006); *Williams v. Netherland*, 181 F. Supp. 2d

604, 613 (E.D. Va. 2002) ("Each question was obviously material because each sought to

identify potential sources of partiality or bias.").

---

that he did not intentionally fail to disclose his brother's employment as a law enforcement officer. While using the transcript of the voir dire proceedings to refresh Juror Treakle's recollection, Porter's counsel opined "there's no mention of your brother, Pernell Treakle, having been disclosed in response," to which Juror Treakle responded, "I thought I did, and I might have made -- made a mistake by being nervous and forgot to mention his name. That could be possible." (ECF No. 240–1, at 82.) He again reiterated, "I thought I did [mention him]. There was so much going on at that time going through my mind, I just -- slipped my memory." (ECF No. 240–1, at 87.) He testified he did not remember thinking of his brother while he was in the courtroom. (ECF No. 240–1, at 87.) He further swore that he did not intentionally fail to mention his brother when asked about familial relations to law enforcement. (ECF No. 240–1, at 121–22.) Even after previously being read the transcript, Juror Treakle maintained that he did disclose his brother as being a member of law enforcement. (ECF No. 240–2, at 72–73.) He again reiterated that he thought he disclosed his brother's employment, but his apparent failure to do so was not intentional. (ECF No. 240–2, at 98–99.) He repeated at least once more that he thought he told the court and the attorneys conducting voir dire about his brother. (ECF No. 240–2, at 105–06.)

While Juror Treakle acknowledges that he failed to completely answer the question regarding familial ties to law enforcement, he repeatedly claimed that he thought he had disclosed his brother's employment. The Fourth Circuit characterized this omission as "at best, withholding critical information, and at worst, lying." *Porter II*, 898 F.3d at 431. However, after giving Porter wide latitude and much opportunity to discover the truth, the record shows that Juror Treakle honestly thought he had disclosed his brother's career. Furthermore, Juror Treakle maintained that he just did not think about his distant cousins during voir dire. (ECF No. 240–1, at 85, 111, 123; ECF No. 240–2, at 74–75, 99–100.) Nevertheless, while this Court would continue to find that Porter has not established that Juror Treakle "failed to answer honestly a material question on *voir dire*," this Court remains bound by the Fourth Circuit's determination that Porter has satisfied this element of *McDonough*. *See* 464 U.S. at 556.

### 2. **Voir Dire with Respect to Criminal Activity**

While the Fourth Circuit has not yet addressed Porter's Amended Claim I, which

now alleges that Juror Treakle failed to answer honestly the questions seeking

information about personal or familial arrests or prosecutions and violent crime victims,

it is clear from its recent remand that Porter has sufficiently satisfied his burden for the

first *McDonough* element as to these questions as well. Unlike with the question seeking

familial ties to law enforcement, Juror Treakle failed to provide any response to the

criminal activity questions at issue. And as Porter established at the evidentiary hearing,

Juror Treakle was aware that members of his family were victims of violent crimes and

had previously been arrested or prosecuted by the time of Porter's trial. While Juror

Treakle clearly did not know the extent of these incidents, and they largely occurred

several years prior to the date of the trial, these considerations pertain to the other aspects

of the *McDonough* analysis. At this stage of the analysis, the Fourth Circuit has simply

instructed this Court to determine whether or not Juror Treakle withheld material

information on voir dire. *See Porter II*, 898 F.3d at 431.

Despite not knowing the full extent of the following matters, Juror Treakle

admitted that he had been aware that his brother Ronald attacked his brother Calvin, his

parents had died as a result of a car crash caused by a drunk driver, and his brothers

Calvin and Ronald, his niece Ylindo, and his son had been arrested or prosecuted by the

time of Porter's trial. However, Juror Treakle failed to disclose this information during

voir dire. Accordingly, based on the Fourth Circuit's conclusions, this Court must find

that Porter has satisfied his burden as to the first element of his *McDonough* claim for

these two criminal activity questions at issue.[30] *See United States v. Blackwell*, 436 F.

App'x 192, 196 (4th Cir. 2011) (unpublished).

Accordingly, for all three questions at issue, this Court's analysis must focus on

the second prong of Porter's *McDonough* claim—that is, whether a correct response on

---

[30] Porter points to Juror Treakle's parents and his brother Calvin as victims of "violent crimes." As adduced throughout the discovery process, Juror Treakle's parents were killed by a drunk driver in 1977. Furthermore, Calvin was the victim of his brother Ronald's attacks on at least two occasions. However, importantly, Juror Treakle repeatedly stated that while he was aware of at least one confrontation between Calvin and Ronald, he was not aware of the facts of the incident, when it occurred, whether anyone was arrested, or the extent of any injury. Indeed, he initially maintained that he did not "think it was assault. . . . just a big disagreement." (ECF No. 240–2, at 10.) Even counsel's attempts to refresh his recollection failed as Juror Treakle maintained that he was unaware of the facts surrounding those incidents. (ECF No. 240–2, at 16, 24–25.)

Furthermore, it is not entirely clear that his parents' deaths, which were the result of a collision with a drunk driver, would have been a readily apparent answer to Juror Treakle during voir dire, and counsel for Porter failed to inquire during Juror Treakle's two depositions about why Porter failed to answer this question during voir dire. *See McDonough*, 464 U.S. at 849 ("The varied responses to respondents' questions on *voir dire* testify to the fact that jurors are not necessarily experts in English usage. Called as they are from all walks of life, many may be uncertain as to the meaning of terms which are relatively easily understood by lawyers and judges."). In fact, during Juror Treakle's deposition, Porter's habeas counsel answered his own question about whether or not Juror Treakle's parents' deaths qualified as a violent crime. (ECF No. 240–1 at 62–63.)

Accordingly, the record does not establish that Juror Treakle drew the conclusion that anyone in his family was the victim of a violent crime. The record shows that, at most, Juror Treakle may have known that Ronald punched Calvin in the face, and that he did not consider either this incident or his parents' deaths to be the results of violent crimes. Indeed, during his depositions, Juror Treakle never classified these incidents as violent crimes. Thus, like the question seeking information on familial employment in law enforcement, this Court would not independently find that Porter has satisfied the first element of *McDonough* as to the question seeking information about jurors' familial or personal ties to victims of violent crimes. However, not only does the Warden claim that "Juror Treakle admitted that he was aware that his brother, Calvin, had been assaulted by one of their brothers, Ronald," (ECF No. 249, at 10), but in its last remand, the Fourth Circuit made clear that any failure to disclose information on voir dire would satisfy the first element of *McDonough, Porter II*, 898 F.3d 408 at 431. Therefore, based on the Warden's concession and the Fourth Circuit's remand, the Court will proceed under the assumption that the first element of *McDonough* is met as to the voir dire question about family members who had been victims of violent crimes.

71

voir dire would have provided Porter with a valid basis to challenge Juror Treakle for

cause. *See McDonough*, 464 U.S. at 556.

### B. Whether Correct Responses Would Have Provided a Valid Basis for a For Cause Challenge

The Fourth Circuit has held that

> [A] *McDonough* claim necessarily fails unless the court would have committed reversible error—that is, abused its discretion—in failing to dismiss [a juror] for cause. As our precedent makes clear, a failure to excuse a prospective juror for cause constitutes an abuse of discretion in only two situations: (1) where a per se rule of disqualification applies; and (2) where the court "demonstrates a clear disregard for the actual bias" of the juror.

*United States v. Fulks*, 454 F.3d 410, 432 (4th Cir. 2006) (quoting *United States v.*

*Turner*, 389 F.3d 111, 115 (4th Cir. 2004); *see also Conaway*, 453 F.3d at 586 ("The bias

of a prospective juror may be actual or implied; that is, it may be bias in fact or bias

conclusively presumed as [a] matter of law." (alteration in original) (quoting *United*

*States v. Wood*, 299 U.S. 123, 133 (1936))); *Porter II*, 898 F.3d at 443 (Shedd, J.,

concurring in part and dissenting in part); *Prieto v. Davis*, No. 3:13cv849–HEH, 2014

WL 3867554, at *21–22 (E.D. Va. Aug. 5, 2014). "The Supreme Court has long

recognized the constitutionally based principle that a prospective juror may be validly

challenged for cause if he cannot be impartial." *Conaway*, 453 F.3d at 586; *see also*

*Turner*, 389 F.3d at 117 ("A juror is impartial only if he can lay aside his opinion and

render a verdict based on the evidence presented in court." (alteration marks omitted)

(quoting *Patton v. Yount*, 467 U.S. 1025, 1037 n.12 (1984))); *Jones*, 311 F.3d at 312

("[T]raditionally, a challenge for cause is granted only in the case of actual bias or

implied bias (although a third category, inferred bias, might also be available)." (citation omitted)).

By finding that Porter has failed to establish an actual bias claim, it is axiomatic that Porter will be unable to establish that the trial court "demonstrate[d] a clear disregard for the actual bias" of Juror Treakle. *See Fulks*, 454 F.3d at 432. In *Porter I*, the Fourth Circuit appeared to indicate that it was not settled "[w]hether or not consideration of actual bias as a component of a *McDonough* claim suffices to dispose of a freestanding actual bias claim . . . ." 803 F.3d at 699 n.3. However, on this second remand, and with further enlightenment from the Fourth Circuit, this Court has done the analysis in the reverse—finding first that Porter has failed to establish an actual bias claim, which in turn implicates his *McDonough* claim—a method the Fourth Circuit has seemingly employed in the past. *See, e.g., Blackwell*, 436 F. App'x at 196; *Fulks*, 454 F.3d at 432. Accordingly, to prevail on his *McDonough* claim, Porter must establish that a *per se* rule of disqualification applies to the facts at issue in this matter. *See Fulks*, 454 F.3d at 432 (quoting *Turner*, 389 F.3d at 115).

The Fourth Circuit has indicated that it is "loath to announce such per se rules" of juror disqualification. *Turner*, 389 F.3d at 115. Indeed, "[p]er se rules of disqualification interfere with the trial court's administration of jury selection. . . . A list of per se exclusions 'would burden the courts needlessly with a responsibility of endless speculation on the presumptive bias of potential jurors.'" *Id.* (quoting *United States v. Brown*, 644 F.2d 101, 105 (2d Cir. 1981)). Accordingly, the Fourth Circuit has limited *per se* rules of disqualification, and the doctrine of implied bias, "to those extreme

situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988); *see also Turner*, 389 F.3d at 116 ("The burden on any litigant seeking to disturb our settled practice of rejecting *per se* challenges is a heavy one."). Such extreme examples may "include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J. concurring); *see Person*, 854 F.2d at 664 (citing *Smith*, 455 U.S. at 222).

As explained below, there is no *per se* rule of disqualification that applies to any of the issues raised in Porter's Amended Claim I. Furthermore, the record in this case supports the conclusion that, had Juror Treakle been completely forthcoming on voir dire, he would not have been subject to a valid for cause challenge.[31]

---

[31] In *Williams v. Netherland*, a case upon which Porter relies, Judge Spencer specifically analyzed how for cause challenges were executed during jury selection in determining whether the juror at issue would have been struck for cause. 181 F. Supp. 2d at 615–16. Specifically, Judge Spencer determined that:

> During jury selection at Williams' trial, thirteen jurors were dismissed for cause. One was dismissed because she had worked as a corrections officer six years prior to the trial. A second juror was dismissed because he was prosecutor Woodson's first cousin. A third juror was dismissed because he equivocated when asked whether he would automatically impose the death penalty. Several were dismissed due to exposure to pretrial information about the case. In contrast to Stinnett, these jurors all revealed information to the Court and the parties.
>
> Defense counsel testified that the trial court was liberal with challenges for cause. Had the trial court and defense counsel known of Stinnett's ties to a law enforcement witness, to the prosecutor, and of her exposure to information about

74

### 1. Family Members in Law Enforcement

As this Court previously held,

> The fact that a juror "once had a family member in law enforcement is plainly not one of the 'extreme situation[s]' in which bias may be implied." *United States v. Brewer*, No. 1:12CR1, 2012 WL 4757894, at *5 (N.D. W. Va. Oct. 5, 2012), *aff'd*, 533 F. App'x 234 (4th Cir. 2013) (quoting *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988)); *see also United States v. LaRouche*, 896 F.2d 815, 830 (4th Cir. 1990). Further, it appears that Porter's trial counsel and the trial court judge were convinced that Juror Treakle would act impartially because of his familial affiliation with another law enforcement officer. Porter now contends that Juror Treakle may have been biased because the city of Chesapeake and its law enforcement community were especially incited by the murder of Officer Reaves. Porter avers that Treakle's relationship with his brother impacted his perception of the evidence and his participation in deciding Porter's guilt and punishment. It may be true that officers from the Chesapeake Sheriff's Office were more involved in his case than officers in Arlington County. However, Porter presents only circumstantial evidence of bias, and a showing of implied bias is a very high bar.
>
> "[T]he doctrine of implied bias is limited in application to those extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Person*, 854 F.2d at 664 (internal quotation marks and citations omitted). "As examples of the 'exceptional' and 'extraordinary' situations that might require a finding of implied bias, Justice O'Connor cited 'a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction,

---

> the case, they would have had a valid basis for a for-cause challenge; moreover, that challenge (if made) would certainly have been granted. Furthermore, the trial court could have moved to exclude her on the Court's own motion.

*Id.* The Court, while it reaches a different conclusion, finds this analysis persuasive.

Notably, unlike in *Williams*, Porter's defense counsel did not testify at his evidentiary hearing, and the parties do not argue that the trial judge in Porter's case was liberal with for cause challenges. Indeed, the record supports the opposite conclusion. In particular, it appears that defense counsel only moved to strike for cause those jurors who equivocated during voir dire about whether they could impose less than the death penalty or weigh mitigating evidence. (Feb. 26, 2007 Tr. 73, 98–104, 120–23, 135–36, 153–54, 215–23, 245–49, 268, 281, 299, 313–14.) Yet, the trial judge denied each motion. Tellingly, Juror Treakle was not one of those jurors whom defense counsel sought to remove from the jury during voir dire.

or that the juror was a witness or somehow involved in the criminal transaction.'" *Fitzgerald v. Greene*, 150 F.3d 357, 365 (4th Cir. 1998) (citing *Smith*, 455 U.S. at 222) (O'Connor, J., concurring). Porter's is not such an egregious situation. There is no *per se* rule requiring the exclusion of a juror whose close relative was a victim of a crime similar to that with which a defendant is being tried, *see United States v. Jones*, 608 F.2d 1004, 1008 (4th Cir. 1979), and "[a]bsent a specific showing of bias, a defendant accused of murdering a police officer is not entitled to a jury free of policemen's relatives," *United States v. Caldwell*, 543 F.2d 1333, 1347 (D.C. Cir. 1974). *See also Jones*, 608 F.2d at 1008. Absent the general connection of the Chesapeake law enforcement officers to the victim, nothing indicates that any of Juror Treakle's relatives had a particularly close connection to the murder. On the information provided, the Court cannot hold that Porter has shown that it was "highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Person*, 854 F.2d at 664.

*Porter v. Davis*, 3:12CV550–JRS, 2014 WL 4182677, at *11–12 (E.D. Va. Aug. 21, 2014) (alterations in original) (emphasis added). The Fourth Circuit, on appeal, did not independently determine whether Porter satisfied his burden as to this aspect of the test, as it did with the first factor. Instead, the Fourth Circuit determined that

[It] also [could not] say as a matter of law that the *McDonough* claim should be dismissed based on the second prong. . . . Because [it could not] surmise which follow up questions (and answers) may have followed from Juror Treakle's correct answer that his brother worked in law enforcement in Chesapeake, [it could not] say as a matter of law that Appellant would not have had a valid basis to challenge for cause. This is a matter that must be further explored in an evidentiary hearing upon remand.

*Porter II*, 898 F.3d at 431–32.

Despite the numerous briefs filed in this matter, and the all-day evidentiary hearing this Court held, Porter has still failed to satisfy his burden as to the second

element of the *McDonough* standard.[32] Porter does not identify any law mandating for cause challenges for jurors who have family members or ties to law enforcement. *Cf. Jones*, 311 F.3d at 312. Furthermore, Juror Treakle credibly testified in his depositions that if he had actually disclosed his brother's employment, as he thought he had done, it would not have affected his ability to remain impartial. (ECF No. 240–1, at 122–23; ECF No. 240–2, at 100–01.) He further assured counsel that he did not think about his cousins or their employment at all, and their employment did not affect his ability to remain fair or impartial. (ECF No. 204–2, at 74–75, 101–03.)

While Porter fails to cite legal authority supporting his argument that Juror Treakle would have been excused for cause if Juror Treakle had correctly responded to this question, Porter does cite in his reply brief Virginia Supreme Court Rule 3A:14, which governs for cause challenges in Virginia. *See Williams*, 181 F. Supp. 2d at 615. Pursuant to that rule, the trial court is required to determine whether any of the prospective jurors

> (1) Is related by blood, adoption, or marriage to the accused or to a person against whom the alleged offense was committed;
> (2) Is an officer, director, agent or employee of the accused;
> (3) Has any interest in the trial or the outcome of the case;
> (4) Has acquired any information about the alleged offense or the accused from the news media or other sources and, if so, whether such information would affect his impartiality in the case;
> (5) Has expressed or formed any opinion as to the guilt or innocence of the accused;
> (6) Has a bias or prejudice against the Commonwealth or the accused; or

---

[32] While Porter does not clearly assert in his Amended Claim that he would have moved to strike Juror Treakle for cause, he does maintain in his Post-Hearing Brief that, had Juror Treakle answered fully to the questions posed on voir dire, he "would not have been permitted to serve on Porter's jury and would have been subject to a valid for-cause challenge." (ECF No. 246, at 22; *contra* ECF No. 221, at 30 ("Had all of this information come to light before trial, [Juror Treakle] would not have been permitted to serve on Porter's jury.").)

(7) Has any reason to believe the juror might not give a fair and impartial trial to the Commonwealth and the accused based solely on the law and the evidence.

Va. Sup. Ct. R. 3A:14(a); *see also Stevens v. Virginia*, 826 S.E.2d 895, 900 (Va. Ct. App. 2019); *Cousins v. Virginia*, 693 S.E.2d 283, 294 (Va. Ct. App. 2010). It is clear that none of these enumerated concerns are at issue in this matter. Furthermore, in Virginia, "[*p*]*er se* presumptions of bias are not favored," *Williams v. Virginia*, 466 S.E.2d 754, 756 (Va. Ct. App. 1996), and "[a] potential juror should be struck for cause if he or she has any interest in the cause, or is related to either party, or has expressed or formed any opinion, or is sensible of any bias or prejudice," *Holloman v. Virginia*, 775 S.E.2d 434, 443 (Va. Ct. App. 2015) (internal quotation marks omitted) (quoting *Mayfield v. Virginia*, 722 S.E.2d 689, 693 (Va. Ct. App. 2012)).

Both the Fourth Circuit and the Supreme Court of Virginia have specifically held that there is no *per se* rule excluding jurors because of their associations with law enforcement. *See United States v. Umaña*, 750 F.3d 320, 342 (4th Cir. 2014) ("A juror's generally favorable impression of law enforcement does not necessarily amount to bias any more than does a juror's personal association with law enforcement."); *United States v. LaRouche*, 896 F.2d 815, 830 (4th Cir. 1990) ("[The district judge] refused to strike 'for cause' all employees of investigatory agencies, particularly when their association was unrelated to an investigative function. [The district judge's] ruling is consistent with case law that refuses to establish a *per se* rule excluding any person who had an association with an investigatory agency."); *Strickler v. Commonwealth*, 404 S.E.2d 227,

234 (Va. 1991) ("If a prospective juror had no knowledge of the facts of the case and demonstrates impartiality, he is not subject to a challenge for cause merely because he has had an association with law enforcement personnel."); *Bay v. Virginia*, 729 S.E.2d 768, 773 (Va. Ct. App. 2012) ("There is no per se disqualification rule for a prospective juror . . . [who has] an association with a law enforcement officer." (citing *Clozza v. Virginia*, 321 S.E.2d 273, 276 (Va. 2003)); *Williams*, 466 S.E.2d at 756 (holding that the trial court did not err in refusing to strike for cause a juror whose brother worked at the same correctional facility as the victim and had heard about the incident at issue from her brother).[33]

Tellingly, none of the members of the panel who answered affirmatively to this question were struck for cause, including Juror Treakle who indicated that his nephew was a police officer in Arlington County. As to the question specifically at issue, seven other jurors on Juror Treakle's panel indicated that they themselves or their family or their close personal friends were employed by law enforcement agencies. (SH 1224–29.) Furthermore, three other jurors had already disclosed their employment with law

---

[33] Notably, other courts throughout the country have held similarly. *See, e.g.*, *United States v. Beasley*, 48 F.3d 262, 267 & n.4 (7th Cir. 1995); *United States v. Nururdin*, 8 F.3d 1187, 1190 (7th Cir. 1993) ("We think a trial judge has discretion to find that a juror's mere relationship to a law enforcement officer is insufficient to strike for cause."); *Depree v. Thomas*, 946 F.2d 784, 788 n.4 (11th Cir. 1991) ("[The petitioner] also urges us to adopt a per se rule of disqualification, in cases involving the murder of a police officer, for ex-police officers or persons related to police officers. . . . We consider such a per se rule to be at odds with the United States Supreme Court's instructions on how to evaluate the qualifications of individuals for jury service. . . . Accordingly, we decline [the petitioner's] invitation to formulate this prophylactic rule." (citing *Patton v. Yount*, 467 U.S. 1025 (1984))); *United States v. Caldwell*, 543 F.2d 1333, 1347 (D.C. Cir. 1974) ("Absent a specific showing of bias, a defendant accused of murdering a police officer is not entitled to a jury free of policemen's relatives.").

enforcement to counsel's prior question seeking information as to whether any juror belonged to organizations that supported law enforcement. (SH 1222–24.) Notably, defense counsel failed to ask each of these jurors if they could remain impartial despite their affiliations with law enforcement. (SH 1222–26.) However, he was apparently satisfied by the jurors' responses who were asked if they could remain fair and impartial, including Juror Treakle, as none of these jurors were moved to be struck for cause because of their personal or familial employment with law enforcement. (Feb. 26, 2007 Tr. 196–203, 215–23, 245–58, 268, 281, 299, 313–14.)

Furthermore, Juror Smith—a member of the venire who was questioned in the morning, and thus questioned separately from Juror Treakle—indicated that her father was a police officer in Chicago, her brother was the former Chief of Police in Arlington, and her son was a "former member of the Arlington Sheriff's Department and the police department." (Feb. 26, 2007 Tr. 63.) Immediately following her response to the question, defense counsel uttered "That's quite a history of law enforcement." (Feb. 26, 2007 Tr. 63.) Despite defense counsel's apparent amazement at Juror Smith's close familial connections to law enforcement, defense counsel failed to move to strike Juror Smith for cause on this basis. However, she was ultimately struck for cause on the Commonwealth's motion because "she clearly stated she would be unable to consider the death penalty as an appropriate punishment under any circumstances." (Feb. 26, 2007 Tr. 73, 120.)

Juror Smith's scenario also establishes that numerous connections to law enforcement did not warrant even a motion to strike for cause, thereby establishing that

had Juror Treakle revealed that multiple members of his family, including his first cousin once removed, were employed by a law enforcement agency, he would not have been subject to a valid for cause challenge. Notably, Juror Smith was not the only member of the panel who responded with multiple connections to law enforcement—and none of these potential jurors were struck for cause because of their answers to this question. (SH 198–203.)

Finally, Porter makes much of the fact that Juror Treakle's brother is not only a law enforcement officer, but is also employed by the City of Chesapeake—which borders the jurisdiction in which Officer Reaves served. (ECF No. 246, at 21.) However, Porter fails to establish that Juror Treakle would have been struck for cause based on the proximity of his brother's employment to the jurisdiction where the crime occurred. In fact, even if Juror Treakle revealed that his brother was a law enforcement officer, it is not clear from the record that the fact he worked in Chesapeake—or Norfolk, as he more likely would have indicated (SH 6215)—would have been revealed on voir dire. For example, Mr. Dilworth—a member of the morning panel who was ultimately excused after the parties exercised their peremptory challenges—indicated in response to this question that he "had friends who are police officers or secret service agents, things like that. I don't think that would affect me," to which defense counsel simply responded "Okay. Thank you for answering that question." (Feb. 26, 2007 Tr. 62, 73, 335–38.) Not only did this juror fail to indicate where his friends were employed as police officers, but defense counsel failed to ask further questions to inquire about where these friends were employed.

Indeed, when this question was posed to Juror Treakle's panel, defense counsel

failed to ask the veniremen to respond with the location of their family members'

employment.  (Feb. 26, 2007 Tr. 198–203.); *cf. Billings v. Polk*, 441 F.3d 238, 245 (4th

Cir. 2006) ("*McDonough* provides for relief only where a juror gives a dishonest

response to a question actually posed, not where a juror innocently fails to disclose

information that might have been elicited by questions counsel did not ask." (citing

*McDonough*, 464 U.S. at 555)).  Furthermore, Juror Treakle did not discuss the Porter

case with his brother Pernell at any time, and Pernell had no recollection of ever knowing

of Officer Reaves's murder or discussing it with Juror Treakle.  Thus, even if Juror

Treakle revealed that his brother was a law enforcement officer, it is not clear to this

Court that the fact that he worked in Chesapeake would ever have been revealed, or that

that revelation would have provided a valid basis to strike Juror Treakle for cause.  *See*

*generally Holloman*, 775 S.E.2d 434 (finding the trial court did not err in refusing to

strike for cause a juror who had personal experience as a police officer in the jurisdiction

where the case was being tried); *cf. Ramos v. Virginia*, 834 S.E.2d 499, 503 (Va. Ct. App.

2019) ("[J]urors need not be totally unaware of the facts and issues involved in the case .

. . ." (citation omitted)).

Accordingly, absent any factual or legal support establishing that a correct answer

to this question on voir dire would have provided Porter with a valid basis to strike Juror

Treakle for cause, Porter has failed to satisfy his burden under *McDonough*.

### 2.  Family Members with Arrests or Prosecutions

The Fourth Circuit has already determined that a juror's failure to honestly respond to a voir dire question about familial arrests or prosecutions cannot form the basis for a challenge for cause under *McDonough*. *See Jones*, 311 F.3d at 312–13.  In *Jones*, the Fourth Circuit reasoned that

> [A]ppellant has proffered evidence only that the juror responded inaccurately when she stated that she had no relatives who had been arrested or subjected to jury trials.  It is far from clear that we look to state law to determine whether a challenge for cause would have been granted, but regardless, appellant cites no North Carolina statute or case allowing a challenge for cause merely on the fact that the juror had relatives who had been arrested or subject to jury trials.  Indeed, none of the jurors who answered "yes" to either of these questions was dismissed for cause on that fact alone.
>
> To the extent that the federal standards governing challenges for cause are implicated, the category of challenges for cause is limited, and traditionally, a challenge for cause is granted only in the case of actual bias or implied bias (although a third category, inferred bias, might also be available).  The mere fact that the juror's relatives had a history of arrests and jury trials certainly does not reach the high standard needed for the implication of bias.  And, the fact that the juror had relatives who were subject to arrest and jury trials does not give rise to an inference that the juror was biased against the appellant; indeed, arguably, the more common-sense assumption is that a juror with this background would be biased in *favor* of the accused.

*Id.* (internal citations and quotations omitted).  The Fourth Circuit concluded that the petitioner failed to establish the second prong of *McDonough*, holding that "even truthful answers to the questions on the questionnaire could not have formed the basis for a challenge for cause." *Id.* at 313.

Thus, even if Juror Treakle had disclosed that his brothers, son, and niece had been arrested, his responses would not have supported a valid basis for a challenge for cause. *See id.*  Indeed, like the claimant in *Jones*, Porter fails to cite any law supporting his assertion that honest responses would have formed a valid basis to strike Juror

Treakle, and Virginia law supports the opposite conclusion. *See id.* at 312; Va. Sup. Ct. R. 3A:14(a); *Ramos*, 834 S.E.2d at 503 ("*Per se* rules of disqualification, which are based on a presumption of bias or prejudice, are disfavored in Virginia." (internal quotation marks omitted) (quoting *McGann v. Virginia*, 424 S.E.2d 706, 710 (Va. Ct. App. 1992))); *cf. Bay*, 729 S.E.2d at 773 ("[T]here are limited instances where the status of a prospective juror creates a *per se* disqualification. . . . [T]he Supreme Court of Virginia opined that *per se* disqualification applied when a venireman was a current client of counsel, . . . or when a venireman's brother, a police officer, would testify as to the crime scene . . . . The Supreme Court of Virginia has also found that a stockholder in a company which is a party to the litigation would be automatically disqualified from serving as a juror . . . as would a venireman who is related within the ninth degree to affinity to the victim." (internal citations omitted)).

Again, the record in this case also supports the conclusion that if Juror Treakle had candidly answered this question, he would not have been the subject of a for cause challenge. In his afternoon panel, several other jurors provided an affirmative response to this question. Specifically, Jurors Hurley, Delaney, and Lautenschlager all indicated that they had personally violated the law and had been arrested. (SH 1209–10.) Notably, Porter readily admits that these jurors provided only "general descriptions" of these crimes. (ECF No. 221, at 13 n.6.) Moreover, Juror Iden responded that her father had been indicted for something, while Juror Pavela said her brother had been recently arrested and charged with "criminal crimes." (SH 1207–09.) Neither disclosed the exact nature of those charges, and counsel appeared satisfied with Juror Pavela's response that

her brother had an addiction when he asked of the general nature of the offenses.  (SH

1207–09.)  Again, Porter acknowledges that these "jurors did not specify the alleged

offense or provide more details."  (ECF No. 221, at 13.)  None of these jurors were struck

for cause based on their responses to these questions.  (Feb. 26, 2007 Tr. 181–84, 215–

23, 245–58, 268, 281, 299, 313–14.)  More significantly, Jurors Hurley, Delaney, and

Lautenschlager were eventually selected to serve on the jury with Juror Treakle.  (SH

1361–64.)

        Accordingly, this Court finds Porter has failed to establish that, had Juror Treakle

disclosed his family's history with arrests and prosecutions, he would have been subject

to a valid for cause challenge.

### 3.  Family Members Who Have Been Victims of Violent Crime

        As with the first two questions, the law, as it pertains to jurors with a familial

history of violent crime victimization, is quite clear—the fact, standing alone, does not

form a valid basis for a challenge for cause.  In *United States v. Jones*, the Fourth Circuit

determined that:

> The fact that a juror or his relative has been the victim of some crime,
> unrelated to the offense being tried, is, we think, only minimally relevant to
> the question of that juror's impartiality.  Indeed, if the mere fact that a juror
> or his relative had been the victim of some crime unrelated to that being tried
> constituted grounds for discharge, it would become difficult, if not
> impossible, to assemble a jury panel.

608 F.2d 1004, 1007 (4th Cir. 1979).  The Fourth Circuit then "decline[d] to establish a

[p]er se rule of disqualification where a juror is related to a victim of a *similar* crime."

*Id.* at 1008 (emphasis added).  The Supreme Court of Virginia has also declined to create

such a *per se* rule. *Stockton v. Virginia*, 402 S.E.2d 196, 200 (Va. 1991) ("Nor is a prospective juror per se disqualified because a family member has been a victim of violent crime."); *see also Holloman*, 775 S.E.2d at 443–44 ("Nor does a venireman's previous experience as a victim of a crime similar to that being tried signify that he or she cannot 'sit fairly and impartially in the case.'" (quoting *Webb v. Virginia*, 397 S.E.2d 539, 540 (Va. 1990))).

While it is not clear that Juror Treakle recognized his parents and his brother as victims of violent crimes, even if Juror Treakle should have disclosed this history, Juror Treakle's parents and brother were undoubtedly victims of crimes unrelated to the charges for which Porter was on trial, and there is no legal basis for which Porter could have validly challenged Juror Treakle for cause if he had given a fully detailed response. *See Jones*, 608 F.2d at 1007–08; *Stockton*, 402 S.E.2d at 200; *Holloman*, 775 S.E.2d at 443–44.

Not only is there no legal argument to support Porter's contention that Juror Treakle would have been struck for cause had he disclosed that his family members were victims of violent crimes, but yet again, his assertion is unsupported by the record. On Juror Treakle's panel, three venireman answered affirmatively that either themselves or their family members had been the victim of a violent crime, and one of the jurors chose to privately disclose to the Circuit Court the nature of that offense. (Feb. 26, 2007 Tr. 179–81, 213–14.) Juror Delaney disclosed that his brother had been mugged seven years earlier, and Juror Hurley indicated that he himself had been robbed several years prior to the date of trial. (SH 1206–07.) Neither juror was struck for cause, and both sat on

86

Porter's jury. (SH 1361–64; Feb. 26, 2007 Tr. 215–23, 268, 281.)  Indeed, none of the

jurors who affirmatively answered this question were struck for cause because of their

response to this question.  (Feb. 26, 2007 Tr. 179–81, 215–23, 245–58, 268, 281, 299,

313–14.)  Thus, even if Juror Treakle had recalled that his family members had been

victims of violent crimes and disclosed that information on voir dire, it is clear from both

the factual record and the applicable law that Juror Treakle would not have been validly

struck for cause.

Accordingly, given the contrary factual and legal support, it is clear that even if

Porter satisfied the first prong of *McDonough* as to this voir dire question, Porter would

not be entitled to relief under *McDonough* as he could not satisfy the second element of

that test.

### C. Collective Impact of Juror Treakle's Failures to Disclose

Porter asks this Court to consider the totality of Juror Treakle's failed responses,

not just in isolation, as evidence of the viability of his *McDonough* claim.  Porter

maintains that the cumulative effect of Juror Treakle's non-responses establishes a valid

basis for a challenge for cause.

However, again, Porter fails to cite any law to support his claim that Juror

Treakle's lack of candor on these three questions would have justified a for cause

challenge.  And the factual record in this case presents the opposite conclusion.  During

the questioning of the afternoon panel, of which Juror Treakle was a member, two

jurors—Jurors Delaney and Hurley—not only affirmatively answered all three questions

at issue in this matter, but defense counsel failed to move to strike these jurors for cause, and both individuals were ultimately selected to serve on Porter's jury.

Specifically, Juror Delaney told counsel that his brother was mugged about seven years prior to the trial at issue, and that no one had been arrested for the offense. (SH 1206.) Despite this, Juror Delaney maintained that he could remain fair and impartial. (SH 1206.) Juror Delaney then disclosed that he had personally been arrested for providing alcohol to minors 12 years earlier, but he again maintained it would not affect his ability to remain impartial. (SH 1210.) Finally, Juror Delaney stated that his cousin was a prison guard in Erie, Pennsylvania, but again, that would not affect his ability as a juror. (SH 1229.) Defense counsel did not move to strike Juror Delaney for cause, and he ultimately sat on the empaneled jury that voted to convict Porter and sentence him to death. (Feb. 26, 2007 Tr. 215–23, 268, 335–38.)

Similarly, during voir dire, Juror Hurley responded that he personally was robbed several years prior to the trial, no one had been arrested, but he could remain fair and impartial. (SH 1206–07.) He also disclosed that he was arrested when he was 17 at a prom picnic. (SH 1209.) Finally, he revealed that he "was a consultant to the U.S. Department of Housing & Urban Development, and part of [his] job was to develop security plans for public housing projects. And [he] was in charge of the law enforcement and in charge of keeping the places safe." (SH 1228–29.) Again, he maintained that his employment would not impair his ability to serve as a juror in that case. (SH 1229.)

Thus, despite Porter's assertion that Juror Treakle would have been the subject of

a valid for cause challenge if he had been completely forthcoming on voir dire, the

evidence shows otherwise. Indeed, Juror Hurley was personally implicated by each

question—that is, he himself was in law enforcement, had been arrested, and had been

the victim of a violent crime. Yet, defense counsel did not even move to strike him for

cause. Instead, Porter was evidently satisfied during voir dire by Juror Hurley's

assurances that he could remain impartial—assurances that Juror Treakle similarly gave

during voir dire and maintained during his depositions. It is indeed hard to surmise how

an individual could be more impacted by familial association to law enforcement, arrests,

and crime victimization than an individual who personally endured them. Accordingly,

in the absence of any legal or factual support, this Court cannot find that Porter not only

would have moved to strike Juror Treakle for cause but could have successfully

distinguished Juror Treakle from the other jurors who were also implicated by the

questions at issue and were not struck for cause.

Confronted with a juror who had responded dishonestly to no fewer than ten

questions on voir dire, the First Circuit determined, in a case upon which Porter heavily

relies, that

> When all is said and done, the existence vel non of a valid basis for a
> challenge for cause is not a matter of labels. Any inquiry into potential bias
> in the event of juror dishonesty must be both context specific and fact
> specific. The outcome of this inquiry depends on whether a reasonable
> judge, armed with the information that the dishonest juror failed to disclose
> and the reason behind the juror's dishonesty, would conclude under the
> totality of the circumstances that the juror lacked the capacity and the will to
> decide the case based on the evidence (and that, therefore, a valid basis for
> excusal for cause existed). The party seeking to upset the jury's verdict has

the burden of showing the requisite level of bias by a preponderance of the evidence.

A number of factors may be relevant in determining whether a juror has both the capacity and the will to decide the case solely on the evidence. This compendium may include (but is not limited to) the juror's interpersonal relationships; the juror's ability to separate her emotions from her duties; the similarity between the juror's experiences and important facts presented at trial; the scope and severity of the juror's dishonesty; and the juror's motive for lying. Although any one of these factors, taken in isolation, may be insufficient to ground a finding of a valid basis for a challenge for cause, their cumulative effect must nonetheless be considered.

. . . .

We conclude that if fully informed of [the juror's] willingness to lie repeatedly, her fragile emotional state, her past experiences with [her family members], and the similarities between those experiences and the evidence to be presented during the penalty-phase hearing, any reasonable judge would have found that the cumulative effect of those factors demonstrated bias (and, thus, a valid basis for excusal for cause). . . .

*Sampson v. United States*, 724 F.3d 150, 165–66, 168 (1st Cir. 2013) (internal citations omitted). However, the facts of this case are drastically different. Juror Treakle repeatedly admitted that he did not intentionally conceal his family history, but instead, he just did not think about his family during voir dire. He also steadfastly assured counsel during voir dire that he would remain fair and impartial throughout the trial, and during the evidentiary hearing before this Court, he maintained that assurance. Unlike the juror in *Sampson*, whose "demeanor while testifying evinced her emotional pain and humiliation" regarding the experiences she withheld during voir dire, Juror Treakle was calm and resolute in his answers—he just did not consider his family's history during voir dire. Indeed, if Juror Treakle had been entirely forthcoming during voir dire, the Court finds that, given his comprehensive answers and demeanor during the post-conviction proceedings, nothing about his responses would have provided a valid basis to

strike him for cause. And again, he had little to no personal knowledge surrounding the majority of the events that Porter maintains should have been revealed during voir dire.

Accordingly, the Court finds that Porter has failed to establish that even the cumulative effect of Juror Treakle's non-disclosures "would have provided a valid basis for a challenge for cause." *See McDonough*, 465 U.S. at 556.

### D. Porter Has Failed to Establish that Juror Treakle's Non-Disclosures Affected the Fairness of His Trial

Importantly, even if Porter could establish both prongs of the *McDonough* test, that would not end this Court's inquiry. As both the Supreme Court and Fourth Circuit have made clear, "[m]isstatements [during voir dire] are troubling, but do not, standing alone, indicate juror bias. As the Supreme Court has instructed, '[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.'" *Jones*, 311 F.3d at 313 (quoting *McDonough*, 464 U.S. at 556); *see also Conaway*, 453 F.3d at 588 ("Even where, as here, the two parts of the *McDonough* test have been satisfied, a juror's bias is only established under *McDonough* if the juror's 'motives for concealing information' or the reasons that affect [the] juror's impartiality can truly be said to affect the fairness of [the] trial.'" (alterations in original) (quoting *McDonough*, 464 U.S. at 556)).

Juror Treakle has made clear that he did not deliberately or intentionally conceal any information during voir dire. He repeatedly stated that he thought he had disclosed his brother's employment with the Chesapeake Sheriff's Office, and that he just did not think about his other relatives or their employment, who he did not see or speak to often.

He also repeatedly said he did not know the extent of his brother Ronald's criminal history, and that while he knew Ronald had at least one confrontation with Calvin, he did not know the facts of the disagreement or the extent of any violence. He also assured counsel that he did not disclose his son's arrest because his son had been a minor at the time. He otherwise stated that he just did not think very hard about the questions, or think about his family during voir dire, only how the questions personally impacted him.

While Juror Treakle may not have been completely forthcoming, he made clear during the two extensive depositions that his reasons for failing to disclose all of the uncovered information were not improper—he just did not think about the full implications of the questions. *See Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) ("[W]e must be tolerant, as jurors may forget incidents long buried in their minds, misunderstand a question or bend the truth a bit to avoid embarrassment. The Supreme Court has held that an honest yet mistaken answer to a voir dire question rarely amounts to a constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality." (citing *McDonough*, 464 U.S. at 555–56)). His repeated, credible reassurances that he did not think about his family reveals that his family's connections to law enforcement and crime could not have affected his judgment during the trial. He further reassured counsel that, if he had thought of his family, it would not have affected his ability to remain fair and impartial.

Porter also relies extensively on the Fourth Circuit's decision in *Conaway*, in which the court held that the petitioner "alleged facts sufficient to establish that [the juror] concealed crucial information in order to serve on [petitioner's] jury. Such

92

dishonesty, of itself, is evidence of bias." *See* 453 F.3d at 588 (internal citations and quotations omitted). However, again, there is no evidence in this case that Juror Treakle was intentionally dishonest or withheld information in order to serve on Porter's jury. Rather, Juror Treakle consistently stated that he did not think about his other family members, and thus, could not have intentionally withheld the information or have been impacted by it during the trial. Thus, the Court finds that Porter has failed to establish that Juror Treakle was not an impartial juror. *See Turner*, 389 F.3d at 117 ("A juror is impartial only if he can lay aside his opinion and render a verdict based on the evidence presented in court." (alteration marks omitted) (quoting *Patton*, 467 U.S. at 1037 n.12)).

Accordingly, while this Court finds that Porter has failed to establish both aspects of the *McDonough* test, even if he had, it is clear that Juror Treakle did not have any improper motives by failing to be completely forthcoming during voir dire, and thus the fairness of Porter's trial cannot be said to have been affected. Indeed, after having heard Juror Treakle's comprehensive responses as to why he failed to provide certain information during voir dire, and having observed his demeanor, the Court finds nothing in these responses that would demonstrate that he was impartial or biased. Accordingly, Porter has failed to establish that he is entitled to a new trial because of any dishonesty exhibited by Juror Treakle. Therefore, Amended Claim I in its entirety must be dismissed.

## V. CONCLUSION

Porter's Amended Claim I lacks merit and will be dismissed. The § 2254 Petition will be denied. A certificate of appealability will be denied.

An appropriate Final Order will accompany this Memorandum Opinion.

/s/
_____
Henry E. Hudson
Senior United States District Judge

Date: **August 14, 2020**
Richmond, VA